### IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **BALFOUR BEATTY RAIL INC.,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. **3:10-CV-1629-L** |
| | § | |
| **THE KANSAS CITY SOUTHERN** | § | |
| **RAILWAY COMPANY**, | § | |
| | § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM OPINION AND ORDER

Before the court is Plaintiff Counter-Defendant's Motion for Partial Summary Judgment and

Defendant The Kansas City Southern Railway Company's Motion for Partial Summary Judgment,

both of which were filed on September 16, 2011. After carefully considering the motions, responses,

briefs, appendices, evidence, record, and applicable law, the court **grants in part and denies in part**

Plaintiff Counter-Defendant's Motion for Partial Summary Judgment and Defendant The Kansas

City Southern Railway Company's Motion for Partial Summary Judgment.

## I.    Background

Plaintiff Balfour Beatty Rail Inc. ("BBRI") is engaged in the business of acting as a prime

contractor on various types of railway construction projects. BBRI originally filed this action on July

19, 2010, in the 191st Judicial District Court, Dallas County, Texas, asserting state law claims for

breach of contract, quantum meruit/unjust enrichment, and failure to promptly pay against Defendant

The Kansas City Southern Railway Company ("KCSR"). BBRI seeks $5,344,800 in damages related

to construction and rehabilitation work performed by BBRI on sixty-four miles of railway track line that runs from Rosenberg, Texas, to Victoria, Texas.

On August 20, 2010, KCSR removed the action to federal court on the basis of diversity jurisdiction, and asserted defenses and a counterclaim for breach of contract for: (1) $2,204,649.70 in costs for ballast material allegedly wasted by BBRI during construction; (2) $1,133,373.97 for trackage rights fees incurred by KCSR in using another third party's tracks as a result of BBRI's failure to timely complete the project within the time specified by the parties' contract; (3) $316,888.31 in costs for work done by other contractors hired by KCSR to supplement and assist BBRI with tamping, regulating, and de-stressing after BBRI fell behind schedule; and (4) $131,244.17 in costs incurred by BBRI for remedial or repair work done by other contractors (CW&W and Lone Star) to correct deficiencies in BBRI's punch list work and other post-construction work.  Both parties also seek attorney's fees, interest, and costs of suit.

The railway track line that forms the basis of the parties' claims was purchased by KCSR from the former G.H. & S.A. Railway Victoria Division.  After purchasing the railway track line, KCSR engaged contractor Gulf Coast Rail Group, Inc. ("Gulf Coast") to perform certain construction and rehabilitation work on approximately 64 to 84 miles of the railway track line. Unhappy with the work performed by Gulf Coast, KCSR approached BBRI in late 2007 about submitting a bid to complete the work on the railway track line.  On August 20, 2008, the parties entered a Master Agreement, effective September 1, 2008, for BBRI as contractor "to furnish, upon request of Company [KCSR], all supervision, labor, material, tools, equipment, supplies, and things of every nature" to complete the work requested by KCSR on the railway track line.  BBRI Resp. App. 27.  On October 31, 2008, BBRI submitted a final proposal to KCSR to undertake the

completion of the construction and rehabilitation work on the line.  On November 13, 2008, the parties executed a Statement of Work that described the work to be performed by BBRI.  The original contract price for the negotiated scope of work was $12,206,666.  This amount included $10,416,193 for mobilization, surveying and setting out, skeletonized track, ballasting, tamping and regulating, welding and stressing, grade crossing (prep and follow-up), and other miscellaneous work (including sidings and bridges).  The contract price also included $1,790,473 for furnishing and installing asphalt.  The Statement of Work contained three deadlines.  BBRI was required to complete "all track construction, ballasting, tamping and rail adjustment" work by May 1, 2009. BBRI Resp. App. 44.  By May 15, 2009, BBRI was required to complete final dressing and clean up of the project site.  *Id.*  BBRI's deadline for demobilization of its equipment and labor was set for May 31, 2009.  *Id.*  The Statement of Work further provides that "[t]ime is of the essence."  *Id.*

BBRI commenced work on the line in November 13, 2008, and completed the work on or about July 17, 2009.  Shortly after work commenced, disputes arose regarding differing site conditions.  BBRI claimed that because the work site conditions were different from those in the plans and specifications supplied by KCSR and unknown at the time it bid on the project, it was entitled to additional compensation for extra work that would be required to complete the project. KCSR took the position that because BBRI agreed to do the work for a lump sum price, it was not entitled to additional compensation.  By February 2009, the project was behind schedule, and both parties blamed each other for delays.  In May 2009, after BBRI failed to complete the project within

the time specified under the parties' contract,[1] KCSR hired other contractors to supplement and assist BBRI with its scope of work.

Before completing work on the project, BBRI sent KCSR three letters in June 2009, seeking $5,344,800 in addition to the $12,206,666 contract price.   BBRI claimed that it was entitled to additional compensation for ballast and fill work not covered or contemplated by the contract, as well as labor and equipment costs incurred as a result of project delays experienced by BBRI.  By letter dated June 24, 2009, BBRI requested an additional $464,056 for ballast work performed due to "irregular and out of tolerance sub-grade surfaces."  KCSR App. 154. According to the letter, the subgrade was low, and BBRI had to install additional ballast and make extra passes to bring the track up to the correct elevation.  By letter dated June 26, 2009, BBRI requested $942,231 for the installation of additional fill material at road crossings that were lower and longer than specified in the contract documents.   By letter dated June 30, 2009, BBRI requested $3,938,513 for labor and equipment costs incurred in conjunction with work it performed after May 1, 2009, as a result of project delays that it contends were caused by KCSR and not within its responsibility or control.

This action was filed after the parties were unable to reach agreement as to the additional sums requested by BBRI.   On September 16, 2011, both parties filed their respective summary judgment motions.  KCSR moved for summary judgment on all of BBRI's contract and quantum

---

[1] As previously noted, the contract contains three deadlines. Specifically, the Statement of Work provides that:

The Work to be performed by the Contractor under this Statement of Work for mainline train operations that include all track construction, ballasting, tamping and rail adjustment will be completed by May 1, 2009, the completion date for all work, including final dressing and clean up of the project site will be on May 15, 2009 (the "Deadline"), and the completion date for demobilization of contractor's equipment and labor will be May 31, 2009.

BBRI App. 43-44.

meruit claims.  BBRI moved for summary judgment on all of KCSR's contract claims except KCSR's claim for wasted ballast.

## II.      Summary Judgment Standard

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).  Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence.  *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994).  The party

opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 832 (1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

## III.   Analysis

Resolution of the parties' motions requires the court to interpret the parties' contract, which consists of the Master Agreement and Statement of Work (collectively "the Contract").[2] In diversity cases, courts apply the substantive law of the forum state. *Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009). The court therefore applies Texas law in deciding the parties' motions.

Under Texas law, a court's primary concern in interpreting a contract is to ascertain the parties' intent. *National Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). Texas courts avoid unreasonable constructions and "construe contracts from a utilitarian standpoint, bearing in mind the particular business activity." *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165

---

[2] The Contract also consists of Bid Documents that are not at issue in the parties' motions.

S.W.3d 310, 312 (Tex. 2005). If a contract "is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). If, however, the contract language is "susceptible to two or more reasonable interpretations" an ambiguity exists. *Enterprise Leasing Co. v. Barrios*, 156 S.W.3d 547, 549 (Tex. 2004). "Courts interpreting unambiguous contracts are confined to the four corners of the document, and cannot look to extrinsic evidence to create an ambiguity." *Texas v. American Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006) (applying Texas law). The court may only consider parol evidence to determine the parties' intent when an ambiguity exists. *National Union Fire Ins.*, 907 S.W.2d at 520. The interpretation of a contract and determination of whether an ambiguity exists is a question of law for the court to decide. *Coker*, 650 S.W.2d at 394. "When a contract contains an ambiguity . . . interpretation of the instrument becomes a fact issue." *See Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1980). Disagreement by the parties, however, over the meaning of an unambiguous contract does turn an otherwise unambiguous contract into one that is ambiguous. *American Tobacco Co.*, 463 F.3d at 407. "The language in an agreement is to be given its plain grammatical meaning unless to do so would defeat the parties' intent." *DeWitt Cty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 101 (Tex. 1999).

### A. KCSR's Motion for Partial Summary Judgment

#### 1. BBRI's Delay Claim

KCSR contends that it is entitled to summary judgment on BBRI's delay claim for labor and equipment costs attributable to project delays. The essence of KCSR's argument is that it "is excused from any obligation to pay any compensation for delay days" or delay damages, because BBRI failed to strictly comply with the parties' agreement regarding notice, meetings, and records

maintenance.  KCSR contends that these are conditions precedent to its duty to pay and BBRI's right

to recover damages attributable to project delays.  KCSR Mot. 15.  KCSR maintains that BBRI's

failure to strictly adhere to these conditions precedent is fatal to its claim for delay damages.

Both parties' arguments with regard to BBRI's delay claim focus on the liquidated damages

provision in the Statement of Work and, in particular, the provision's inclusion of the term "Delay

Day":

> The Contractor shall reimburse the Company for delays to its equipment or operations resulting from the Contractor's default.  Delay charges for trains shall be $500 per hour.  Time allowed for 60 care ballast trains shall be 12 hours from time of arrival at unloading location.  Rail trains shall be allowed 48 hours maximum from time of arrival at unloading location at which time delay charges shall be assisted [sic] until such time as train is ready for departure.
>
> Contractor will mitigate to the extent reasonably practicable any delays caused by the Company's failure to timely meet its obligations under this Statement of Work.  **If such failure by the Company prevents Contractor's crews from working more than 4 hours during a day (each such occurrence referred to as a "Delay Day"), then Contractor shall notify railroad of such delay and reason therefore.  Contractor agrees to keep a record of any Delay days caused by the Company during the term of this Agreement.  The Project Managers for the Company and Contractor will meet periodically to jointly agree upon the number of Delay Days.  The Company will pay Contractor the daily rates set forth in equipment and labor rates added to [S]chedule 1, and as supplemented from time to time in Schedule 1 herein, for such agreed-upon Delay Days.**  The Contract Time shall be extended by the number of days equal to the number of Delay Days incurred during the time period beginning on the date hereof and the Deadline.

BBRI Resp. App. 44 (emphasis added).  The parties not only disagree whether the bolded portion

of this provision constitutes a condition precedent to BBRI's right to recover delay damages, but they

also dispute what this language requires of the parties as far as their respective responsibilities.

KCSR interprets the Liquidated Damages provision as requiring "that for every day where

[BBRI's] forces are unable to work at least four hours, BBRI must (i) notify KCSR of *delay days*,

(ii) keep a record of *delay days*, and (iii) have both companies' project managers meet periodically to discuss *delay days*."  KCSR Motion 15 (emphasis added).  KCSR contends that BBRI is not entitled to recover delay damages because it failed to notify KCSR of "delay days," maintain records of "delay days," and meet periodically with KCSR to discuss and agree on "delay days" in accordance with the Liquidated Damages provision.  *Id.*  KCSR asserts that instead of providing it with notice and a contemporaneous explanation of the reasons for the delays, BBRI waited until after it completed work on the project and surprised KCSR with a "demand for payment" for $3.9 million.  KCSR Mot. 2, 15-16.  According to KCSR, the purpose of the procedures in the Liquidated Damages provision was to "(i) allow[] the parties to contemporaneously evaluate the [e]vents at the time and how they may have impacted the construction process, (ii) assur[e] that neither party was taken advantage of by the other, and (iii) avoiding surprises like that dropped on KCSR by BBRI with its $4 Million after-the-fact claim." *Id.* 15.  KCSR therefore maintains that BBRI's delay claim for $3.9 million fails as a matter of law because it failed to satisfy the contractual conditions precedent for such claims.

BBRI counters that the notice, record keeping and meeting language in the Statement of Work are covenants, not conditions precedent, and thus do not affect its right to recover delay damages under the Contract.  Even if construed as conditions precedent, BBRI contends that KCSR's motion still fails because BBRI kept records of delays through daily reports and gave notice of delays to KCSR in e-mails, written correspondence, and verbal conversations at the work site.  BBRI contends that it also attempted but was unable to meet with KCSR due to KCSR's unavailability.

BBRI maintains that KCSR was fully aware that its failure to timely supply BBRI with ballast would delay completion of the project.

In addition, BBRI takes issue with KCSR's summary and interpretation of the Liquidated Damages provision, contending that KCSR's rendition of "Delay Days" would lead to the absurd result that "so long as one person in BBRI's workforce could work, then there was no delay" even though "BBRI had multiple *crews* working on multiple distinct tasks along the track." BBRI Resp. 19 (emphasis in original). BBRI further asserts that the parties' differing interpretations of this language creates a fact issue.

KCSR replies that the Contract should be construed as a matter of law and what constitutes a delay day is immaterial because its motion is "based solely on the issue of whether or not BBRI complied with the conditions precedent established by the Statement of Work that must be achieved before KCSR must pay delay damages." KCSR Reply 14, n. 22. Despite its contention in this regard, KCSR raised the following new arguments in its Reply that BBRI did not have the opportunity to address: (1) BBRI's evidence of delays is not a basis to deny summary judgment because none of purported delays are compensable under the Contract or support BBRI's $3.9 million delay claim [KCSR Reply 11]; (2) BBRI failed to comply with the Master Agreement's requirement in section 18 that notice be provided in writing and delivered by hand, overnight delivery, certified mail, fax, or e-mail, and if by fax or e-mail, the requirement that a follow-up copy of the fax or e-mail be sent by hand, overnight delivery, or certified mail [KCSR Reply 12]; and (3) under the Contract, BBRI was not only required to meet and discuss delay days with KCSR, it was

also responsible for and failed to request a meeting and agree on delay days.[3]  KCSR also asserts a number of evidentiary objections to BBRI's evidence that are discussed herein as necessary.

### a.      Applicable Law

Under Texas law, "[a] party seeking to recover under a contract bears the burden of proving that all conditions precedent have been satisfied." *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 283 (Tex. 1998).  "A condition precedent is an act or event that must take place before performance of a contractual obligation is due." *Cedyco Corp. v. PetroQuest Energy, LLC*, 497 F.3d 485, 488 (5th Cir. 2007).   To determine whether a condition precedent is present, the court examines "the parties' intent as manifested in the contract." *Interstate Contracting Corp. v. City of Dallas*, 407 F.3d 708, 727 (5th Cir. 2005) (citing *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990)).  Generally, terms such as "if," "provided that," "on condition that," or similar language must be used in the contract to support finding a condition precedent.  *Id.*  "If no such language is used, the terms will be construed as a covenant in order to prevent a forfeiture" if another reasonable reading of the contract is possible. *Criswell*, 792 S.W.2d at 948.  "When the intent of the parties is doubtful or when a condition would impose an absurd or impossible result, the agreement will be interpreted as creating a covenant rather than a condition." *Id.*  Because of their harshness in operation, conditions precedent are generally not read into contracts. *Id.*

---

[3] Although these arguments were raised by KCSR for the first time in its Reply, the court will address them, but only if the court has sufficient information and doing so will not prejudice BBRI. As explained herein, the court does not have sufficient information, and BBRI would be prejudiced if the court were to rule on the first new issue raised in KCSR's reply brief, that is, whether the specific delay damages sought by BBRI are compensable under the Contract. The court, however, will address the second and third new issues raised by KSCR regarding notice required under the Contract.

   **b.**  **Whether the Contract Language Regarding Notice, Meetings, and Maintenance of Records are Conditions Precedent**

  The Liquidated Damages provision contained in the Statement of Work provides that BBRI as contractor "shall notify railroad of such delay and reason therefor[]."  BBRI Resp. App. 44.  The Statement of Work states that it "is subject to the terms and conditions set forth in the Master Agreement."  BBRI Resp. App. 43.  Section 18 of the Master Agreement specifies the manner in which notice must be given by the parties under the Contract.  Section 18 states:

**SECTION 18.  NOTICES**.

  Notices provided under this Agreement must be in writing and delivered by (i) certified mail, return receipt requested, (ii) hand delivered, (iii) facsimile with receipt of a "Transmission OK" acknowledgment, (iv) e-mail, or (v) delivery by a reputable overnight carrier service (in the case of delivery by facsimile or e-mail the notice must be followed by a copy of the notice being delivered by a means provided in (i), (ii) or (v)). . . . Notice must be delivered to the following addresses or at such other addresses as many be later designated by notice:

| The Kansas City Southern Railway Company: 427 West 12th Street Kansas City, MO 64105 Attention: Mr. John S. Jacobsen Vice President and Chief Engineer of International Engineering Phone: (816) 983-1525 Fax: (816) 983-1186 | Balfour Beatty Rail, Inc. 13907 Gainsville St. Houston, TX 77015 Attention: Mr. Jose Luis Garcia Area Manager Tel: (713) 330-1118 Fax: (713) 330-1171 |
|---|---|

BBRI Resp. App. 38.  Under Texas law, "[w]hen a contract provides for a particular form of notice, compliance with such provisions is a condition precedent to invoking the contract rights which are conditioned on the notice."  *Emerald Forest Util. Dist. v. Simonsen Constr. Co.*, 679 S.W.2d 51, 54 (Tex. App.    Houston [14th Dist.] 1984, writ ref'd n.r.e.).

While section 18 of the Master Agreement provides for a particular form of notice, neither it nor the Liquidated Damages provision expressly conditions BBRI's right to recover damages for delays on such notice.  Likewise, use of the words "will" and "agrees" in the liquidated damages provision with regard to record keeping ("Contractor *agrees* to keep a record of any Delay Days caused by the Company") and meetings ("Company and Contractor *will* meet periodically") are not conditional and do not expressly condition BBRI's right to recover delay damages on BBRI's maintaining records or the parties' agreement to meet periodically to discuss delays.  Contrary to KCSR's assertion, this provision does not place the burden of requesting meetings on BBRI. Additionally, interpreting the provision to preclude recovery of delay damages caused by KCSR but not agreed to would lead to the absurd result that KCSR could dispute or refuse to agree upon delay days and thereby avoid liability all together even if it is  responsible for the delays.  The court therefore determines that providing notice, keeping records, attending meetings, and reaching agreement on delays are not conditions precedent to KCSR's duty to pay or BBRI's right to recover delay damages.

KCSR cites a handful of cases for the proposition that similar notice provisions have been held by courts to create conditions precedent.  These cases, however, are distinguishable.  *City of Houston v. Gribble* and *Associated Mechanical Contractors, Incorporated v. Martin K. Eby Construction Company, Incorporated* both involved construction contracts where delay claims were expressly conditioned on providing notice.  *City of Houston*, 542 S.W.2d 242, 244 (Tex. Civ. App.   Tyler 1976, writ ref'd n.r.e.) ("No claims for extension of time will be considered unless the claim is filed between the first (1st) and the fifteenth (15th) of the month in which the delay was

occasioned."); *Associated Mech Contractors, Inc.*, 271 F.3d 1309, 1315 (11th Cir. 2001) ("Delays . . . Any damages . . . must be filed in writing . . . within ten (10) days . . . otherwise, any such claims will be considered void."). Although the court in *F. Garofalo Elec. Company, Incorporated. v. New York University* concluded that "[t]he contract's notice and documentation requirements for extra work and delay damages are conditions precedent to plaintiff's recovery and the failure to strictly comply is deemed a waiver of such claims," the opinion does not include language from the contract at issue and is devoid of any reasoning. *Id.* at 705 N.Y.S.2d 327, 331 (N.Y. App. Div. 2000). The opinion states only that "[t]he basis of the motion was that plaintiff had failed to provide the contractually required contemporaneous written notice and documentation of these claims, and that they were therefore barred." *Id.* at 329. As a result, the basis for the court's conclusion in this regard is not clear. Moreover, there is no requirement in the Contract that notice be given contemporaneously. The court's holding was also based on New York law and is not binding on this court. Finally, contrary to KCSR's assertion, the court in the Oklahoma case that it relies on declined to construe the notice of claims provision in the contract at issue as a condition precedent. *M.J. Lee Const. Co. v. Oklahoma Transp. Auth.*, 125 P.3d 1205, 1213-15 (Okla. 2005). As a result, this and the other cases cited by KCSR do not support its position.

The court further disagrees with KCSR's contention that BBRI's notice under the Liquidated Damages provision was untimely because it did not provide KCSR with a "demand for payment" until the end of June 2009, shortly before completing work on the project. KCSR Mot. 15. From this, it appears KCSR is conflating notice of delays with notice of delay claims or demands for payment. The Contract, however, contains no requirement that BBRI give notice of delay claims or

provide the dollar amounts of such claims in the form of a formal "demand for payment" or otherwise, and, as previously noted, no set time limit is specified in the Liquidated Damages provision or elsewhere in the Contract for giving notice of project delays.

Additionally, because the Contract does not expressly require strict compliance in providing notice of project delays, maintaining records, or participating in periodic meetings to discuss delays, the court disagrees that absolute literal compliance was required.  In situations where the parties' contract does not expressly require strict compliance with the contract's terms, substantial compliance is sufficient.  *See Interstate Contracting Corp.*, 407 F.3d at 727 ("Substantial compliance excuses deviations from a contract's provisions that do not severely impair the contractual provision's purpose and is the legal equivalent of compliance unless otherwise provided."); *Burtch v. Burtch*, 972 S.W.2d 882, 889 (Tex. App.   Austin 1998, no pet.); *Telles v. Vasconcelos*, 417 S.W.2d 491, 494 (Tex. Civ. App.   El Paso 1967, writ ref'd n.r.e.) ("[I]n all domains of the law, unless it is otherwise provided, either expressly or by necessary implication, a substantial compliance with the specified requirements [of a contract] is the legal equivalent of compliance.") (quoting *Christy v. Williams*, 292 S.W.2d 348, 351-52 (Tex. Civ. App.   Galveston 1956, writ dism'd w.o.j.)).

When the Liquidated Damages provision is read in conjunction with the contractual "[t]ime is of the essence" language, it is apparent that the primary purpose of the procedures in the Liquidated Damages provision was to keep the parties apprised of delays that could potentially impact the construction schedule and project deadlines.  Although the Liquidated Damages provision specifies and limits the damages that BBRI may recover for delays attributable to KCSR, it does not require BBRI to give prior notice of specific or approximate amounts of damages sought for delays.

The court therefore disagrees that this provision was intended to avoid surprise or prevent BBRI from seeking additional compensation after-the-fact as contended by KCSR. Consequently, substantial compliance with the notice, records, and meeting procedures for project delays will not severely impair the contractual provision's purpose.

> ### c.      Whether BBRI Substantially Complied With the Notice, Records, and Meeting Procedures

The record establishes that from February 10, 2009, to May 22, 2009, before BBRI sent its final notice and request for $3,938,513 for delay damages on June 30, 2009, BBRI sent at least thirteen written notices of delays to KCSR in the form of letters and e-mails regarding issues pertaining to ballast and rail deliveries, the Colorado bridge not being complete in time for BBRI to do its work on the track, and change orders that affected BBRI's efficiency. BBRI Resp. App. 144-67, 221-23. A majority of these notices was provided to KCSR's project manager, Miguel Cruz ("Cruz"). BBRI's June 30, 2009 letter also notes "[a]s a further example of delays . . . BBRI just received an instruction to build the set out track at Louise siding commencing on June 28, 2009, because Kanza is scheduled to finish its grade works to this area on June 27, 2009." KCSR App. 218; BBRI Resp. App. 127. In addition, BBRI submitted the deposition testimony of Colin Kendrick, BBRI's Director of Contract Management, who testified that he frequently communicated with Cruz at the project site regarding ongoing issues, including these pertaining to KCSR's delivery of ballast to the job site. BBRI App. 138-40.[4] BBRI also relies on daily reports that include the number of hours worked by the members of its crews and references to construction progress and delays.

---

[4] Exclusive of page 16, lines 19-25 and page 17, line 1, objected to by KCSR as hearsay.

**Memorandum Opinion and Order – Page 16**

The court concludes that these notices, reports, and discussions between the parties served the intended contractual purpose of keeping KCSR apprised of potential delays to the project schedule so it could monitor progress and address issues during the project.  Accordingly, this evidence is sufficient to establish the existence of a genuine dispute of material fact as to whether BBRI substantially complied with the terms of the Liquidated Damages provision.  In concluding that a fact issue exists, the court does not comment on the strength or validity of BBRI's delay claims or address KCSR's argument that none of the purported delays relied on by BBRI is compensable under the Contract.  Because this argument was raised for the first time in KCSR's Reply, BBRI did not have the opportunity to respond to it, and the court determines that it goes far beyond KCSR's summary judgment motion based on BBRI's failure to satisfy the notice, records, and meeting procedures for delays in the Statement of Work.  Moreover, for the court to decide this issue, it would need analysis from both parties that is much more detailed.  Thus, although KCSR may be correct that not all of the delay damages sought by BBRI are recoverable under the Contract, the court does not address the issue here.

The court further notes and cautions that while evidence of substantial compliance with these procedures may be sufficient to get BBRI over the first hurdle to recovering damages under the Contract based on project delays, the Liquidated Damages provision is quite specific as to what damages for delays are recoverable and also specifies the manner in which the parties agreed that such damages would be calculated.  Again, however, it is not the court's job to sift through the voluminous record and make such calculations and analysis.  In light of the court's determination that the notice, meeting, and records maintenance procedures are not conditions precedent to BBRI's

**Memorandum Opinion and Order – Page 17**

right to recover delay damages and do not excuse KCSR's duty to pay any such claims, the court

need not address the parties' remaining contentions regarding BBRI's delay claim.

### 2. BBRI's Claim for Additional Fill and Ballast Work

KCSR contends that it is entitled to summary judgment on BBRI's claims for additional fill

and ballast work, because neither constitutes extra work under the Contract, and BBRI failed to

comply with the differing site conditions provision's notice requirement.  In addition, KCSR asserts

that summary judgment is proper to the extent BBRI seeks payment for invoices submitted more than

ninety days after work was performed in violation of the Contract.  Because the court determines that

the issue of whether BBRI complied with the differing site conditions provision's notice requirement

is dispositive, it addresses the parties' contentions regarding this matter first.

KCSR contends that BBRI failed to comply with the requirement in the differing site

conditions provision that notice be given regarding such conditions upon discovery.  KCSR also

contends that the Contract placed the risk for differing site conditions on BBRI because it was

instructed to investigate the work site conditions beforehand.  BBRI disputes KCSR's contentions

regarding risk, because, among other things, KCSR provided it with preliminary drawings that were

still not finalized when BBRI bid on the project and construction commenced.  BBRI also contends

that a fact issue exists as to whether it complied with the differing site conditions provision's notice

requirement.

The differing site conditions provision is included in the Statement of Work and states in

pertinent part as follows:

**Differing Site Conditions**

The Contractor shall immediately upon discovery, and before the conditions are further disturbed[,] give verbal notice to the Company and confirm said notice in writing of:

(a)     Subsurface or latent physical conditions at the site which differ materially from those indicated in the Company supplied Contract Documents;

(b)     Unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inherent in Work of the character provided for in the Contract;

(c)     Material deviations from dimensions, tolerances, conditions or locations of facilities indicated in the Contract Documents;

. . .

In the event that a dispute arises between the Company and the Contractor as to whether a conditions [sic] complies with (a), (b), (c) . . . above or causes a decrease or increase in the Contractor's cost of, or time required for, performance of any part of the Work, the Contractor . . . ***shall strictly comply with the notice and other claims procedures set forth in the Master Agreement.***

BBRI Resp. 6, ¶ 7; BBRI Resp. App. 44-45 (emphasis added).  Unlike the provisions that apply to notice of construction delays, this provision specifically requires strict compliance with section 18 of the Master Agreement if a dispute arises.  *See id.*

BBRI acknowledges that this provision applies to its claims for additional ballast and fill work based on differing site conditions.  *See* BBRI Resp. 22.  It also concedes that "disputes arose" between it and KCSR during the project as a result of numerous changes to the work associated with differing site conditions, and KCSR refused to compensate BBRI for those changes.  BBRI Resp. 8, ¶ 11; BBRI Resp. App. 3, ¶ 9.  BBRI submitted the following evidence to demonstrate that it complied with the notice requirement in this provision:

(1)    Request for Information ("RFI") 49 from BBRI to KCSR project manager Cruz[5] on January 22, 2009, regarding "differences on the sub grade elevation" from "Mile post 82.28 to M.P. 72" and asking KCSR to advise BBRI on how to proceed.  BBRI App. 252.  According to BBRI, the distance between these mile posts is "approximately ten miles."  BBRI Resp. 12, ¶ 21; BBRI Resp. App. 3, ¶ 12.  RFI 49 also states that BBRI foreman Jose Figueroa notified KCS Field Representative Eduardo Pena about the issue.

(2)    RFI 58 from BBRI to Cruz on February 11, 2009, regarding the need to raise the track elevation 5 inches on the average from station 3854+00 to station 3853+00 based on a comparison of the "As built and the planned elevations."  BBRI Resp. App. 254.  Like RFI 49, this request asks KCSR to advise BBRI on how to proceed.

(3)    May 9, 2009 e-mail from BBRI manager Jose Garcia to Cruz advising of "Top of the Rail Elevation Inconsistencies" on FM 448 at station 1469+00; the crossing at station 1391+00; station 1390+00; and station 1392+00.  BBRI Resp. App. 256.  Cruz responded and instructed Garcia to "[m]aintain 10 [inches] under the ties.  If for some reason this can't be done I will need to know before work continues."  *Id.*

The record also contains some additional evidence that BBRI verbally notified KCSR of issues pertaining to differing site conditions.  *See, e.g.,* BBRI Resp. App. 232-33 (Altez Dep. p. 49, ln. 1-19; and p. 225).  KCSR contends that this and BBRI's other evidence is insufficient because it pertains only to a few small sections of the railway, whereas BBRI is seeking compensation for work performed on almost the entire length of the track between mileposts 72 and 82.28.

---

[5] From the record, it appears that Cruz was the project manager until May 2008 when KCSR appointed John Dunsworth as the new project manager.  *See* BBRI Resp. App. 7-9.

The court concludes that BBRI's evidence is insufficient to raise a genuine dispute of material fact as to whether it strictly complied with the notice requirement applicable to differing site conditions, and more specifically section 18 of the Master Agreement's requirement that written notice be given in a particular manner.  A comparison of BBRI's June 26, 2009 letter and BBRI's prior notices also confirms KCSR's contention that BBRI is seeking damages for work performed on a majority of the track, although it only notified KCSR of differing site conditions regarding certain sections of the track.  *See* KCSR App. 196-217.  Accordingly, KCSR is entitled to summary judgment on BBRI's claims for additional ballast and fill work performed as a result of differing site conditions.  In light of this ruling, the court finds it unnecessary to address the alternative arguments raised by KCSR.

### 3.     BBRI's Quantum Meruit Claim

KCSR contends BBRI's quantum meruit claim fails as a matter of law because the work it seeks compensation for was "an integral part of the Contract scope of work as opposed to work arising outside and independent of the contract, something not required in the Contract's performance."  KCSR Mot. 22 (internal quotes omitted).  As a result, it argues that quantum meruit is not available to BBRI and cites the following cases for support: *Truly v. Austin*, 744 S.W.2d 934, 936 (Tex. 1988); *Black Lake Pipe Line Company v. Union Construction Company, Incorporated*, 538 S.W.2d 80, 86 (Tex. 1976), *overruled on other grounds by Sterner v. Marathon Oil Company*, 767 S.W.2d 686 (Tex. 1989); and *DiMiceli v. Affordable Pool Maintenance, Incorporated*, 110 S.W.3d 164 (Tex. App.    San Antonio 2003, no pet.).  BBRI responds that *Truly* and the other cases

relied on by KCSR are distinguishable.  BBRI, nevertheless, asserts that the exceptions discussed in *Truly* support its argument that it is entitled to pursue a quantum meruit claim.

As previously noted, the construction of a written instrument is a question of law for the trial court. *MCI Telecomm., Corp. v. Texas Util. Elec. Co.*, 995 S.W.2d 647, 650  51 (Tex. 1999).  Thus, whether an express contract covers the services at issue is a legal question for the court to decide. *Christus Health v. Quality Infusion Care, Inc.*,      S.W.3d    , No. 01:09-00591-CV, 2011 WL 6365139, at *4 (Tex. App.    Houston [1st Dist.] Dec. 8, 2011, no pet.).  If the contract covers the service at issue, "*then* the question of whether a party may recover in quantum meruit is for the trier of fact.  *Id.* (quoting *Gulf Liquids New River Project, LLC v. Gulsby Eng'g, Inc.*, No. 01  08  00311  CV, 2011 WL 662672, at *12 (Tex. App.    Houston [1st Dist.]  Feb. 17, 2011, no pet.).

"In general under Texas law, a party seeking to recover for services rendered will only be able to recover under quantum meruit when there is no express contract between the parties." *U.S. Quest Ltd. v. Kimmons*, 228 F.3d 399, 406 (5th Cir. 2000) (citing *Truly*, 744 S.W.2d at 936). "Therefore, a plaintiff may not recover under the general rule of quantum meruit when the claim pleaded fits within the subject matter of a contract between the parties," unless the claim falls within one of the two exceptions recognized by *Truly*:  (1) "[r]ecovery in quantum meruit is allowed when a plaintiff has partially performed an express contract but, because of the defendant's breach, the plaintiff is prevented from completing the contract"; and (2) quantum meruit recovery is sometimes allowed when a plaintiff partially performs an express contract that also happens to be unilateral in nature.  *U.S. Quest Ltd.* 228 F.3d at 406 (quoting *Truly*, 744 S.W.2d at 936-37).

The Contract here is an express contract that addresses the circumstances in which BBRI may recover damages for certain delays and differing site conditions. Thus, quantum meruit is unavailable unless one of the *Truly* exceptions applies. BBRI contends that its quantum meruit claim falls under the *Truly* exceptions merely because this case involves a construction contract. The court disagrees.

Although the court in *Truly* noted that "[t]he only Texas cases that have permitted a breaching plaintiff to recover in quantum meruit have involved building or construction contracts, and "[i]n these cases, plaintiffs have been allowed to recover the reasonable value of services less any damages suffered by the defendant," that a case involves a building or construction contract is not enough to bring it within the two *Truly* exceptions. *See Truly*, 744 S.W.2d at 936-37. Moreover, BBRI does not allege that this case involves partial performance of an express contract. The court therefore determines that neither of the *Truly* exceptions applies and KCSR is entitled to summary judgment on BBRI's quantum meruit claim.

## B.     BBRI's Motion for Partial Summary Judgment

### 1.     KCSR's Claim for Completion, Correction, or Remedial Work

#### a.     The Parties' Contentions

With regard to KCSR's claim for completion, correction, or remedial work, BBRI argues that KCSR failed to provide it with notice in accordance with section 6(B) of the Master Agreement, which BBRI contends is a condition precedent to KCSR recovering damages for any work it undertook to complete, correct, or remedy work performed by BBRI. Based on the deposition testimony of various KCSR witnesses, who were unaware whether KCSR had provided notice to

BBRI in accordance with this provision, BBRI contends that "no notice was provided to BBRI." BBRI Mot. 10.  BBRI further asserts that KCSR waived its right to seek recovery for any such work as a result of its failure to provide the required written notice.

KCSR acknowledges that section 6(B)'s notice requirement is a condition precedent to its recovery under this section.  It contends, however, that its wasted ballast claim and claim for work performed by Kanza and Holland, contractors brought in by KCSR on or about May 22, 2009, to assist and supplement BBRI's welding/de-stressing and tamping work after it fell behind schedule, are not subject to the notice requirement in section 6(B).  In addition, KCSR contends that its performance in this regard was excused by BBRI's prior repudiation and breach of the Contract. Alternatively, to the extent notice was required, KCSR submitted evidence that it notified BBRI by letter dated February 11, 2009, that BBRI had fallen behind schedule and if it did not catch up, it would hire additional contractors to supplement BBRI's work at BBRI's expense.  *See* KCSR App. 293.  Finally, KCSR responds that BBRI's waiver defense fails because it has presented no evidence that KCSR expressly or impliedly intended to relinquish its right to seek recovery of its out-of-pocket costs associated with these claims.

### b.   Analysis

Before the court can address the parties' contentions, it must first determine which of KCSR's claims for damages is meant to be included in what BBRI refers to as KCSR's "claim to recover costs for completion, correction, or remedial work" because, it appears that the parties are not on the same page.  BBRI Mot. 7 (internal quotations omitted).  Although KCSR's pleadings with regard to its counterclaim assert a claim for breach of contract, there is no mention of completion,

correction, or remedial work.  These terms are derived from KCSR's answers to written discovery

that BBRI cites in support of its summary judgment motion.  According to KCSR's interrogatory

answers, it seeks to recover damages for: (1) cost of extra ballast (KCSR's claim that BBRI wasted

ballast); (2) costs KCSR paid for trackage rights as a result of BBRI's delay in timely completing

the project; (3) costs for retaining additional contractors Kanza and Holland to perform tamping,

regulating, and de-stressing to assist BBRI in completing its scope of work; and (4) costs incurred

by KCSR in hiring other contractors (CW&W and Lone Star) to perform punch list and other post

construction remedial work that BBRI failed to complete or correct.  BBRI Mot. App. 108, 110-11,

Interrog. Answers 9 and 13.  The court therefore concludes that BBRI's reference to KCSR's claim

for completion, correction, or remedial work and related costs refers to the third and fourth of these

categories that are addressed below.

> **i.**      **Whether the Contract Applies to the Damages Sought by KCSR for Completion, Correction and Remedial Work**

KCSR's pleadings in support of its breach of contract claim state:

> As stated in the Contract, BBRI agreed to complete its obligations before a specific deadline.  Time was of the essence under the Contract.  BBRI breached the contract, *inter alia*, by ***failing to timely complete its contractual obligations and by failing to perform the work in compliance with the plans and specifications by the Contract.***

Doc. 4, ¶¶ 51-52 (emphasis added).  Section 6(B) of the Master Agreement similarly applies to the

contractor's failure to timely complete work in accordance with the Contract specifications:

> If Contractor fails within a reasonable time after written notice from the Company ***to correct defective Work or to remove and replace rejected Work, or if Contractor fails to perform the Work in accordance with this Agreement or the Statement of Work***, the Company may, after seven (7) days' written notice to contractor, correct and remedy, at Contractor's sole cost and expense, any such

> deficiency, including but not limited to hiring additional contractors to provide all or a portion of the Work that would otherwise be completed by Contractor.  To the extent necessary to complete corrective and remedial action, the Company may exclude Contractor from all or part of the site, take possession of all or part of the Work, and/or suspend Contractor's services related thereto . . . all direct costs incurred by the Company in exercising such rights and remedies will be charged against Contractor, and the Company shall be entitled to an appropriate decrease in contract price.

BBRI App. 31 (emphasis added).  Thus, by its terms, this provision applies to corrective work necessary to remedy defective work, as well as any failure by BBRI to timely perform work in accordance with the Contract.  KCSR's contract claim to recover costs for tamping, regulating, and de-stressing due to BBRI's falling behind schedule and costs for punch list and other remedial work falls under section 6(B).  As a result, KCSR was required to give seven days' notice to BBRI under section 6(B) to provide it with the opportunity to correct or cure any deficiencies in its work before proceeding to hire outside contractors to supplement or correct the work.   The court further determines that section 6(B)'s use of the conditional language "[i]f" indicates that such notice and opportunity to cure was intended to be a condition precedent to KCSR's right to recover costs associated with its exercise of rights under this provision; however, because neither section 6(B) nor section 18 of the Master Agreement requires strict compliance, substantial compliance is sufficient. The court therefore considers the parties' contentions and evidence to determine if KCSR substantially complied with the requirement that it provide BBRI with notice and the opportunity to cure before hiring outside contractors to perform tamping, regulating, de-stressing work, and punch list/post construction remedial work.

### ii.     Whether KCSR Substantially Complied with Section 6(B)'s Notice Requirement

KCSR submitted evidence that it notified BBRI by letter dated February 11, 2009, that BBRI had fallen behind schedule and if BBRI did not catch up, it would hire additional contractors to supplement BBRI's work at BBRI's expense.  *See* KCSR App. 293.  KCSR's letter to BBRI states:

> We are in receipt of your letter dated February 10, 2009 regarding the schedule for completion of track construction work to be done by Balfour Beatty Rail, Inc. ("Balfour") on our Victoria to Rosenberg rail line.  As set forth in the Master Agreement . . . track construction, placement and tamping of ballast, and adjustment of the rail must be completed by May 1, 2009, with all work, including distressing of the rail and any necessary clean up of the work site, to be finished by May 15, 2009.

> KCSR is concerned that based upon the staff and equipment currently engaged on this project, Balfour will not be able to complete this work by this deadline.  As indicated in your schedule that accompanied your letter, Balfour is already behind schedule.

> Please accept this letter as notice of our determination that Balfour is behind schedule, and pursuant to the statement of work executed by the parties for this work, KCSR requests that Balfour engage additional staff and equipment at no additional charge to KCSR until the work is back on schedule.  KCSR will continue to monitor the progress Balfour makes with respect to completing this work on time.  If Balfour is still behind schedule on February 17, 2009, then KCSR may take other action permitted under the Agreement, including but not limited to hiring additional contractors to supplement the work to be done by Balfour and deducting any amounts paid to such contractor from the amount due to Balfour under the Agreement.

KCSR App. 293.  Although it is unclear whether this letter was sent via certified mail or another manner as required by section 18 of the Master Agreement, the court determines that this evidence and other evidence of the parties' discussions regarding this matter was sufficient to put BBRI on notice that KCSR intended to hire additional contractors to supplement BBRI's work in order to get the project back on schedule.  *Id*.; *see also* BBRI Mot. App. 147, 1-11; BBRI Mot. App. 160, 19-28;

BBRI Mot. App. 161, 1-25.  Moreover, this letter undercuts BBRI's argument that KCSR intended

to waive its right to recover costs for such work.  The record further reflects that KCSR did not bring

in additional contractors to supplement BBRI's work until sometime in May 2009, after the

contractual construction deadline.  KCSR App. 273, ¶ 6.  BBRI therefore had approximately three

months to get the project back on schedule before KCSR brought in additional contractors to assist.

Thus, a genuine dispute of material fact exists as to whether KCSR substantially complied with

section 6(B)'s notice requirement such that BBRI is not entitled to summary judgment on KCSR's

contract claim to recover the cost of retaining additional contractors Kanza and Holland to perform

tamping, regulating, and de-stressing to assist BBRI in completing its scope of work.

KCSR's February 11, 2009 letter, however, does not and could not have given BBRI notice

of deficiencies related to punch list and other post construction work that KCSR admittedly did not

discover until *after* BBRI completed its work and left the job site on or about July 17, 2009.

Moreover, KCSR acknowledges that it did not give BBRI notice of these issues and instead contends

that its performance in this regard was excused.

### iii.    Whether KCSR's Performance Under Section 6(B) was Excused

KCSR argues that it was not required to give notice of its intent to hire other contractors to

perform remedial work after BBRI left the job site, because its performance in this regard was

excused by BBRI's prior material breach of failing to timely complete the project by May 1, 2009.

Additionally, KCSR asserts that its performance was excused because BBRI repudiated the Contract

by submitting "change order" demands in late June 2009 for additional work and delay damages,

after most of the work had been completed, without complying with the contractual notice or delay

procedures.  KCSR submitted the declaration of KCSR general manager of engineering Frederick

Lebanon Peek ("Peek") in which Peek states:

> In late June 2009, after most of the work had been completed, BBRI submitted
> 'change order' requests totaling approximately $5.8 million (roughly 55% of the
> original contract price) claiming that it was required to perform additional work due
> to differing site conditions and delays BBRI attributes to KCSR.  These change
> orders and the size of them were a complete surprise to KCSR.  At the time KCSR
> received these monetary demands, I felt that KCSR's relationship with BBRI had
> changed from a contractual partner to an adversarial role.  While I did not know for
> certain that litigation would ensue, it became obvious that if BBRI was going to
> pursue the recovery of an additional $5.8 Million the working relationship between
> BBRI and KCSR had ended.
>
> After BBRI left the job site, it was discovered that various repair and punch list work
> needed to be completed. Because BBRI had in essence terminated a contractual
> working relationship by submitted [sic] grossly unfounded requests for additional
> monies, I made the decision to hire two other contracts [sic] (CW&W and Lone Star)
> to perform the work.

KCSR App. 274, ¶¶ 8-9.  BBRI did not respond to KCSR's contentions in this regard.

Under the doctrine of repudiation, a party's further performance under a contract is excused

if the opposing party repudiates the contract or commits a material breach of that contract.  *BFI*

*Waste Sys. of N. Am. v. N. Alamo Water Supply Corp.*, 251 S.W.3d 30, 30  31 (Tex. 2008) (per

curiam); *Burford v. Pounders*, 199 S.W.2d 141, 143 (Tex. 1947).  KCSR acknowledges that

repudiation occurs when, by words or actions, a party to a contract indicates its intention that it is

"not going to perform the contract according to its terms in the future."  *Hauglum v. Durst*, 769

S.W.2d 646, 651 (Tex. App.   Corpus Christi 1989, no writ); KCSR Resp. 9.  Repudiation "is

conduct which evidences a fixed intention to abandon, renounce and refuse to perform the contract."

*Hauglum*, 769 S.W.2d at 651 (citing *Moore v. Jenkins*, 211 S.W. 975, 976 (Tex. 1919)).

Under Texas law, repudiation and prior material breach are affirmative defenses. *City of The Colony v. North Tex. Mun. Water Dist.*, 272 S.W.3d 699, 746 (Tex. App.   Fort Worth 2008, pet. dism'd); *Brantley v. Etter*, 662 S.W.2d 752, 757 (Tex. App.   San Antonio 1983, writ ref'd n.r.e.). KCSR therefore has the burden of establishing "'beyond peradventure all of the essential elements of the . . . defense[s].'" *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). The "beyond peradventure" standard is a heavy one. *See, e.g., Continental Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, No. Civ. A. 3:04-CV-1866-D, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007) (Fitzwater, J.).

Failure to perform in a timely manner constitutes a material breach when time is of the essence in the contract and excuses a party from further performance when the other party fails to timely perform its contractual obligations. *Mustang Pipeline Co.*, 134 S .W.3d at 196-200. If the non-breaching party treats the contract as continuing after the breach, however, he is deprived of any excuse for terminating his own performance. *Long Trusts v. Griffin*, 222 S.W.3d 412, 415  16 (Tex. 2007) (per curiam); *Hanks v. GAB Bus. Servs., Inc.*, 644 S.W.2d 707, 708 (Tex. 1982).

The record demonstrates, and KCSR admits, that BBRI had completed most, but not all work under the Contract when it submitted its three letters to KCSR in June 2009, seeking compensation for additional work and project delays caused by KCSR. KCSR App. 274, ¶ 8. More importantly, the record reflects that after the May 1, 2009 deadline and after BBRI sent the letters in June 2009, both parties continued to perform under the Contract until the end of July, when BBRI completed its work and KCSR completed its final inspection and acceptance of that work, including BBRI's

punch list work.  BBRI Mot. App. 163-65 (Cruz Dep.); BBRI Mot. App. 3, ¶ 8 ("BBRI fully completed its work on or about July 17, 2009.").[6]  This evidence does not support KCSR's contention that BBRI intended to abandon the Contract or not complete its work under the Contract. Furthermore, even assuming that BBRI materially breached or repudiated the Contract by treating the Contract as continuing after BBRI failed to meet its May 1, 2009 deadline and sent the June 2009 letters, KCSR waived its excuse of prior repudiation and material breach. *Hanks*, 644 S.W.2d at 708; *see also Kupersmith v. Weitz*, No. 14-05-00167-CV, 2006 WL 3407832, at *3 (Tex. App.   Houston [14th Dist.] Nov. 28, 2006 (discussing the holding in *Hanks* and other Texas cases dating back to 1967 that have addressed the same issue and reached the same conclusion).  The court therefore determines that BBRI is entitled to summary judgment as to KCSR's contract claim to recover costs for corrective or remedial work performed by other contractors (CW & W and Lone Star) after BBRI

---

[6] KCSR objects to paragraph 8 of the Affidavit of BBRI Vice President of Rail Services Mark Snailham on the grounds that the statements in this paragraph are based on hearsay and outside of his personal knowledge because he does not state (1) that he was at the site when construction began, (2) that he reviewed construction documents before or after work began, or (3) any other facts to show that he was on site or has any personal knowledge of what took place on the job site during the project.  KCSR therefore contends that Snailham's knowledge could only be based on inadmissable hearsay, that is, what BBRI's employees told him.  The court disagrees and overrules this objection to the extent it goes to Snailham's statement that "BBRI fully completed its work on or about July 17, 2009."  Snailham's testimony in this regard is consistent with the deposition testimony of KCSR project manager Cruz that BBRI completed work on the project around the end of July.  Moreover, as the vice president of BBRI's rail services, Snailham is entitled to testify to facts regarding BBRI's activities based on sources other than those obtained from personal involvement in the project's daily operations.  *See Martinez v. Hays Const., Inc.*, No. 01-09-00593-CV, 2011 WL 1834818, at *6-7 (Tex. App.—Houston [1st Dist.] May 12, 2011) (citing *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 224 (Tex. 2004), and concluding that "[t]he mere fact that Hays did not personally hire Melendez or involve himself in the day-to-day operation of Hays Construction's Braes Bayou project, but instead gathered his knowledge about the project from other corporate sources at Hays Construction for the purpose of completing his affidavit, does not violate the personal knowledge requirement.").  Snailham's affidavit states that he "was actively involved in the project that is the subject of this lawsuit, and [has] knowledge concerning the scope of BBRI's work, estimating performed for BBRI in connection with the various proposals, change orders, and claims submitted by BBRI to KCS for the various change orders, and delays that have caused BBRI's damages on the project . . . [and] knowledge regarding communications between BBRI and KCS."  The court therefore concludes that Snailham had sufficient personal knowledge to testify regarding the date BBRI completed its work on the project.

sent the June 2009 letters and after KCSR completed and accepted the punch list work performed by BBRI.

> ### 2.      Whether KCSR's Damages for Trackage Rights Fees are Consequential Damages Recoverable Under the Contract

Last, BBRI asserts that it is entitled to summary judgment on KCSR's claim to recover trackage rights fees that KCSR paid to use another railroad in May and June 2009 until the project was complete.  BBRI contends that any such costs are consequential in nature and precluded by the Contract's limitation of damages provision.  BBRI cites a Texas case involving KCSR to support its argument that the trackage rights fees sought are consequential damages.  *See Kansas City S. and the Texas Mexican Ry. Co. v. Port of Corpus Christi Auth.*, 305 S.W.3d 296 (Tex. App.    Corpus Christi 2009, pet. denied).

KCSR counters that the costs sought are for direct, not consequential damages, because they are for KCSR's loss of use of the track or inability to use the track due to BBRI's failure to timely complete the project.  KCSR cites a handful of cases for the proposition that, in Texas, the measure of damages recoverable by a project owner when a contractor fails to timely complete a project is the rental value of the project.  KCSR asserts that although the KCSR track at issue does not have a readily ascertainable rental value, because Class One railroads do not typically lease their tracks to one another, the value of the use can be determined by the cost to KCSR of moving its trains across alternative routes, that is, the cost of the trackage fees KCSR paid to use another railroad's tracks during the period of delay.  Additionally, KCSR contends that the case cited by BBRI is distinguishable and not relevant to the issue at hand because it involved the issue of whether

damages were recoverable under sections 271.151-271.160 of the Texas Local Government Code, which provides for limited waiver of sovereign immunity in certain circumstances.

"Under Texas law, the measure of breach-of -contract damages is 'just compensation for the loss or damage actually sustained'" or the "benefit-of-the-bargain." *Arete Partners, L.P. v. Gunnerman*, 594 F.3d 390, 405 (5th Cir. 2010); *Amigo Broadcasting, LP v. Spanish Broadcasting Sys., Inc.*, 521 F.3d 472, 482 (5th Cir. 2008) (citing *Stewart v. Basey*, 245 S.W.2d 484, 486 (1952)). The purpose of contract damages is to restore "the injured party to the economic position he would have enjoyed if the contract had been performed" and may include foreseeable consequential damages that can be traced to the breach if not otherwise precluded by a contractual provision limiting liability for such damages. *See Mood v. Kronos Prods., Inc.*, 245 S.W.3d 8, 12 (Tex. App.  Dallas 2007, pet. denied); *see, e.g., Spinal Concepts, Inc. v. Curasan, AG*, 3:06-CV-0448-P, 2006 WL 2577820 (N.D. Tex. Sep. 7, 2006) (vacating in part arbitrator's ruling and holding that contractual limitation of liability provision did not preclude recovery of lost profits as consequential damages).

Common law actual damages are either direct or consequential. *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997). "Direct damages are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong." *Id.* They "compensate the plaintiff for the loss that is conclusively presumed to have been foreseen by the defendant from his wrongful act." *Id.* "Consequential damages, on the other hand, result naturally, but not necessarily, from the defendant's wrongful acts . . . [and] need not be the usual result of the wrong, but must be foreseeable, and must be directly traceable to the wrongful act and

result from it." *Id.*   Damages that flow naturally but not necessarily from a breach are those that

"require the existence of some other fact (known or unknown) beyond the relationship between the

parties." *Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, ___ S.W.3d___, No. 01-09-00876-CV,

2011 WL 1598758, at *4 (Tex. App.   Houston [1st Dist.] Apr. 28, 2011, no pet.).

BBRI contends that the trackage fees sustained by KCSR may have resulted "naturally" from

BBRI's alleged breach but not "necessarily."   BBRI Mot. 21.   KCSR, on the other hand, argues,

based on the Contract's "time is of the essence" language and a June 5, 2007 newsletter that was

publicly available on KCSR's website, that BBRI knew, understood and agreed that a strict project

completion deadline was necessary for KCSR to avoid the longer "around the horn" route on Pacific

Union's tracks, as well as related charges for travel on Pacific Union's tracks.   KCSR Resp. 11.   The

June 2007 newsletter relied on by KCSR states in pertinent part regarding the project:

> Rehabilitation of the line will shorten KCS' U.S. route to Mexico by approximately 70 miles.   It will also eliminate the need for KCS to operate over nearly 160 miles of Union Pacific-controlled track between Rosenberg and Victoria, Texas, via Flatonia, Texas, which is a heavily used rail corridor.   This would allow a mileage reduction in KCS' use of track rights over Union Pacific between Beaumont and Robstown, Texas, by over 40 percent.

> This project is one of the most strategically important actions our company could undertake right now . . . Upon completion, it will immediately reduce our operating costs to the point that the project will pay for itself.

KCSR App. 282.   For demonstrative purposes, KCSR included in its Response a map depicting

KCSR's tracks in red and Union Pacific's tracks in green, including the longer "around the horn"

route on Pacific Union's tracks.   KCSR Resp. 11.

"Like lost profits, lost use damages are frequently, but not categorically, consequential in

nature."   *Id.* at *6.   Here, section 22 of the Master Agreement does not specifically refer to "loss of

use" damages or damages for the cost of substitute services of the type sought by KCSR but indicates that its application is not limited to the type of consequential damages listed:

**Limitation on Damages**

> Neither party will be liable to the other for consequential, indirect or punitive damages for any cause of action, whether in contract, tort or otherwise. Consequential damages include, but are not limited to, lost profits, lost revenues and lost business opportunities, whether the other party was or should have been aware of the possibility of these damages.

BBRI Resp. App. 39. Moreover, there is no evidence from which the court can conclude that the loss of use damages sought by KCSR are direct damages. For example, there is no evidence BBRI was actually aware of the June 2007 newsletter on KCSR's website before entering the Contract; nor is there evidence that BBRI was aware that KCSR was using Union Pacific's tracks and would have to incur or would continue to incur costs for using Union Pacific's tracks. Indeed, the court was unable to find any evidence, and KCSR has cited none, that BBRI had communications of any kind with KCSR regarding the project before November 2007. *See* BBRI Resp. App. 3, ¶ 2 ("In November and December 2007, KCS invited BBRI to bid on the construction of an 84 mile railroad track fro KCS between Rosenberg to Victoria, Texas (the 'Project')").[7]

Furthermore, although the Contract states that "[t]ime is of the essence," it says nothing about the potential consequences to KCSR for BBRI's failure to complete the track construction within the time specified by the Contract. The Liquidated Damages provision allows KCSR to recover for delays to its equipment and operations resulting from BBRI's default, but it is clear from this provision that the parties only contemplated delay charges for ballast trains as a result of delays in

---

[7] The court overrules KCSR's objections regarding this statement in Snailham's Affidavit for the same reasons previously explained in footnote 3.

unloading and departures of such trains.  See BBRI Resp. App. 44.  As a result, the court cannot

conclude that the trackage fees paid by KCSR to third party Union Pacific were "conclusively

presumed to have been foreseen" or contemplated by BBRI as a consequence of its failure to timely

complete the project.[8]  *See Hoppenstein Props., Inc. v. McLennan Cnty. Appraisal Dist.*, 341 S.W.3d

16, 21 (Tex. App.  Waco 2010, no pet.) (profits lost under a contract between parties are direct

damages, while profits lost under other contracts resulting from a defendant's breach are

consequential damages); *Tennessee Gas Pipeline Co. v. Technip USA Corp.*, No. 01  06  00535  CV,

2008 WL 3876141, at *9-10 (Tex. App.  Houston [1st Dist.] Aug. 21, 2008, pet. denied) (mem. op.)

(holding that cost for renting a backup generator necessitated by power outage were consequential

damages of defendant's premature dismantling of old generator and costs for penalty under utility

contract for delayed use of utilities were consequential damages from construction delay because the

cost depended on terms of owner's contract with third party utility company that were not addressed

in the parties' contract and would not have been within the contemplation of the defendant); *cf.*

*Powell Elec. Sys., Inc.*, 2011 WL 1598758, at *3-6 (discussing holding in *Tennessee Gas Pipeline*

and concluding that costs incurred for transformer repair as a result of defendant's substandard

performance were direct costs because they addressed in the parties' contract; however, costs for a

temporary transformer to replace one of two transformers were determined to be consequential

because the ability to run on one transformer was a necessary part of the defendant's performance

of its work under the contract).  The court therefore concludes that no genuine dispute of material

---

[8] The cases cited by KCSR do not change the court's conclusion because none involves a contractual limitation of liability provision and do not address whether loss of use damages are direct or consequential damages. Although the case addressed whether loss of use damages was direct or consequential, it is also distinguishable because the court's reasoning was based on the circumstances of that case, and the issue of whether the trackage fees sought by KCSR were "conclusively presumed to have been foreseen" by BBRI is fact specific.

fact exists regarding this issue and BBRI is entitled to judgment as a matter of law on KCSR's claim for trackage rights fees.

## IV.    KCSR's Objections to BBRI's Summary Judgment Evidence

KCSR objected to the affidavit of Snailham "in its entirety" on the grounds that Snailham's statements are based on hearsay rather than personal knowledge and conclusory.  KCSR also objects to page 16, line 19 to page 17, line 1, and page 225, line 5 to line 9, of Colin Kendrick's deposition testimony on the grounds that it is based on hearsay.  For similar reasons, KCSR objects to the deposition testimony of Mark Snailham at page 41, line 4 through page 42, line 12.  To the extent not previously addressed, KCSR's objections are **overruled as moot** since the court's opinion is not based on this evidence and it only considered evidence that is admissible pursuant to Rule 56 of the Federal Rules of Civil Procedure and the summary judgment standard herein enunciated.

## V.    Conclusion

For the reasons herein stated, the parties' summary motions are **granted in part and denied in part**.  No genuine dispute of material fact exists regarding BBRI's claims based on differing site conditions and quantum meruit.   Likewise, no genuine dispute of material fact exists regarding KCSR's contract claim to recover costs for trackage rights fees and corrective or remedial work performed by CW & W and Lone Star.  Accordingly, with regard to these claims, the court **grants** Plaintiff Counter-Defendant's Motion for Partial Summary Judgment and **grants** Defendant The Kansas City Southern Railway Company's Motion for Partial Summary Judgment.  The parties' motions are **denied** in all other respects.  The claims that remain to be tried are: (1) BBRI's contract claim for delay damages; and (2) KCSR's  contract claims based on (a) ballast material allegedly

wasted by BBRI,  and (b) the cost of retaining additional contractors Kanza and Holland to perform tamping, regulating, and de-stressing to assist BBRI in completing its scope of work.

Now that the court has ruled on the parties' summary judgment motions, the parties are in a better position to assess the strengths and weaknesses of their respective claims and defenses. Bluntly speaking, neither side is "out of the woods."  Given the current posture of the case, the court believes that the parties should attempt to resolve this action without the necessity of a trial.  The court reaches such conclusion because of judicial economy, additional costs involved, and counsel's schedules.  The court believes that the best approach is to order a mediation or settlement conference before a United States Magistrate Judge and will do so by separate order.  If the matter cannot be resolved before a magistrate judge, the court will confer with the parties regarding their availability for an appropriate trial setting.

**It is so ordered** this 31st day of July, 2012.

Sam A. Lindsay
United States District Judge