IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **BALFOUR BEATTY RAIL, INC.,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. **3:10-CV-1629-L** |
| | § | |
| **THE KANSAS CITY SOUTHERN** | § | |
| **RAILWAY COMPANY**, | § | |
| | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

The court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure following a bench trial on the following claims by Plaintiff Balfour Beatty Rail Inc. ("Plaintiff" or "BBRI") and Defendant The Kansas City Southern Railway Company ("Defendant" or "KCSR") that remained after summary judgment and were tried to the court: (1) BBRI's contract claim for cumulative impact or prolongation delay damages ("Prolongation Delay Claim"); (2) BBRI's claims based on Change Orders 4 and 36 through 50 (contract and quantum meruit); (3) BBRI's claim under the Texas Prompt Payment Act; (4) KCSR's breach of contract counterclaim to recover for ballast material[1] allegedly wasted by BBRI; and (5) KCSR's breach of contract counterclaim to recover the cost of retaining additional contractors Kanza and

---

[1] Ballast is crushed stone placed below, between, and around the railroad or railway ties, that holds in place the railroad ties, which in turn hold the rail in place. *See* Tr. 78, 1092-93. The railroad ties used in this Project were made of concrete or wood, were rectangular in shape, and were laid perpendicular to and between the rails. Railroad or railway ties, frequently referred to simply as "ties" by the parties and witnesses in this case, provide support for the rails.

Holland to perform tamping, regulating, and de-stressing[2] to supplement and assist BBRI in completing its scope of work.  A number of affirmative defenses asserted by the parties also remain. Following a bench trial, and for the reasons that follow, the court **finds** and **concludes** that BBRI is entitled to recover, subject KCSR's request for a setoff, **$34,820.35** plus prejudgment interest for Change Orders 45, 46, 47, and 50; that KCSR is entitled to recover **$2,353,299.40** plus prejudgment interest on its counterclaim against BBRI for wasted ballast,[3] and the court will enter judgment in favor of KCSR on that claim in accordance with this memorandum opinion after offsetting the amount awarded to BBRI. Except for attorney's fees, all other relief not expressly granted herein is **denied**, and the parties' remaining claims that survived summary judgment are **dismissed with prejudice** except to the extent set forth in this opinion. The court also **denies as moot** Defendant's Motion for Partial Judgment as a Matter of Law (Doc. 91).

## I.     Procedural Background

BBRI originally filed this action against KCSR on July 19, 2010, in the 191st Judicial District Court, Dallas County, Texas, asserting state law claims for breach of contract, quantum meruit/unjust enrichment,[4] and failure to promptly pay under the Texas Prompt Payment Act ("TPPA") related to

---

[2] De-stressing is a thermal adjustment process used with continuously welded rail that involves heating the rail before it is welded and joined together to prevent it from later fracturing in extreme hot or freezing temperatures. Tr. 79, 1093.  Continuously welded rail is rail that is over 80 feet in length.  Tr. 1093. Tamping and regulating the rail is a process used to establish the height or top of the railroad. Tr. 30, 1092. Tampers and regulators are used for surfacing or ballast work.  Tr. 944.

[3] As herein explained, this amount does not account for KCSR's right to a setoff of $34,820.35 plus prejudgment interest for Change Orders 45, 46, 47, and 50.

[4] In its pleadings, BBRI treats its "quantum meruit/unjust enrichment" as one claim or theory of recovery. The theory of unjust enrichment applies when the defendant has obtained a benefit from another by fraud, duress, or the taking of an undue advantage. *See Pope v. Garrett*, 147 Tex. 18, 211 S.W.2d 559, 560, 562 (1948); *Austin v. Duval*, 735 S.W.2d 647, 649 (Tex. App.—Austin 1987, writ denied).  When "a plaintiff's own actions, rather than the defendant's

construction delays and work performed by it on sixty-four miles of railway track line that runs from Rosenberg, Texas, to Victoria, Texas.

On August 20, 2010, KCSR removed the action to federal court on the basis of diversity jurisdiction, and asserted defenses and counterclaims under the parties' contract for: (1) ballast material allegedly wasted by BBRI during construction; (2) trackage rights fees incurred by KCSR in using another third party's tracks as a result of BBRI's failure to timely complete the railroad construction work or project ("Project") within the time specified by the parties' contract; (3) costs for work done by other contractors hired by KCSR to supplement and assist BBRI with tamping, regulating, and de-stressing after BBRI fell behind schedule; and (4) costs incurred for remedial or repair work done by other contractors to correct deficiencies in BBRI's punch list work and other postconstruction work. Both parties also seek attorney's fees, prejudgment and postjudgment interest, and costs of suit.

On September 16, 2011, both parties moved for summary judgment. KCSR moved for partial summary judgment on BBRI's contract and quantum meruit claims based on delays, ballast, and fill material. BBRI moved for partial summary judgment on all of KCSR's counterclaims except for KCSR's claim for wasted ballast. On July 31, 2012, the court granted in part and denied in part the parties' summary judgment motions. The court granted KCSR's summary judgment motion with

---

equitable wrongs, are the source of the plaintiff's loss, there can be no unjust enrichment." *Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 841 (5th Cir. 2004). BBRI's quantum meruit/unjust enrichment is based on its contention that it performed work at KCSR's request, and KCSR accepted the benefit conferred by BBRI's performance of work without compensating it. BBRI does not allege, and there is no evidence, that KCSR obtained a benefit from BBRI by fraud, duress, or undue advantage. Moreover, as herein explained, the court concludes that BBRI's own actions are the source of its loss. For this reason and because BBRI's pleadings and evidence more closely resemble quantum meruit, the court construes its request to recover under "quantum meruit/unjust enrichment" as one for quantum meruit rather than unjust enrichment.

respect to BBRI's contract and quantum meruit claims based on BBRI's allegation that it performed additional ballast and fill material work at crossings due to differing site conditions. The court also granted the motion with respect to BBRI's quantum meruit claim based on prolongation delays but denied KCSR's request to dismiss BBRI's contract claim based on prolongation delays.[5]

The court also granted BBRI's summary judgment motion with respect to KCSR's claim to recover costs for trackage rights fees and corrective or remedial work performed by other contractors and dismissed with prejudice these claims. In its July 31, 2012 opinion, the court indicated that the following claims remained after summary judgment: (1) BBRI's contract claim for prolongation delay damages; and (2) KCSR's counterclaims under the parties' contract based on (1) wasted ballast; and (2) the cost of retaining additional contractors Kanza and Holland to perform tamping, regulating, and de-stressing to assist BBRI in completing its scope of work. Also remaining after summary judgment were BBRI's claims for quantum meruit and breach of contract based on Change Orders 4 and 36 through 50, as well as BBRI's claim for alleged violations of the Texas Prompt Payment Act

---

[5] As KCSR's summary judgment motion was limited to BBRI's contract and quantum meruit claims based on delays, ballast, and fill material for crossings, the court's ruling with respect to BBRI's quantum meruit theory of recovery was necessarily limited to BBRI's Prolongation Delay Claim and claims based on ballast and fill material for crossings. To the extent that the court's July 31, 2012 opinion on the parties' summary judgment motions was not so limited or appears to dispose of BBRI's quantum meruit claim in its entirety, the court **clarifies** that its prior dismissal of BBRI's quantum meruit claim was limited to BBRI's Prolongation Delay Claim and claims based on ballast and fill material for crossings. Although the Joint Pretrial Order does not include any reference to quantum meruit, the court determines that BBRI's quantum meruit theory of recovery as to its remaining change order claims was not waived in light of the foregoing clarification. Moreover, some evidence, although insufficient to establish BBRI's quantum meruit burden, in the form of testimony and documents was presented at trial without objection by KCSR. *See Arsement v. Spinnaker Explor. Co., LLC*, 400 F.3d 238, 245 (5th Cir. 2005) ("It goes without saying that a pre-trial order controls the scope and course of trial; a claim or issue not included in the order is waived, unless presented at trial without objection."). For this reason and in light of the court's disposition of BBRI's change order claims, the court determines that KCSR will not be prejudiced by the court's consideration of BBRI's quantum meruit theory, to the extent relevant, in deciding its remaining change order claims.

("TPPA"), which were not at issue in KCSR's summary judgment motion or addressed in the court's prior opinion.

A nine-day bench trial of the parties' remaining claims was conducted from April 2, 2013, to April 11, 2013. The court heard testimony during the trial from the following witnesses: Patrick Castle ("Castle"), Jose Garcia ("Garcia"), Steve Whitfield ("Whitfield"), Bradford Bright ("Bright"), Colin Kendrick ("Kendrick"), Mark Snailham ("Snailham"), Lee Peek ("Peek"), David Brookings ("Brookings"), Lynn Carnes ("Carnes"), and Bryan Byrd ("Byrd"). Joint Exhibit Nos. 1 through 375, to which there were no objections, were preadmitted at the beginning of the trial. All other evidence was preadmitted subject to objections and the parties' agreement to withdraw exhibits during or at the end of the trial.[6] In addition, the court admitted, as exhibits, transcribed and videotaped deposition testimony designated by the parties for witnesses who did not testify in person during the trial. These exhibits included Plaintiff's Exhibits 538 through 554 and Defendant's Exhibits 624 through 634, which consist of deposition designations by the parties for the following witnesses who performed worked on the Project for BBRI or KCSR: Miguel Cruz ("Cruz"); John Gable ("Gable"); Bryan Brown ("Brown"); Corby Cline ("Cline"); John Dunsworth ("Dunsworth"); Roosevelt Altez ("Altez"); Humberto Garcia; Harry Stillwagon ("Stillwagon"); and Rigoberto Gordillo. The

---

[6] To expedite the bench trial proceedings, some objections to exhibits were ruled on at the time the objections were made, while other objections were taken under advisement. The court explained that any outstanding objections would be addressed, as necessary, in the court's findings of fact and conclusions of law. Specifically, the court explained that if there was an objection to a particular exhibit and the exhibit was discussed in the court's opinion, this meant that the court overruled the objection. On the other hand, if an objection was not specifically addressed in the court's findings and conclusions, this meant that the court either sustained the objection or concluded that the exhibit was not necessary for its findings of fact and conclusions of law. The same is true with respect to any objections to witness testimony that were not ruled on during the course of the trial.

deposition testimony of Mike Russell (Defendant's Exhibit 635) was not admitted, as Plaintiff's objection to this exhibit was sustained.

Plaintiff's Exhibits 536 and 537, which are Primavera native schedule files, were admitted for demonstrative purposes subject to the parties' agreement that KCSR's expert Byrd would be allowed to examine and opine regarding them, although he may not have previously rendered an opinion on them before trial.   Plaintiff's Exhibits 536 and 537 are the files from which Joint Exhibit 230, an as-planned Primavera schedule, was printed.   Joint Exhibit 230, however, does not contain all of the information included in the native Primavera files.  Defendant's Exhibits 610 and 612 through 616 were admitted for demonstrative purposes subject to Plaintiff's objection that they exceed Byrd's prior expert report and deposition testimony and went beyond Plaintiff's Exhibits 536 and 537, which, according to Defendant, were not produced prior to trial or included in Plaintiff's exhibit list.   The court **overrules** Plaintiff's objections in this regard.   Plaintiff did not show to the court's satisfaction that these files were produced prior to trial. Regardless of whether the software files were capable of being physically Bates-stamped, Plaintiff could have given the files Bates numbers and notified Defendant when producing the files that certain Bates numbers corresponded to the Primavera files produced in native format. Plaintiff could have also given the files exhibit numbers and included them in its pretrial exhibit list as it did with Pl.'s Ex.  484, a native formatted Punch List. Proceeding in this manner would have prevented the confusion and dispute that ensued at trial regarding Plaintiff's Exhibits 536 and 537, the new rebuttal exhibits created by Defendant in response to these exhibits, and the use of the new exhibits at trial by the parties' expert witnesses. The court also admitted for all purposes Defendant's Exhibits 609 and 611, subject to Plaintiff's objections regarding inconsistent

dates. The court **overrules** the objections to these exhibits because, as explained during the trial, such objections go to the weight of the evidence, not its admissibility.

On April 26, 2013, after the trial in this case concluded, the parties filed a joint list of Exhibits Withdrawn by Both Parties (Doc. 77).  On the same day, BBRI objected in writing (Doc. 79) on hearsay grounds to a large number of joint exhibits that were preadmitted and exhibits that were offered by BBRI and KCSR and preadmitted before the trial subject to objections.  Alternatively, BBRI requested that the court strike these exhibits, which KCSR would not agree to withdraw.

In response, KCSR contends that BBRI waived any objections to these exhibits by failing to timely object during the trial or by the March 18, 2013 deadline for making written pretrial objections to evidence.  For support, KCSR cites Federal Rule of Evidence 103(a)(1)(A) for the proposition that a party may only claim error in the admission of evidence if it timely objects or moves to strike the evidence on the record and states the specific ground for the objection.

The court agrees.  BBRI cannot claim error in the admission of these exhibits because the joint exhibits were preadmitted by agreement of the parties, and the parties' respective exhibits were preadmitted by agreement subject to the objections of the parties to the exhibits.  *See* Fed. R. Evid. 103(a)(1)(A).  Moreover, BBRI did not object to these exhibits at trial, and no objections to the exhibits were included in BBRI's written pretrial objections, which were required to be filed by March 18, 2013.  BBRI's April 26, 2013 hearsay objections are, therefore, untimely and waived under Federal Rule of Civil Procedure 26(a)(3)(B), unless it can show that good cause exists for its failure to object to the exhibits before trial.

BBRI's objection stems from KCSR's refusal to agree to the withdrawal of the exhibits attached to its objection.  BBRI contends that, based on its understanding of the court's ruling and instructions, the exhibits listed in Exhibit A to its objections should not be considered as evidence because they were not used by either party in the trial via live testimony or deposition designations.

BBRI's understanding in this regard is not entirely correct.  The court did not require the parties to preadmit or withdraw any exhibits; rather, it simply gave them the option of preadmitting exhibits and withdrawing irrelevant documents during or at the end of the trial to expedite the bench trial and avoid burdening the record with exhibits determined by the parties to be irrelevant to their respective claims and defenses.  *See* Tr. 9-13.  If the parties are unable to agree to withdraw certain exhibits that they previously agreed to preadmit, the court cannot force either party, at this stage, to withdraw an exhibit that was not objected to in writing by March 18, 2013.  For the same reason, the court concludes that BBRI has not established good cause for its prior failure to object timely on hearsay or other grounds to the exhibits attached to its April 26, 2013 objection.  Accordingly, the court **overrules** BBRI's hearsay objection and request for the court to strike the exhibits attached as Exhibit A to its objection (Doc. 79).

On June 11, 2013, Defendant filed its Motion for Partial Judgment as a Matter of Law (Doc. 91).  On June 28, 2013, the parties filed their proposed findings of fact and conclusions of law,[7] and Defendant moved to supplement or correct the trial record with recorded deposition testimony that was played during the trial to impeach BBRI's witnesses but not previously transcribed by the court

---

[7] The court refers herein, when citing to the parties' respective proposed findings of fact and conclusions of law, as "Pl.'s Br." and "Def.'s Br."

**Memorandum Opinion and Order - Page 8**

reporter and included in the trial record.[8] The court granted Defendant's motion to supplement or correct the record. In the same order, the court advised the parties that it would address their contentions with respect to Defendant's Partial Judgment as a Matter of Law (Doc. 91) in its findings and conclusions. On September 6, 2013, the court heard closing arguments.

Based upon a preponderance of the evidence,[9] the court makes the following findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.[10] The facts contained herein are either undisputed or the court has made the finding based on the credibility or believability of each witness. In doing so, the court considered all of the circumstances under which the witness testified, including: the relationship of the witness to Plaintiff or Defendant; the interest, if any, the witness has in the outcome of the case; the witness's appearance, demeanor, and manner of testifying while on the witness stand; the witness's apparent candor and fairness, or the lack thereof; the reasonableness or unreasonableness of the witness's testimony; the opportunity of the

---

[8] Certain portions of the recorded depositions were indecipherable and the court reporter was unable to transcribe these portions. This, however, did not affect the court's resolution of the parties claims, as it listened to the recorded depositions during the trial when they were played for purposes of impeaching Plaintiff's witnesses.

[9] Proving a fact by a "preponderance of the evidence" means showing that the existence of a fact is more likely than not. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983). Thus, to prove a fact or claim by a preponderance of the evidence, a party must prove that it is more likely than not that its version of the facts is true. *Id.*

[10] In preparing this memorandum opinion and order, the court carefully considered the trial testimony and exhibits and applied the standard in this circuit for findings of fact and conclusions of law. *See Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (discussing standard for findings and conclusions under Rule 52). In accordance with that standard, the court has not set out its findings and conclusions in "punctilious detail" or "slavishly traced the claims issue by issue and witness by witness, or indulged in exegetics, parsing or declaiming every fact and each nuance and hypothesis." *See id.* The court instead has limited its discussion to those legal and factual issues that form the basis for its decision. *Id.* Even taking this approach, the opinion exceeds 140 pages. The court apologizes for the delay in finishing this opinion; however, the record was quite voluminous and, frankly, the manner in which the evidence was presented made the court's job quite onerous. Although the parties agreed to preadmit the majority of exhibits, there was insufficient discussion by the parties of many of the exhibits during the trial and in their posttrial briefs. The correlation between the evidence and the claims and defenses was also lacking, particularly with respect to Plaintiff's change order claims, which made up the bulk of the claims asserted in this case. The court, nevertheless, pored over the voluminous record and, in doing so, made numerous credibility determinations.

witness to observe or acquire knowledge concerning the facts to which he or she testified; the extent to which the witness was contradicted or supported by other credible evidence; and whether such contradiction related to an important factor in the case or some minor or unimportant detail.  When necessary, the court comments on the credibility of a witness or the weight to be given to a witness's testimony. Where appropriate, any finding of fact herein that should more appropriately be regarded as a conclusion of law shall be deemed as such, and vice versa.

## II.    Findings of Fact

The parties' claims in this case arise out of a railway track construction Project. The railway track line that forms the basis of the parties' claims was purchased by KCSR from the former G.H. & S.A. Railway Victoria Division.  In November 2007, KCSR solicited bids for a track contractor to construct approximately 85 miles of main line track between Victoria and Rosenberg, Texas.  BBRI submitted its bid to perform this work in December 2007.  KCSR did not accept the bid initially submitted by BBRI and instead awarded the contract to contractor Gulf Coast Rail Group, Inc. ("Gulf Coast") to perform certain construction and rehabilitation work on the main line track between Victoria and Rosenberg, Texas.

KCSR subsequently terminated its contract with Gulf Coast and approached BBRI in late 2007 about submitting another bid to complete the work started by Gulf Coast.  As was the case with the initial bid process, BBRI had the opportunity and obligation to assess fully the work required to complete the Project.  BBRI had access to the railroad track site, as well as the plans and specifications prepared by KCSR for prospective bidders. The Information to Bidders that was provided to BBRI during the bid process required each bidder to visit the site to become familiar with the site conditions relating to the execution of the Project.  The Information to Bidders warned bidders

that failure to do so would not relieve the successful bidder of its obligation to provide all material and labor necessary to successfully complete the Project by the specified date.

In the KCSR bid form submitted by BBRI, BBRI certified that it had inspected the site and read the bid documents.  The bid form warned that the failure or omission of BBRI, as a bidder, to inspect the worksite or carefully review the bid documents would not relieve it from any obligation with respect to its bid.  KCSR met with BBRI at the Project site, answered BBRI's questions, and provided BBRI with construction design plans that were final in some respects but incomplete with respect to the track construction work to be performed by BBRI.  During this time, BBRI had the opportunity to inspect the Project site and observe the work done to date on the Project, including the grading work done thus far by KCSR's grading contractor Kanza before contracting with KCSR to construct the main line track.  BBRI, therefore, was able to see the type of grade on which it would be constructing track.  BBRI was also able to observe the pre-ballast area and the rest of the line that still needed to be graded.[11]

On August 20, 2008, the parties entered a Master Agreement, effective September 1, 2008, for BBRI as contractor "to furnish, upon request of Company [KCSR], all supervision, labor, material, tools, equipment, supplies, and things of every nature" to complete the work requested by KCSR on the railway track line.  Jt. Ex. 84.003.  In addition to generally describing the work to be

---

[11] Peek, KCSR's director of track projects, explained that the "preballast area" referred to the area in the southern end of the Project in which a "geogrid and six inches of ballast" were put down after the grade was "built or improved, either with prefolding or subballast."  Tr. 1118-19.  Pre-ballasting was done initially for the first five miles of track before BBRI came onto the Project but was stopped because the process was not working well and made track construction with the New Track Construction ("NTC") machine more difficult.  BBRI knew that it would have to deal with this pre-ballast area because it was there when it bid on the Project in 2008.  *Id.*  Castle, who oversaw BBRI's bid process for the Project, explained that sub-ballast is "the rock below the track ballast. It is a prepared rock formation upon which the track structure sits."  *Id*. at 69.  Castle testified that Kanza was responsible as the grading contractor for preparing the "subballast road bed."  According to Castle, the parties' agreement required Kanza to prepare the sub-ballast road bed with "six inches of preballast."  Castle explained that pre-ballast is "the ballast that sits under the tie on top of the subballast."  *Id*. at 69-70.  "It is called preballast because it is done before a track is constructed."  *Id*. at 70.

performed by BBRI, the Master Agreement sets forth the general terms of the parties' agreement that govern compensation and invoicing, change orders, safety, notices, limitation of damages and Project delays, amendments, and prior or contemporaneous agreements.

From October 15, 2008, to October 31, 2008, a series of proposals by BBRI to complete the Project was submitted to KCSR. These proposals included various changes to the mileage and scope of the Project because, during the time that BBRI continued to submit proposals and the parties negotiated the SOW, Gulf Coast continued to do work on the Project, which shrunk the scope of the work remaining to be performed by BBRI. Castle, who oversaw BBRI's proposals, acknowledged during the trial that he was aware that Gulf Coast was still on the jobsite performing work at the South end of the Project while BBRI and KCSR continued to negotiate the SOW. Tr. 132-33. On October 31, 2008, BBRI submitted a final proposal to KCSR that decreased the amount of rail to be constructed by BBRI from 77 miles to 65.1 miles because a decision was made to have Gulf Coast continue constructing a small portion of rail at the southern end of the Project. When BBRI submitted its final proposal, Gulf Coast had not finished constructing the portion of rail at the southern end of the Project, where BBRI intended to start its work on the Project. Tr. 92.

Subject to the terms and conditions set forth in the Master Agreement, the parties executed a Statement of Work ("SOW") on November 13, 2008, that describes the work to be performed by BBRI. The court refers herein collectively to the Master Agreement and SOW as the "Contract." The first page of the SOW summarizes the Project as follows:

> The former G.H. & S.A. Railway Victoria Division from Rosenberg to Victoria has been purchased by . . . (KCSR) for rehabilitation. The limits of this project are from MP RV 18.6 near Rosenberg, Texas to MP RV 82.28 near Victoria, Texas. [BBRI] will construct track on the mainline with concrete ties and through El Campo between MP 36.29 and MP 41.77 on wood ties as well as the siding at El Campo and El Toro. This track work project can be described as track construction

utilizing KCSR-supplied material.  KCSR will be supplying 136# welded rail (1,400-ft and 1,600 strings), and ballast in a stockpile to be transloaded into bottom dump ballast cares and/or ballast in bottom dump rail cars, concrete ties, and the elastic fasteners.  The contractor will be responsible for unloading the track material and transporting it to the required locations.  Concrete ties will be supplied by trucks to a central location and offload[ed] and reloaded onto tie cars by [BBRI].  The reconstruction of the at-grade road crossings is included in this project.  It is expected that the contractor will be working from [the] south end of the project going north.

Jt. Ex. 4.  The SOW required each party to designate a project manager, who was to act as the point of contact for the other party.  *Id.* at 4.014.  The SOW incorporates Exhibits A through G, which set forth the scope of work; rates and fees; supplemental terms; subcontractor and material lists; additional track construction terms; and specifications, drawings, plans, and track charts.  Exhibit E to the SOW pertaining to materials provides: "Unless otherwise stated herein, [BBRI] shall furnish all materials, supplies, tools, equipment and labor necessary for the proper prosecution and completion of the Services."  Jt. Ex. 4.018. The first page of the SOW also incorporates by reference the "Bid Documents," which are defined as only "the materials delivered to the Contractor in connection with the Company's solicitation of Contractor's proposal to provide the Work" on the Project.  Jt. Ex. 4.  The SOW states that, to the extent that the Bid Documents conflict with the SOW, the terms of the SOW control.  The Contract requires BBRI to perform its work in a safe manner.

The original contract price for the negotiated scope of work was $12,206,666.  This amount included a lump-sum amount of $10,416,193 for mobilization, surveying and setting out, skeletonized track, ballasting, tamping and regulating, welding and stressing, grade crossing (prep and follow-up), and other miscellaneous work (including sidings[12] and bridges), plus $1,790,473 to furnish and install asphalt, which was calculated and paid based on a unit rate of $115 per ton of asphalt installed.  The

---

[12] A "siding" is a "passing track" used to "pass on what is predominantly a single-line route." Tr. 60.

**Memorandum Opinion and Order - Page 13**

SOW provides that BBRI will construct the track pursuant to the Project specifications.[13]  The SOW

required at least 10 inches of ballast to be installed under the tie with an allowed variance of +/- 2

inches and dictated that care be "exercised not to distribute ballast in excess of the amount required

for the lift to be made." Jt. Ex. 4.020, 4.022.  The SOW also provided for a shoulder of no more than

12 inches from the tie.  *Id*. at 4.022.  The parties intended and the SOW provides that skeleton track

construction using the NTC machine would only be conducted on alternate weeks to allow for rail

distribution.  *Id*. at 4.008.  The parties recognized that there would be instances when other

contractors would be working in the vicinity of BBRI.  *Id.* at 4.014.  In this regard, the SOW expressly

states: "It shall be [BBRI's] responsibility to coordinate with others so as not to disrupt the progress

of [its] own or other work.  *Id.*

Section 5 of the Master Agreement contains a specific procedure for change orders applicable

to claims for adjustment in the Contract price as a result of additions, deletions, or revisions in the

Contract Work requested by KCSR.  This provision required BBRI, as the contractor, to submit a

written claim for an increase in the amount to be paid by KCSR as a result of the requested change

in work within 15 days of being notified of the requested change.  The provision further required

BBRI to provide data to support the claimed amount and a written statement that the amount claimed

for the change covered all known amounts to which it was entitled as a result of the change order.

Section 5.B states that no claim for a price adjustment by BBRI will be valid or paid by KCSR unless

---

[13] BBRI made much ado about the state of KCSR's design specifications during the trial, but the Contract does not make KCSR responsible for delays caused by incomplete or inaccurate design specifications, and BBRI knew that KCSR's design specifications had not been finalized in all respects when it bid on the Project and executed the Contract with KCSR.  Incomplete design specifications is, therefore, not a basis for recovery or a defense to BBRI's failure to complete its work under the initial schedule agreed upon by the parties. *See El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 811 (Tex. 2012) ("[F]or an owner to be liable to a contractor for a breach of contract based on faulty construction specifications, the contract must contain terms that could fairly imply the owner's 'guaranty of the sufficiency of the specifications.'") (citation omitted).

set forth in a written change order signed by both parties.  In the event the parties are unable to reach agreement on the amount of price adjustment, the change order provision states that BBRI will not be obligated to perform the additional work requested by KCSR, but it must not unreasonably withhold, delay, or condition its consent to the change requested by KCSR.  Section 5.C of the change order provision provides that BBRI will not be entitled to an increase in the agreed upon Contract price or an extension of the Contract time with respect to any work it performs that is not required by the SOW unless the SOW is amended, modified, or supplemented accordingly.

The Master Agreement states that any amendment to the agreement must be done in writing and signed by an authorized representative for each party.  Regarding compensation and invoicing, the Master Agreement required BBRI to submit invoices for all work performed under the Contract within 90 days of performance of the work, and states that any invoice reflecting work performed more than 90 days prior to KCSR's receipt of the invoice will not be paid.

Regarding Project delays, the SOW provides:

> If, in the opinion of the Company, the Contractor falls behind schedule at any time, Contractor will add additional manpower and equipment immediately and keep them on the job until the work is back on schedule without any additional cost to the Company. If overtime work is required to maintain the schedule, Contractor will direct its work force to do so without any additional cost to the Company.

Jt. Ex. 4.002.   The SOW includes a liquidated damages provision that further provides the following regarding delays caused by KCSR's failure to timely meet its obligations under the SOW:

> Contractor will mitigate to the extent reasonably practicable any delays caused by the Company's failure to timely meet its obligations under this [SOW]. If such failure by the Company prevents Contractor's crews from working more than 4 hours during a day (each such occurrence referred to as a "Delay Day"), then Contractor shall notify railroad of such delay and reason therefor[]. Contractor agrees to keep a record of any Delay Days caused by the Company during the term of this Agreement. The Project Managers for the Company and Contractor will meet periodically to jointly agree upon the number of Delay Days. The Company will pay Contractor the daily

rates set forth in equipment and labor rates added to schedule 1, and as supplemented
. . . , for such agreed-upon Delay Days.

*Id.*

The SOW contains three deadlines. BBRI was required to complete "all track construction, ballasting, tamping and rail adjustment" work by May 1, 2009. Jt. Ex. 4.001-.002. The parties refer to this as the substantial completion deadline. By May 15, 2009, BBRI was required to complete final dressing and clean up of the Project site. BBRI's deadline for demobilization of its equipment and labor was set for May 31, 2009. The SOW expressly provides that "[t]ime is of the essence in completing the Services," and the parties' conduct during the Project and witness testimony demonstrate that both parties understood that time was of the essence in completing the Project on schedule. Jt. Ex. 4.002. Other language in the Contract demonstrates the parties' intent that time was of the essence in completing the Project. BBRI stipulated at trial that time was of the essence but contends that KCSR waived the right to assert that time was of the essence. The testimony and documentary evidence in this case, however, establish the contrary and show that both parties understood at all times during the Project that time was of the essence in completing the Project by the deadlines set forth in the Contract.[14] Moreover, as herein explained, the defenses of waiver and

---

[14] Peek testified that time was of the essence for KCSR to complete the Project because the track being constructed provided a shorter shipping route for KCSR to get Asian shipments and allowed KCSR to take advantage of business that had drastically increased through Mexico and, in particular, the Port of Lazaro. Peek testified that KCSR was spending a lot of money to rehabilitate the track and wanted to start getting a return on its investment as quickly as possible. Tr. 1110. Peek testified that KCSR replaced Gulf Coast with BBRI because Gulf Coast fell behind schedule. Tr. 1112. Peek testified that the decision was made to approach BBRI in 2008 because he had known Garcia, BBRI's area manager, for years and knew from prior experience that, when Garcia took on a project, he was "very intense" and "would move heaven and earth" to get the job done. Tr. 1113. In a November 25, 2008 e-mail to Garcia and other Project contractors, Peek approved BBRI's request for KCSR to issue a joint check to the owner of the NTC machine and stated "The completion of the Rosenberg project on time an budget is critical to our success. . . . We need to expedite the confirmation of this matter in order to avoid further delays in progress of these critical project contractors." Def.'s Ex. 579. Snailham testified that he understood that time was of the essence to complete the Project by May 1, 2009. Tr. 1038. In an e-mail dated December 19, 2008, to Kendrick, BBRI's director of contract management who oversaw the Project change orders, Altez recommended that BBRI consider bringing in a second subcontractor and crew to work from the North end of the Project while BBRI's other crews continued to work from the South. Def.'s Ex. 624 at 117-118;

estoppel were only alleged by Plaintiff in its pleadings and included in the Pretrial Order as defenses

to KCSR's claims. Accordingly, the court does not consider BBRI's waiver and estoppel arguments

to the extent it contends in its posttrial brief that waiver or estoppel supports its own claims.

The as-planned construction schedule that BBRI submitted to KCSR in October 2008 in

conjunction with its bid included the following dates:  (1) November 3, 2008 mobilization start; (2)

April 29, 2009 final ballast drop; (3) April 30, 2009 final de-stressing; and (4) May 9, 2009 punch

list completion. BBRI understood that this schedule was aggressive and complex, and that time was

of the essence.  Among other things, the schedule included little or no float[15] and involved extensive

labor and equipment working on a single track with no parallel track that could be used to bring in

materials.  BBRI knew going into the Project that the design plans were not complete.  It also knew

---

Jt. Ex. 49.  Altez made this suggestion because he knew BBRI was behind schedule and needed to make changes to make up lost time ("If we don't get something fixed or changed, then we're not going to finish on time.").  *Id.* at 118-119. Early on, KCSR similarly considered hiring another contractor to supplement BBRI's work by working from the North.  Altez also sought bids to have the wood ties for El Campo pre-plated.  Altez testified that Cruz constantly threatened to replace BBRI if its crews continued to fall behind schedule and cause delays because he was getting a lot of pressure from KCSR's management to finish the Project on time by May 1, 2009. Pl.'s Ex. 538 at 174-75. In December 2008, KCSR provided BBRI with a revised rail schedule and requested BBRI to prepare a revised construction schedule that would take into account the new rail schedule and get construction back on schedule.  From December 2008 to February 2009, BBRI's scheduler Whitfield prepared several revised aggressive schedules in an effort to get BBRI's work back on schedule and complete the Project by the May 1, 2009 deadline.  In e-mails dated January 18, 2009, Cruz advised Garcia and Altez of various delays caused by BBRI's crews and demanded that the problems be addressed by BBRI's project manager immediately or he would order BBRI to replace its project management staff. Jt. Ex. 52, 54.  In a February 11, 2009 letter, KCSR notified Altez that BBRI was behind schedule and expressed concern about whether BBRI would be able to complete the Project on time with its current staff and equipment.  KCSR stated that, pursuant to the Contract, it might bring in additional contractors to supplement BBRI's work if BBRI was unable to get back on schedule.  Jt. Ex. 71. In response to KCSR's letter, Snailham, BBRI's vice president of rail services, advised that BBRI had recently strengthened its resources to complete the Project on schedule.  Def.'s Ex. 586.  On May 2, 2009, Davis notified Altez and Garcia that: "The results of [BBRI's] rail adjustment for Friday and Saturday continue to not make the schedule commitments . . . Please respond with your action plan to get back on schedule."  Def.'s Ex. 585. In May 2009, after BBRI failed to complete the Project within the time specified under the Contract, KCSR hired contractors Kanza and Holland to perform tamping, regulating, and de-stressing to supplement and assist BBRI in completing its scope of work. These are only a few examples of the parties' conduct that demonstrate that time was always of the essence throughout the Project.

[15] "Float" in a construction schedule refers to the amount of days an activity can be delayed before the delay affects the scheduled completion date.  Tr. 487-88.  If the float is zero, the activity cannot be delayed without impacting the overall Project completion date.  *Id.*

**Memorandum Opinion and Order - Page 17**

that it would have to interface and coordinate its work and schedule with the work and schedules of other contractors working on the Project site.  BBRI had never undertaken a project of this magnitude and kind using the construction methods it proposed, including use of an NTC machine for track construction to build skeleton track[16] and, as a result, experienced a steep learning curve in the beginning of the Project.

During the first few months, the Project and BBRI's work were plagued by delays and problems attributable to BBRI and its crew.  BBRI did not begin building skeleton track with the NTC machine until November 25, 2008, eight days after the scheduled start time, because it was involved in protracted negotiations with Harsco, the owner of the NTC machine, over the NTC machine subcontract.  The NTC machine sat idle at the jobsite while BBRI continued its negotiations with Harsco, who wanted assurances of payment and refused to contract with BBRI unless KCSR provided that assurance by agreeing to pay Harsco under a joint check agreement. As a result, BBRI's start of ballast distribution was delayed by nine days. BBRI was three weeks late in starting its surfacing works (tamping and regulating ballast). BBRI did not start its de-stressing until more than two months after the scheduled start date.  As of December 10, 2008, BBRI had been working on the Project for 23 days but had "only built five miles of skeleton track," although BBRI's original as-planned construction schedule required it to complete this amount of skeleton track by November 21, 2008. Def.'s Ex. 624 at 94-95.  BBRI fell behind the tamping and de-stressing schedule and was never able to catch up.  BBRI's de-stressing crews were inexperienced and did not timely or properly de-stress the rail, which resulted in broken ties and misalignment of the rail, and BBRI's failure to meet its construction targets.

---

[16] "Skeleton track" is raw or unfinished track with railroad ties and rail, but no ballast.  Tr. 44, 76.

**Memorandum Opinion and Order - Page 18**

To complicate matters, BBRI encountered problems with its crew during the first two months of the Project.  Altez was brought in by Snailham, BBRI's vice president of rail services, to serve as BBRI's Project Manager, although BBRI area manager Garcia believed that he was the only person qualified to do the job.  Altez was responsible for Project documentation, including change orders, and oversight and organization of the Project. Garcia's brother, Humberto Garcia, was appointed to act as BBRI's field construction supervisor.  Altez was overwhelmed by the Project, lacked people skills, and had difficulty communicating with Peek, Humberto Garcia, and other people on the Project.  Humberto Garcia and Altez were unable to get along and argued about everything from paperwork to crew work assignments.  Altez complained to his supervisor that Humberto Garcia was a problem and blamed him for delays in the Project.  Humberto Garcia, on the other hand, did not believe that Altez was providing him with the information needed to do his job.  Humberto Garcia told his brother (Jose) that he could no longer work with Altez and left the Project.  As a result of the lack of communication, BBRI's crews were unorganized, and its foremen resorted to fighting over equipment and workers.

Additional delay early on in the Project resulted from BBRI's decision to start the Project with equipment that could not pull rail.  BBRI started with a loader, but it soon realized that the loader did not have sufficient horsepower to pull the rail.  BBRI then brought in a "dozer"; however, the dozer also lacked sufficient power.  Def.'s Ex. 631 at 31-34.  For a period of time, BBRI used the loader and the dozer in tandem to pull the rail, which did not work well.  BBRI finally brought in a loader that was big enough to do the job.

BBRI had issues with its mini-train because its crew had never worked with a mini-train before and had to be trained on the job, and one of the mini-train cars had a bent wheel that caused

four or five derailments.  Every time it derailed, the rails on the car had to be off-loaded, then a track hoe would lift the car back on the rail, and the rails would be reloaded onto the car.  Each derailment caused a delay of several hours.  BBRI also began by pulling the rail six miles at time, which required pulling two ¼-mile strings six miles, two ¼-mile strings 5¾ miles, and so on.  This proved to be inefficient and ultimately had to be changed.  BBRI dragged the rail over the bed in a way that damaged the track bed.  BBRI's rollers constantly broke and even caught fire from overuse.  In addition, BBRI had difficulties with road closings at crossings that caused delays and caused the Texas Department of Transportation ("TXDOT") to scrutinize and shut down work at the crossings early on in the Project.

When BBRI finally started distributing rail, it experienced delays because its ballast distribution and tamping crews were "jumping around" the Project rather than following the linear schedule as planned.  Tr. 563.  By mid-December, it was apparent to Altez that BBRI would not be able to complete the Project on time because of its slow start.  Because of the slow start, KCSR had to slow down ballast deliveries in late December 2008, as the ballast stockpile was full, and there was no place for it to put the new deliveries of ballast.  KCSR stopped delivering ballast on December 20, 2008, for approximately two weeks to give BBRI a chance to catch up.

In an effort to get the Project back on schedule, KCSR revised its rail delivery schedule and considered supplementing BBRI's work by bringing in a second crew to build track conventionally (without the NTC machine) from the north end of the Project.  Because of the delays that BBRI had experienced, Altez thought this was a good idea and recommended to BBRI on December 19, 2008, that it subcontract this work at a competitive rate to build from the north so BBRI could finish the Project on time while continuing to work from the south end of the Project.  This never happened.

Whitfield, BBRI's planning and technical support manager in Jacksonville, Florida, instead modified the Project schedule to shorten the time that BBRI had to complete each task and changed the sequence of certain work to be done concurrently.  Whitfield's proposed revised Project schedule was more aggressive than the original schedule and had no float for critical path[17] work to be performed by BBRI.  Whitfield acknowledged that in the five years before this Project, he had not prepared a schedule with as little float as the revised schedule for this Project.  Whitfield's revised proposed schedule was unrealistic in many respects in that it did not account for the way in which BBRI was building track, and a number of these flaws in the proposed schedule were exposed during KCSR's cross-examination of Whitfield during the trial.

Adjustments to BBRI's plans and schedule continued in January 2009. On January 11, 2009, BBRI, knowing that it was behind schedule, notified KCSR by e-mail that it was adjusting its schedule and bringing a new superintendent to the job to improve its performance. At the same time, BBRI requested that KCSR stop the railroad tie deliveries so it could make the adjustments to its performance.  In January 2009, KCSR resumed ballast deliveries after BBRI started to make progress with the track construction, and straightened out its schedule and processes.  Even though it was just now adding resources in January 2009, BBRI had already determined that its production costs in November and December were more than it had anticipated.

By February 2009, the Project was still behind schedule, and both parties blamed each other for delays.  On February 11, 2009, KCSR notified BBRI that it was behind schedule and was in danger of not meeting the contractual completion date.  In that notice, KCSR requested that BBRI engage additional staff and equipment at no charge to KCSR to get the work back on schedule. On

---

[17] "Critical path" is the longest schedule path from start to finish in a construction schedule.  Tr.  491:20-23.

February 11, 2009, and again on February 12, 2009, BBRI confirmed that it had recently added additional resources for ballast operations, that it was behind on de-stressing operations, and that it would provide additional people and equipment to complete that work on time. Around the same time, BBRI began to demand increasing deliveries of ballast and attributed the delays in its work to KCSR's failure to deliver sufficient amounts of ballast to the site.

BBRI arrived in El Campo, Texas, on February 20, 2009, a day earlier than planned, but it was not prepared to proceed with the skeleton track construction through El Campo because it had not pre-plated[18] the wood ties that were to be used through El Campo with the NTC machine, which is designed to use either concrete ties or pre-plated wood ties. The SOW required KCSR to provide ties but it did not require KCSR to provide pre-plated ties or labor to pre-plate the ties supplied.[19] *See* Jt. Ex. 4.018-19. BBRI knew that the SOW required it to construct the track through El Campo with wood ties and planned to use the NTC machine through El Campo. For this reason and because the Contract did not require KCSR to supply pre-plated ties for El Campo or any other areas, BBRI was responsible for pre-plating the ties for use through El Campo. In December 2008, Altez solicited bids for a subcontractor to pre-plate the wood ties to determine if it was more cost efficient to subcontract the work. In February 2009, BBRI submitted a change order request to KCSR seeking approximately

---

[18] Plaintiff contended during the trial that it intended to use "preplated" wood ties to build certain portions of the mainline track, that is, wood ties that had "fastenings already included" like concrete ties so the NTC machine could be used in laying track. Tr. 108-09.

[19] For reasons herein explained, the court gives little or no weight to Garcia's and Castle's trial testimony that BBRI expected KCSR to supply pre-plated ties for use through El Campo based on their experience on other projects with other companies that had provided pre-plated wood ties. The court also notes that Peek testified that KCSR has never supplied pre-plated wood ties to a contractor for any of its projects in the past.

$231,000 for timber tie pre-plating for El Campo.  The change order was denied by KCSR because the cost was part of BBRI's lump-sum bid and Contract price.  Although BBRI knew that the El Campo section would require pre-plated ties, it never performed the pre-plating or obtained a subcontractor to do it before reaching El Campo.  In retrospect, Altez was unable to recall why the ties did not get pre-plated before BBRI arrived at El Campo and believed that BBRI simply never got around to getting the ties pre-plated.  Because the NTC machine required pre-plated wood ties, BBRI was unable to continue its work with the NTC machine when it arrived at El Campo.  Garcia testified at trial that if KCSR had not required it to move the NTC machine to the North on February 20, 2009, after it arrived at El Campo, BBRI could have proceeded though El Campo using the NTC Machine without pre-plated wood ties as it had done at FM 444.  According to Garcia, the process of using wood ties that were not pre-plated could be done as follows using the NTC machine:

> [T]he machine would thread the rails on top of the ties, and then there is a man in the middle of the machine under there putting the insulators on top of the plates. At that same time when this machine was threading the rail, my intention was to set spikes on top of the ties just enough to keep it engaged
> for the machine to go through and come back and spike it with mechanized equipment spike the rest of the rail.

Tr. 207.  Garcia and Kendrick both reluctantly acknowledged, though, that Harsco and KCSR had concluded that this manner of using the NTC machine was unsafe and not recommended.  For this reason, KCSR did not allow BBRI to use the NTC Machine and wood ties that had not been pre-plated through El Campo and instead requested BBRI to move the NTC Machine to the North of the Project to avoid delay and having the NTC machine sit idle while BBRI constructed the track through El Campo conventionally. BBRI was opposed to the move even though it had previously considered adding a second crew in the North to make up lost time and finish the Project work by May 1, 2009. BBRI requested and KCSR agreed to compensate BBRI to make the move to the North, which

**Memorandum Opinion and Order - Page 23**

according to Garcia, took five days.  According to Garcia, KCSR also agreed to an change order for

BBRI to move certain equipment again to El Campo when it reached the Colorado River bridge.

As of February 13, 2009, BBRI had adjusted only one rail less than one thousand feet and was

struggling to achieve ¼ mile of de-stressing per day.  KCSR, therefore, requested that BBRI provide

a remedial action plan explaining how it intended to get back on schedule.  On February 21, 2009,

Garcia notified KCSR that he would be personally overseeing the de-stressing operation to ensure that

it was done in a proper and efficient manner.  Garcia had been on the Project since the beginning.

Initially, he spent only one to two days per week on the jobsite helping BBRI's crews unload

equipment and material.  In late December 2008, Snailham told Garcia he was needed on the Project

on a full-time basis.  Altez believed that Garcia's full-time presence on the Project was needed to

facilitate communication with Peek.  Garcia also helped in organizing BBRI's work on the Project,

which according to Garcia, was "pretty unorganized" in the beginning and fraught with issues due to

the BBRI's steep learning curve in overseeing such a large project.  Tr. 186.

BBRI was never able to recover fully from the numerous issues it experienced early on during

the Project.  In May 2009, after BBRI failed to complete the Project within the time specified under

the Contract, KCSR hired contractors Kanza and Holland to perform tamping, regulating, and de-

stressing to supplement and assist BBRI in completing its scope of work.  Specifically, KCSR hired

Kanza to perform tamping work at a cost of $234,703.31 and Holland to perform welding services

at a cost of $73,185.  KCSR seeks to recover these costs,$2,353,299.40 for ballast wasted by BBRI,

and its attorney's fees and costs.

On June 30, 2009, BBRI submitted a change order to KCSR, requesting $3,938,513 in

additional compensation for delays in its work under the Contract.  BBRI contends that it incurred

**Memorandum Opinion and Order - Page 24**

a twenty-eight-day delay in completing its work because it ran out of ballast several times.  BBRI contends that KCSR breached the Contract in failing to provide sufficient ballast deliveries, which was critical to the Project schedule.  In addition to its Prolongation Delay Claim for $3,938,513, BBRI submitted fifty-one change order requests to KCSR, thirty-four of which KCSR paid.  BBRI seeks $432,549 for the remaining unresolved Change Orders 4 and 36 through 50.  BBRI contends that it is entitled to interest on these unpaid sums under the TPPA in the amount of $2,989,391.59.  BBRI also seeks to recover $1,193,113.97 for attorney's fees, consultant fees, and expenses.  Overall, BBRI seeks a total of $8,553,567.73, which amount is in addition to the $12,206,666 lump-sum amount agreed to by the parties and already paid by KCSR.  It is also in addition to the approximate $200,000 paid to BBRI for change orders that were agreed upon by the parties and not the subject of this lawsuit.  *See* Jt. Ex. 345.

## III.   Conclusions of Law

As previously noted, the following claims were tried to the court: (1) BBRI's contractual Prolongation Delay Claim and its Change Orders 4 and 36 through 50 based on contract and quantum meruit theories of recovery; (2) BBRI's claim under the TPPA; (3) KCSR's contractual counterclaim to recover wasted ballast; and (4) KCSR's contractual counterclaim to recover the cost of retaining additional contractors Kanza and Holland to perform tamping, regulating, and de-stressing to supplement and assist BBRI in completing its scope of work.  The parties agree that Texas law governs their claims and defenses.

A.        **Breach of Contract**

1.        **Breach of Contract and Damages**

The elements of a breach of contract claim under Texas law are: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (citation omitted).   "A breach of contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform." *Case Corp. v. Hi-Class Bus. Sys.*, 184 S.W.3d 760, 669-70 (Tex. App.—Dallas 2005, pet. denied). A breach of contract also occurs when one party to a contract prevents another party to the contract from performing its side of the bargain.  *See Texas Nat'l Bank v. Sandia Mortg. Corp.*, 872 F.2d 692, 699 (5th Cir. 1989).  The court determines as a matter of law what the contract requires of the parties.  *See Meek v. Bishop Peterson & Sharp, P.C.*, 919 S.W.2d 805, 808 (Tex. App.—Houston [14th Dist.] 1996, writ denied).  When the terms of a contract are clear and unambiguous, and the facts concerning breach or performance are undisputed or conclusively established, the issue of whether the facts show performance or breach is also decided as a matter of law.  *Id.*  Generally, a party to a contract who is in default is precluded from bringing an action for breach of the contract.  *Dobbins v. Redden*, 785 S.W.2d 377, 378 (Tex. 1990) ("[A] party to a contract who is [itself] in default cannot maintain a suit for its breach."); *Baker Marine Corp. v. Weatherby Eng'r Co.*, 710 S.W.2d 690, 696 (Tex. App.—Corpus Christi 1986, no writ) ("Baker, the breaching party, cannot take advantage of provisions favorable to it contained in the very contract which it was found to have breached.").

Under Texas law, "[t]he normal measure of damages in a breach of contract case is the benefit-of-the-bargain measure." *Mays v. Pierce*, 203 S.W.3d 564, 577 (Tex. App.—Houston [14th

Dist.] 2006, pet. denied). Under this standard for measuring damages, "[a] nonbreaching party is generally entitled to all actual damages necessary to put it in the same economic position in which it would have been had the contract not been breached." *CQ, Inc. v. TXU Mining Co., L.P.*, 565 F.3d 268, 278 (5th Cir. 2009) (citation and internal quotation marks omitted); *Parkway Dental Assocs., P.A. v. Ho & Huang Props., L.P.*, 391 S.W.3d 596, 607 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ("The goal in measuring damages for a breach-of-contract claim is to provide just compensation for any loss or damage actually sustained as a result of the breach."); *Tacon Mech. Contractors, Inc. v. Grant Sheet Metal, Inc*., 889 S.W.2d 666, 670 (Tex. App.—Houston [14th Dist.] 1994), writ denied).

The benefit-of-the-bargain measure of damages "is not based upon the facts as they actually occurred but instead is focused on what the injured party's economic position would have been if the contract had been fully performed." *Id.* at 608. Benefit-of-the-bargain damages are calculated by subtracting the value received by the non-breaching party from the value the party expected to receive when the contract was made. *See Arthur Andersen & Co. v. Perry Equip. Corp*., 945 S.W.2d 812, 817 (Tex. 1997) ("[B]enefit-of-the-bargain damages measure the difference between the value as represented and the value received."); *DaimlerChrysler Motors Co. v. Manuel*, 362 S.W.3d 160, 180 (Tex. App.—Fort Worth 2012, no pet.) ("[T]he benefit of the bargain measure . . . utilizes an expectancy theory and evaluates the difference between the value as represented and the value received.") (internal quotation marks and citation omitted)).

The party seeking to recover for remedial damages or the cost of completion in a breach of contract case generally has the burden to prove that the damages sought are reasonable and necessary. *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 200-01 (Tex. 2004) (per curiam).

Evidence of the amounts charged and paid, standing alone, is generally insufficient to show that the charges are reasonable and necessary. *Id.* at 200-01.

When there is substantial conflict in the evidence as to the exact cost of repairs and whether items are "extras" or included in the contractual scope of work, such inconsistencies and conflict do not preclude recovery. *Vance v. My Apartment Steak House of San Antonio, Inc.*, 677 S.W.2d 480, 484 (Tex. 1984). When "an injured party has produced the best evidence available, and if it is sufficient to afford a reasonable basis for determining [its] loss, [it] is not to be denied a recovery because the exact amount of the damage is incapable of ascertainment." *Id.* The issue should instead be decided by the fact finder. *Id.*

### 2.    Recovery for Substantial Performance Under a Contract

In building or construction contracts, the strict rule that one who has not fully or strictly complied with a contract cannot maintain a suit for its breach is relaxed by the doctrine of substantial performance, which allows the breaching party to go forward with a contract action even though it has breached nonmaterial terms of the contract but has otherwise substantially performed under the contract. *Dobbins*, 785 S.W.2d at 378; *Vance*, 677 S.W.2d at 481. Thus, the doctrine of substantial performance allows a party to a contract who breaches but nevertheless substantially completes performance to sue on the parties' contract and recover damages for that performance under the contract. *Dobbins*, 785 S.W.2d at 378. The doctrine of substantial performance can also be asserted as an affirmative defense to a breach of contract claim. *See Smith v. Smith*, 112 S.W.3d 275, 279 (Tex. App.—Corpus Christi 2003, pet. denied). Substantial performance is a condition precedent to bringing a lawsuit on a contract. *Atkinson v. Jackson Bros.*, 270 S.W. 848, 850 (Tex. Comm'n App. 1925). The contractor seeking to recover under the doctrine of substantial performance has the

burden to plead and prove substantial performance. *Carr v. Norstok Bldg. Sys., Inc.*, 767 S.W.2d 936, 940 (Tex. App.— Beaumont 1989, no writ).

> Substantial performance" means:
>
> [T]he contractor must have in good faith intended to comply with the contract, and shall have substantially done so in the sense that the defects are not pervasive, do not constitute a deviation from the general plan contemplated for the work, and are not so essential that the object of the parties in making the contract and its purpose cannot, without difficulty, be accomplished by remedying them.

*Turner, Collie & Braden, Inc. v. Brookhollow, Inc.*, 642 S.W.2d 160, 164 (Tex. 1982) (quoting *Atkinson v. Jackson Bros.*, 270 S.W. at 850). "[T]he doctrine assumes, if there is substantial performance, the breach is immaterial." *Gentry v. Squires Const., Inc.*, 188 S.W.3d 396, 403, n.3 (Tex. App.—Dallas 2006, no pet.). Accordingly, "[i]f a party has committed a material breach of a contract, [its] performance cannot be substantial." *Patel v. Ambassador Drycleaning & Laundry Co.*, 86 S.W.3d 304, 309 (Tex. App.—Eastland 2002, no pet.) (citing *Measday v. Kwik–Kopy Corp.*, 713 F.2d 118 (5th Cir. 1983) ("The principle of substantial performance may be expressed by saying: . . . that a breach which is material, or which goes to the root of the matter or essence of the contract, is fatal to the plaintiff's case in spite of [its] part performance.")) (citation omitted).

Generally, there are two measures of damages for the breach of a construction contract: remedial damages and difference-in-value damages. *Id.* Under the doctrine of substantial performance, a contractor may recover the full contract price less the cost of remedying the defects that are remediable without impairing the building or thing constructed as a whole. *Vance*, 677 S.W.2d at 482-83. If the owner counterclaims alleging the contractor breached the construction contract, the owner's measure of damages is generally the cost of completing the job or remedying the defects that are remediable. *Weitzul Constr., Inc. v. Outdoor Environs*, 849 S.W.2d 359, 363 (Tex.

**Memorandum Opinion and Order - Page 29**

App.—Dallas 1993, writ denied).  If the owner has paid only part of the contract price to the contractor, the owner's damages are credited against the balance of the amount owed on the contract. *Id.*  When a contractor fails to substantially comply with the terms of a contract, the difference-in-value measure will generally apply.  *Turner, Collie & Braden, Inc.*, 642 S.W.2d at 164. The difference-in-value measure allows an owner to recover the difference between the value of the building or thing as constructed and its value had it been constructed according to the contract.  *Id.*

While the remedial and difference-in-value measures of damages generally apply in construction contract cases, the Texas Supreme Court in *Vance* explained that the proper measure of damages must be determined by the facts of each individual case.  *Vance*, 677 S.W.2d at 482 n.1 ("There are numerous factual settings that may arise in the context of a building construction contract dispute, and we do not imply that the rules set forth herein will apply to all building contract cases. The proper measure of damages as well as any allowance for offsets must be determined by the facts of the case.") (citing Guittard, Building Contracts: Damages and Restitution, 32 Tex. B.J. 91 (1969)); *see also Carr*, 767 S.W.2d at 940 (applying benefit-of-bargain measure of damages in contract construction case); *Classic Superoof LLC v. Bean*, No. 05-12-00941-CV, 2014 WL 5141660, at *7 (Tex. App.— Dallas Oct. 14, 2014, pet.  denied) (same); *Westminster Falcon/Trinity L.L.P. v. Shin*, No. 07-11-0033-CV, 2012 WL 5231851, at *2 n.3 (Tex. App.—Amarillo Oct. 23, 2012, no pet.) (mem. op.) (awarding benefit-of-bargain measure of damages after concluding that remedial and difference-in-value damage theories did not apply based on facts of construction case).

BBRI contends for the first time in its posttrial brief that, even if it did not fully perform under the Contract, it substantially performed.  Prior to trial and in the Joint Pretrial Order, BBRI maintained only that it fully complied with the Contract or was excused by KCSR's material prior

breach of the Contract.  Under Rule 15(b), [w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings" and "failure so to amend [the pleadings] does not affect the result of the trial of these issues." Fed. R. Civ. P. 15(b).  The purpose of this rule "is to allow the course of the trial, rather than the formal pleadings, to control the outcome." *Flannery v. Carroll*, 676 F.2d 126, 131 (5th Cir. 1982).  "[I]t is not often," however, "that amendments are allowed after the close of evidence, since the opposing party may be deprived of a fair opportunity to defend and to offer any additional evidence." *Triad Elec. & Controls, Inc. v. Power Sys. Eng'r, Inc.*, 117 F.3d 180, 193-94 (5th Cir. 1997).  As a result, "trial of unpled issues by implied consent is not lightly to be inferred under Rule 15(b), [and] such inferences are to be viewed on a case-by-case basis and in light of the notice demands of procedural due process." *Id.* at 193-94.

Whether an issue has been tried by consent turns on: "whether the parties recognized that the unpleaded issue entered the case at trial, whether the evidence that supports the unpleaded issue was introduced at trial without objection, and whether a finding of trial by consent prejudiced the opposing party's opportunity to respond." *Portis v. First Nat'l Bank of New Albany*, 34 F.3d 325, 332 (5th Cir. 1994).  A party does not consent to try "a new issue by introducing evidence or failing to object to evidence when the evidence is relevant to pleaded issues in the case." *Moody v. FMC Corp.*, 995 F.2d 63, 66 (5th Cir. 1993).  Courts have "broad discretion in determining whether or not a pretrial order should be modified or amended." *United States v. Texas*, 680 F.2d 356, 370 (5th Cir.1982).

Federal Rule of Civil Procedure 16(e) permits a court to modify a pretrial order in order to prevent "manifest injustice."  "It has been suggested that proper treatment of the pretrial order after entry requires an appropriate balance between firmness to preserve the essential integrity of the order,

and adaptability to meet changed or newly discovered conditions or to respond to the special demands

of justice." *Central Distribs., Inc. v. M.E.T., Inc.*, 403 F.2d 943, 944 (5th Cir. 1968). The Fifth

Circuit has allowed amendments when "no surprise or prejudice to the opposing party results." *Quick*

*Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 346 (5th Cir. 2002).

Here, BBRI did not request to amend its pleadings or the Joint Pretrial Order, and the court

concludes that prejudice will occur if it allows BBRI to amend the Joint Pretrial Order after the trial

of this case. BBRI acknowledged at trial that it did not complete its work by the contractual deadlines

in the SOW, and there was conflicting evidence as to whether BBRI's work substantially complied

with these deadlines. This evidence, however, is relevant to the pleaded issues of whether time was

of the essence in completing the work and KCSR's breach of contract claim because the SOW

required a substantial portion of BBRI's mainline track work (track construction, ballasting, tamping,

and rail adjustment) to be completed by May 1, 2009, whereas completion of all work, including final

dressing and clean up of the Project site was to be done by May 15, 2009. The evidence is also

relevant to BBRI's affirmative defenses of whether any breach under the Contract by it, including the

contractual requirement that time was of the essence, was excused or waived. Accordingly, the court

concludes that the issue was not tried by consent, and the failure to plead substantial performance or

include it in the Pretrial Order resulted in waiver of the issue. Even assuming that the issue was tried

by consent and not waived, BBRI would not be able to prevail under the equitable theory of

substantial performance because, as herein explained, the court concludes that it materially breached

the Contract first. *See Patel*, 86 S.W.3d at 309 ("If a party has committed a material breach of a

contract, [its] performance cannot be substantial.").

### 3.  Contract Interpretation

"The interpretation of a contract—including whether the contract is ambiguous—is a question of law." *McLane Foodservice, Inc. v. Table Rock Rests., L.L.C.*, 736 F.3d 375, 377 (5th Cir. 2013); *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). A court's primary concern in interpreting a contract under Texas law is to ascertain the parties' intent. *National Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). Texas courts avoid unreasonable constructions and "construe contracts from a utilitarian standpoint, bearing in mind the particular business activity." *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005). "The language in an agreement is to be given its plain grammatical meaning unless to do so would defeat the parties' intent." *DeWitt Cty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 101 (Tex. 1999). If a contract "is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." *Coker*, 650 S.W.2d at 393. If, on the other hand, the contract language is "susceptible to two or more reasonable interpretations," an ambiguity exists. *Enterprise Leasing Co. v. Barrios*, 156 S.W.3d 547, 549 (Tex. 2004). Disagreement by the parties, however, over the meaning of an unambiguous contract does not turn an otherwise unambiguous contract into one that is ambiguous. *McLane Foodservice, Inc.*, 736 F.3d at 378 ("Ambiguity does not arise because of a 'simple lack of clarity,' or because the parties proffer different interpretations of the contract.").

In *National Union Fire Insurance Company v. CBI Industries, Incorporated*, the Texas Supreme Court explained that an ambiguity in a contract may be "patent" or "latent": "A patent ambiguity is evident on the face of the contract. A latent ambiguity arises when a contract which is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears

by reason of some collateral matter." 907 S.W.2d at 520 (internal quotation marks, footnotes, and citations omitted). Parol evidence is admissible to ascertain the true intention of the parties as expressed in their contract when a latent ambiguity arises. *Id.*

"Courts interpreting unambiguous contracts are confined to the four corners of the document, and cannot look to extrinsic evidence to create an ambiguity." *Texas v. American Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006) (applying Texas law). "When a contract contains an ambiguity . . . interpretation of the instrument becomes a fact issue." *See Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1980). The court may only consider parol evidence to determine the parties' intent when an ambiguity exists. *National Union Fire Ins.*, 907 S.W.2d at 520. Parol evidence, however, "is inadmissible to contradict, vary, or add to the terms of an unambiguous written agreement." *Hall v. Hubco, Inc.*, 292 S.W.3d 22 (Tex. App.—Houston [14 Dist.] 2006, pet. denied). Thus, "parol evidence cannot be used to prove another promise not contained in the contract" if such evidence is offered to contradict, vary, or add to the terms of an otherwise unambiguous contract. *Id.*

During the trial of this case, both parties resorted to parol evidence, and both parties objected to the other's use of parol evidence, to the extent it was being offered to contradict or vary the terms of their contract. At one point, Plaintiff asserted that it was not taking the position that the Contract is ambiguous. It nevertheless relied heavily on parol evidence at trial to support its various claims for relief, and it contended in posttrial briefing that the Contract was ambiguous. Defendant contends that Plaintiff did not plead ambiguity. Typically, a party seeking to establish ambiguity under a written contract must specifically plead such ambiguity. *Crozier v. Home Children Maint. & Educ. Trust*, 597 S.W.2d 418, 421 (Tex. App.—San Antonio 1980, writ ref'd n.r.e.). Neither party specifically pleaded ambiguity; nor was the issue included in the Joint Pretrial Order. The Texas

Supreme Court, however, has held that a court may conclude that a contract is ambiguous even in the absence of such a pleading by either party. *Sage St. Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 445 (Tex. 1993).

### 4.    Conditions Precedent

"A condition precedent is an act or event that must take place before performance of a contractual obligation is due." *Cedyco Corp. v. PetroQuest Energy, LLC*, 497 F.3d 485, 488 (5th Cir. 2007); *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992). The "party seeking to recover under a contract bears the burden of proving that all conditions precedent have been satisfied." *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 283 (Tex. 1998). "[T]o determine whether a condition precedent exists, the intention of the parties must be ascertained; and that can be done only by looking at the entire contract." *Solar Applications Eng'r, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 109 (Tex. 2010); *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990). Generally, terms such as "if," "provided that," "on condition that," or similar language must be used in the contract to support finding a condition precedent. *Id.* "When no conditional language is used and another reasonable interpretation of the contract is possible, the terms will be construed as a covenant in order to prevent a forfeiture." *Solar Applications Eng'r, Inc.*, 327 S.W.3d at 109 (citation and internal quotation marks omitted); *Criswell*, 792 S.W.2d at 948. Likewise, "[w]hen the intent of the parties is doubtful or when a condition would impose an absurd or impossible result, the agreement will be interpreted as creating a covenant rather than a condition [precedent]." *Id.* Because of their harshness in operation, conditions precedent are generally not read into contracts. *Id.*

### 5.     Covenants

"A covenant, as distinguished from a condition precedent, is an agreement to act or refrain from acting in a certain way." *Solar Applications Eng'r, Inc.*, 327 S.W.3d at 108.  In every contract, "there exists an implied promise that a party will not do anything to prevent or delay the other party from performing the contract." *Texas Nat'l Bank*, 872 F.2d 692 at 698.  Texas law does not favor implied covenants but recognizes this principle of contract law and implies a duty to cooperate in every contract only when "cooperation is necessary for performance of a contract." *Bank One, Texas, N.A. v. Stewart*, 967 S.W.2d 419, 434 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (declining to imply a duty of cooperation in a bailment agreement).  Texas courts look beyond a written agreement to imply a covenant "only if necessary to effectuate the intention of the parties as disclosed by the contract as a whole, but not to make the contract fair, wise, or just. *Id.*  "An implied covenant is necessary to effectuate the parties' intentions only if the obligation is 'so clearly within the contemplation of the parties that they deemed it unnecessary to express it.'" *Id.* (citing *Danciger Oil & Ref. Co. v. Powell*, 154 S.W.2d 632, 635 (Tex. 1941)).

### 6.     Contract Modification and Reformation

The Contract states that it "may not be amended or modified except in writing signed by an authorized representative of each party." Jt. Ex. 84.016.  Texas law recognizes that "a written agreement not required by law to be in writing may be modified by a later oral agreement, even though it provides that it can be modified only in writing." *Double Diamond, Inc. v. Hilco Elec. Co-op., Inc.*, 127 S.W.3d 260, 267 (Tex. App.—Waco 2003, no pet.) (citing *Mar-Lan Indus., Inc. v. Nelson*, 635 S.W.2d 853, 855 (Tex. App.—El Paso 1982, no writ)).  "When [the] evidence consists of the conduct of the parties and their course of dealing with one another, then mutual agreement may

be inferred from the circumstances, in which event the contract is said to be 'implied' as opposed to being an 'express' contract. *Id.* (citing *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex. 1972)).

Texas law also recognizes and favors the equitable remedy of contract reformation when necessary to make an agreement accurately reflect the intention of the parties. *Midland West Corp. v. FDIC*, 911 F.2d 1141, 1145 (5th Cir. 1990). Contract reformation does not change the terms of the agreement; rather, it merely reforms the writing to reflect the "real intention or agreement of the parties." *Automobile Ins. Co. of Hartford v. United Elec. Serv. Co.*, 275 S.W.2d 833, 840 (Tex. Civ. App.—Fort Worth 1955, writ ref'd n.r.e.). The equitable reformation of a written contract is generally based upon "the premise that a contract was actually made, but the written memorandum thereof, because of a mutual mistake, does not truly reflect the actual agreement of the parties." *Huttleston v. Beacon Nat'l Ins. Co.*, 822 S.W.2d 744, 746 (Tex. App.—Fort Worth 1992, writ denied). Reformation is an appropriate proper remedy "when the parties have reached a definitive and explicit agreement, understood in the same sense by both, but, by their mutual or common mistake, the written contract fails to express the agreement." *Id.* (citing *Champlin Oil & Refining Co. v. Chastain*, 403 S.W.2d 376, 377 (Tex. 1965)). The party seeking reformation has the burden of proving both an antecedent agreement that reflects the parties' true agreement, and a mistake in reducing the agreement to writing. *Huttleston*, 822 S.W.2d at 746. The mistake must either be mutual in nature or consist of a mistake by the party seeking reformation accompanied by fraud or inequitable conduct of the other party. *Automobile Ins. Co. of Hartford*, 275 S.W.2d at 839.

Parol evidence may be used to prove a mutual mistake, even if the written agreement is unambiguous. *Brinker v. Wobaco Ltd. Trust*, 610 S.W.2d 160, 164 (Tex. App.—Texarkana 1980,

writ ref'd). Knowledge by one party of the other's mistake regarding an expression of the contract is sufficient to show mutual mistake. *Automobile Ins. Co. of Hartford*, 275 S.W.2d at 840. The mistake can be one of fact or law. *Brinker*, 610 S.W.2d at 164. "Any mistake of the scrivener which could defeat the true intention may be corrected in equity by reformation, whether the mistake is one of fact or law." *Id.* (citing *McClung v. Lawrence*, 430 S.W.2d 179 (Tex. 1968)). That "the written instrument is couched in unambiguous language, or that the parties knew what words were used and were aware of their ordinary meaning, or that they were negligent in failing to discover the mistake before signing the instrument, will not preclude relief by reformation." *Brinker*, 610 S.W.2d at 164 (citing *San Antonio Nat'l Bank v. McLane*, 70 S.W. 201 (1902)). Once agreement and mistake are established, a court of "equity may reform the written instrument so as to conform thereto but cannot create and bring into being an agreement not made by the parties." *Huttleston*, 822 S.W.2d at 746.

### B.    Quantum Meruit

Quantum meruit is an equitable theory of recovery based on an implied agreement "to pay for beneficial services rendered and knowingly accepted." *Vortt Explor. Co., Inc. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990). Recovery on an express contract and on quantum meruit are inconsistent. *See Woodard v. Southwest States, Inc.*, 384 S.W.2d 674, 675 (Tex. 1964). When there exists a valid express contract covering the subject matter, there can be no implied contract. *Id.*; *Mitsubishi Aircraft Int'l, Inc. v. Maurer*, 675 S.W.2d 286, 288 (Tex. App.—Dallas 1984, no writ). If the work for which recovery is sought is covered by and falls within the scope of an express contract, the party seeking to recover damages must look to the contract for compensation unless an

exception to this general rule applies.[20]   *Black Lake Pipe Line Co. v. Union Constr. Co., Inc.*, 538 S.W.2d 80, 86 (Tex. 1976) (citations omitted), *overruled on other grounds by Sterner v. Marathon Oil Co.*, 767 S.W.2d 686 (Tex. 1989).   The existence of an express contract, however, does not preclude recovery in quantum meruit for the reasonable value of services rendered and materials supplied that are not covered by the contract.  *Id.*  The Texas Supreme Court in *Black Lake Pipe Line Company* established the following test to determine whether work in the form of services performed or materials supplied is covered by an express contract or constitutes "extra work" that falls outside of the scope of an express contract:  "(1) whether the work was extra and (2) whether the contract[] made provision for the type of extra work performed."  *Id.*

The Contract between BBRI and KCSR does not expressly define "extra work" but contains a provision and procedure for "Change Orders" applicable to claims for adjustment in the Contract price as a result of additions, deletions, or revisions in the Contract Work requested by KCSR.  Jt. Ex. 84.006.   The parties dispute, however, whether the procedure for Change Orders in the Master Agreement applies to BBRI's change order claims.  As herein explained, the court concludes that it applies to additions, deletions, and changes to BBRI's work requested by KCSR.  "Extra work" in construction cases has been defined by some Texas courts as "work arising outside and independent

---

[20] "[R]ecovery in quantum meruit is permitted despite the existence of an express contract that covers the subject matter of the claim" when "a plaintiff has partially performed an express contract but, because of the *defendant's* breach, the plaintiff is prevented from completing the contract."  *See Truly v. Austin*, 744 S.W.2d 934, 936-37 (Tex. 1988).  Recovery in quantum meruit is also permitted when the contract is invalid or abandoned. *W & W Oil Co. v. Capps*, 784 S.W.2d 536, 537 (Tex. App.—Tyler 1990, no pet.).  Neither of these exceptions applies in this case because, as herein explained, BBRI was not prevented from completing the Contract by the contractual deadlines as a result of any alleged breach by KCSR, and its change order claims are not based on partial performance or inability to perform work under the Contract because of any breach by KCSR.  BBRI instead contends that it experienced delays to its work under the Contract.  The Contract, however, covers delays to BBRI's work and the manner in which the parties agreed that BBRI would be compensated for delays caused by KCSR.  Further, BBRI does not contend, and there is no evidence, that the Contract is invalid.  The evidence also does not support a finding that either party abandoned the Contract.  At all times during the Project and periods in dispute, KCSR (and BBRI) treated the Contract as continuing and continued to demand performance in accordance with its terms even after BBRI materially breached.

of the contract, something not required in its performance." *See, e.g., Brown–McKee, Inc. v. Western Beef, Inc.*, 538 S.W.2d 840, 844 (Tex. Civ. App.—Amarillo 1976, writ ref'd n.r.e.); *City of Houston v. L. J. Fuller, Inc.*, 311 S.W.2d 285, 290 (Tex. Civ. App.—Houston 1958, no writ). "Additional work," on the other hand, is work that is necessary or "required in the performance of the contract and without which it could not be carried out." *Id.* Ultimately, the determination of whether work performed or materials supplied fall within the scope of an express contract is determined by application of basic rules of contract construction to determine the parties' intentions as expressed in the contract. *Id.* at 289.

A claimant is only entitled to recover under a theory of quantum meruit "when non payment for the services rendered would result in an unjust enrichment to the party benefited by the work." *Id*. (citations and internal quotation marks omitted). The party seeking to recover under quantum meruit must prove:

> 1) valuable services were rendered or materials furnished;
>
> 2) for the person sought to be charged;
>
> 3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him;
>
> 4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged.

*Id.* To satisfy this last requirement, the claimant must show that, *before* it provided services or furnished materials, it notified the person or entity sought to be charged that it anticipated payment for such services or materials or the person or entity sought to be charged had notice *beforehand* that the claimant anticipated payment for the services or materials being provided. *See Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 & n.4 (Tex. 1992) (noting that there was no

**Memorandum Opinion and Order - Page 40**

evidence "that the City had notice that Heldenfels anticipated payment from the City before Heldenfels delivered the T-beams" and rejecting the dissent's reasoning that this requirement was satisfied by evidence "that Heldenfels relied on the City for payment" because: "The issue is whether Heldenfels notified the City prior to the delivery of the T-beams that it anticipated payment from the City," not whether Heldenfels relied on the City for payment).

The proper measure of damages for quantum meruit is "the reasonable value of the work performed and materials furnished." *City of Houston v. Swinerton Builders, Inc.*, 233 S.W.3d 4, 10 n.7 (Tex. App.—Houston [1st Dist.] 2007, no pet.).   The party seeking to recover under quantum meruit has the burden of establishing the reasonable value of work performed and the materials furnished. *ITS Grp., Inc. v. Woodcrest Capital, L.L.C.*, 222 S.W.3d 918, 920-21 (Tex. App.—Dallas 2007, no pet.); *M.J. Sheridan & Son Co., Inc. v. Seminole Pipeline Co.*, 731 S.W.2d 620, 624-25 (Tex. App.—Houston [1st Dist.] 1987, no writ) (concluding that contractor hired to construct pipeline on right-of-way to be provided by pipeline company was not entitled to recover on quantum meruit theory for damages allegedly caused by pipeline company's failure to timely acquire right-of-way because there was no evidence of reasonable value of work performed on the "move arounds" as a result of contractor moving crews around and doing other work while waiting on pipeline company to obtain right-of-way).

## C.   Texas Prompt Payment Act

The TPPA provides:

> If an owner or a person authorized to act on behalf of the owner receives a written payment request from a contractor for an amount that is allowed to the contractor under the contract for properly performed work or suitably stored or specially fabricated materials, the owner shall pay the amount to the contractor, less any amount withheld as authorized by statute, not later than the 35th day after the date the owner receives the request.

**Memorandum Opinion and Order - Page 41**

Tex. Prop. Code Ann. § 28.002(a) (West 2000).  Thus, the TPPA only applies to amounts owed and allowed to a contractor under the parties' contract.  *See id.*  An unpaid amount under this statute "begins to accrue interest on the day after the date on which the payment becomes due."  *Id.* § 28.004(a). "An unpaid amount bears interest at the rate of 1 ½ percent each month," and "[i]nterest on an unpaid amount stops accruing under this section on the earlier of: (1) the date of delivery; (2) the date of mailing, if payment is mailed and delivery occurs within three days; or (3) the date a judgment is entered." *Id.* § 28.004(b)-(c).  In the event of a good faith dispute about the amount owed for a payment requested by a contractor, section 28.003(b) allows the party disputing the payment to withhold from the payment no more than the amount in dispute, but it does not exempt the withheld amount from accruing interest if it is ultimately determined that the amount requested is owed.  *See id.* § 28.003(b); *Patel v. Creation Const., Inc.*, No. 05-11-00759-CV, 2013 WL 1277874, at *3 (Tex. App.—Dallas Feb. 27, 2013, no pet.); *Gordon v. Leasman*, 365 S.W.3d 109, 118 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ("Prejudgment interest [under the Prompt Payment Act] is recoverable as a matter of right when an ascertainable sum of money is found due and payable at a definite date before judgment.").  "A good faith dispute includes a dispute regarding whether the work was performed in a proper manner."  *Id.* § 28.003(b).

### D.    Affirmative Defenses

In its Answer, KCSR asserts that it is entitled to an offset or reduction of damages, and that KCSR's performance was excused or BBRI's damage claims are barred by: (1) BBRI's unclean hands or failure to act in good faith, which bars BBRI's quantum meruit claim and unjust enrichment theory of recovery; (2) BBRI's prior material contract breach; (3) the contract's language precluding recovery of consequential or indirect damages; and (4) BBRI's failure to comply with contractual

conditions precedent.  In addition, KCSR asserts that is entitled to "an offset for extra-contractual material costs that were caused by BBRI's failure to perform the work according to the Contract specifications," and that BBRI's TPPA claim is precluded because a good faith dispute exists as to whether BBRI is entitled to recover the amounts it seeks for its substantive claims.  Def.'s Original Answer ¶ 40.

With respect to KCSR's counterclaims, BBRI similarly asserts that: (1) its performance or any alleged breach by it was excused as a result of KCSR's prior material breach of the contract; (2) KCSR failed to perform all conditions precedent under the contract; and (3) KCSR's counterclaims were waived or are barred by estoppel.  The court has already addressed the law applicable to the good faith dispute defense under the TPPA and the contractual defense of conditions precedent. Texas law regarding the parties' remaining defenses follows.

### 1.    Waiver

"Waiver is the intentional relinquishment of a right actually known, or intentional conduct inconsistent with claiming that right." *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008).  The party asserting waiver must establish: "(1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right." *Id.*  Waiver can be express or implied.  *Motor Vehicle Bd. v. El Paso Indep. Auto. Dealers Ass'n, Inc.*, 1 S.W.3d 108, 111 (Tex. 1999).  Express waiver can be established by evidence of a party's express renunciation of a known right.  *Id.*  "[F]or implied waiver to be found through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances." *Id.*  Waiver is normally a fact issue, but can be decided as a matter of law "when the facts and circumstances are admitted or clearly

established." *Id.* Waiver of the terms of a contract cannot be based on statements that were made or conduct that occurred before the signing of the contract. *Comiskey v. FH Partners, L.L.C.*, 373 S.W.3d 620, 640 (Tex. App.—Houston [14th Dist.] 2012, pet. denied).

### 2.    Estoppel

Only BBRI relies on the affirmative defense of estoppel.  BBRI contends that KCSR's counterclaims are barred by contractual estoppel and quasi-estoppel.  BBRI asserts that contractual estoppel precludes KCSR from recovering on its counterclaims because it cannot deny its obligation under the Contract to provide materials needed to complete the Project and notices required by the Contract. Pl.'s Br. ¶ 162. BBRI's reference to materials appears to pertain to KCSR's duty to supply ballast. BBRI contends that quasi-estoppel "prohibits KCSR from asserting a right inconsistent with a position that it previously took concerning the extra work performed and the providing of excess materials without notice to BBRI of any breach." *Id.* ¶ 163. In addition, BBRI argues that "KCSR affirmed any alleged breach committed by BBRI by its acts or conduct thereby acting in a manner that induced BBRI's conduct creating an estoppel situation."[21] *Id.* ¶ 161.

Under the doctrine of estoppel by contract, a party may be estopped when its conduct induces action in reliance upon it and "would operate as a fraud upon the assured to allow the party to disavow [its] conduct." *Coffey v. Singer Asset Fin. Co., L.L.C.*, 223 S.W.3d 559, 569 (Tex. App.—Dallas 2007, no pet.) The doctrine of estoppel by contract is simply another way of saying that "a party is bound by the terms of [its] contract unless it is void, annulled, or set aside in some way."

---

[21] These and similar assertions by BBRI with respect to its Prolongation Delay Claim and change order claims lead the court to believe that BBRI is relying on waiver and estoppel to support its own claims; however, the defenses of waiver and estoppel were only alleged by Plaintiff in its pleadings and included in the Pretrial Order as defenses to KCSR's claims. Accordingly, the court does not consider BBRI's waiver and estoppel arguments to the extent it contends in its posttrial brief that waiver or estoppel supports its own claims.

*Id.* "Estoppel by contract is a form of 'quasi estoppel' based on the idea that a party to a contract will not be permitted to take a position inconsistent with its provisions, to the prejudice of another." *Johnson v. Structured Asset Servs., LLC*, 148 S.W.3d 711, 721-22 (Tex. App.—Dallas 2004, no pet.).

Unlike equitable estoppel, quasi estoppel does not require evidence of a misrepresentation or detrimental reliance. *Vessels v. Anschutz Corp.,* 823 S.W.2d 762, 765 (Tex. App.—Texarkana 1992, writ denied); *El Paso Nat'l Bank v. Southwest Numismatic Inv. Grp., Ltd.*, 548 S.W.2d 942, 948 (Tex. Civ. App.—El Paso 1977, no writ). This doctrine precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken. Quasi estoppel applies when it would be unconscionable to allow a party to maintain a position that is inconsistent with one to which it previously acquiesced. *Steubner Realty 19 v. Cravens Road 88*, 817 S.W.2d 160, 164 (Tex. App.—Houston [14th Dist.] 1991, no writ). "[Q]uasi-estoppel forbids a party from accepting the benefits of a transaction or statute and then subsequently taking an inconsistent position to avoid corresponding obligations or effects." *Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 240 (Tex. App.—Corpus Christi 1994, writ denied). "The doctrine essentially requires (1) a previous action and (2) a subsequent inconsistent action which is thereby sought to be estopped." *Mulvey v. Mobil Producing Tex. & N.M. Inc.*, 147 S.W.3d 594, 607 (Tex. App.—Corpus Christi 2004, pet. denied).

### 3.      Failure to Mitigate

BBRI and KCSR both allege as an affirmative defense that the other party's contract claims are barred by a failure to mitigate its damages. The mitigation of damages doctrine "prevents a party from recovering for damages resulting from a breach of contract that could be avoided by reasonable efforts on the part of the plaintiff." *Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 426 (Tex. 1995). Texas mitigation law "requires a claimant to mitigate damages if it

can do so with 'trifling expense or with reasonable exertions.'" *Gunn Infiniti v. O'Byrne*, 996 S.W.2d 854, 857 (Tex. 1999) (citing *Great Am. Ins. Co.*, 908 S.W.2d at 426).  The party asserting failure to mitigate has the burden of proving facts establishing lack of mitigation and must prove the amount by which the damages were increased by the failure to mitigate. *Cotten v. Weatherford Bancshares*, 187 S.W.3d 687, 708 (Tex. App.—Fort Worth 2006, pet. denied).

### 4.    Offset or Setoff

Although KCSR alleges offset or setoff as an affirmative defense, it is actually an equitable counterclaim because it does not negate BBRI's claims. *See Bright & Co. v. Holbein Family Mineral Trust*, 995 S.W.2d 742, 747 (Tex. App.—San Antonio 1999, pet. denied) (holding that the defendant's overpayments of royalties in one period did not negate the plaintiff's claim for nonpayment of royalties in another period, and thus amounted to a counterclaim, rather than an affirmative defense of offset).  Offset or "[s]etoff is a form of equitable counterclaim which brings together obligations of parties opposing each other and, by judicial action, makes each obligation extinguish the other. . . . In order for one demand to be set off against another, both demands must mutually exist between the same parties." *Capital Concepts Props. v. Mutual First, Inc.*, 35 F.3d 170, 175 (5th Cir. 1994) (interpreting Texas law); *Nalle v. Harrell*, 12 S.W.2d 550, 551 (1939) (explaining that the aim of an offset or setoff is "to adjust the indebtedness between the parties, and to permit executory process to be enforced only for the balance that may be due") (internal quotation marks omitted).

### 5.    Excuse from Performance Based on Prior Material Breach

"A fundamental principle of [Texas] contract law is that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from any obligation to

perform," and its failure to perform cannot be considered a termination or breach of the contract. *Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994); *Jack v. State*, 694 S.W.2d 391, 398-99 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.).

A party who elects to treat a contract as continuing, however, deprives itself of any excuse for ceasing performance on its own part. *Hanks v. GAB Bus. Servs., Inc.*, 644 S.W.2d 707, 708 (Tex. 1982); *Chilton Ins. Co. v. Pate & Pate Enters., Inc.*, 930 S.W.2d 877, 887 (Tex. App.—San Antonio 1996, writ denied) (concluding that when the nonbreaching party continues to insist on performance by the party in default after the breach, "the previous breach constitutes no excuse for nonperformance on the part of the party not in default and the contract continues in force for the benefit of both parties."). When one party breaches its contract, the other party must elect whether to continue or cease performance under the contract. *Compass Bank v. MFP Fin. Servs., Inc.*, 152 S.W.3d 844, 858 (Tex. App.—Dallas 2005, pet. denied). Any conduct "indicating an intent to continue will operate as a conclusive choice" but does not deprive the nonbreaching party of its contract claim for the breach that has already taken place. *Id.*; *Gupta v. Eastern Idaho Tumor Inst., Inc.*, 140 S.W.3d 747, 757 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (concluding that, while the nonbreaching party "must elect between continuing or ceasing performance, the election does not affect whether [it] can sue for a former or future breach."). It is deprived only of any excuse for ceasing its own performance under the contract. *Compass Bank*, 152 S.W.3d at 858. Once the "non-breaching party elects to treat the contract as continuing and insists the party in default continue performance, the previous breach constitutes no excuse for nonperformance on the part of the party not in default and the contract continues in force for the benefit of both parties." *Gupta*, 140 S.W. 3d at 756.

**Memorandum Opinion and Order - Page 47**

Whether a breach is material is generally a question of fact.  *Mustang Pipeline Co.*, 134 S.W.3d at 196.  A breach "is material if the injured party does not receive the substantial benefit of the bargain" under the contract.  *Id.*  When "it is clear the parties intend that time is of the essence to a contract, timely performance is essential to a party's right to require performance by the other party." *Id.*  This is not to say that "in every case, a 'time is of the essence' provision *ipso facto* makes any delay a material breach."  *CFS Forming Structures Co., Inc. v. Flintco, Inc.*, 393 F. App'x 136, 144-45 (5th Cir. 2010) (unpublished).  Such a determination instead depends on the facts of each case. *Id.* at 144 (citing and discussing the holding in *Mustang Pipeline Co.*, 134 S.W.3d at 200).  "In determining the materiality of a breach, courts will consider, among other things, the extent to which the nonbreaching party will be deprived of the benefit that it could have reasonably anticipated from full performance."  *Hernandez*, 875 S.W.2d at 693.  Other factors includes:

> (I) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (ii) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (iii) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; (iv) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Id.*

### 6.      Unclean Hands

The "unclean" hands doctrine is an affirmative defense to equitable relief.  *Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 840 (5th Cir. 2004).  This doctrine requires that the party seeking equitable relief must come into court with clean hands.  *Id*.  Once the defense is raised, "a plaintiff seeking equitable relief . . . must show that [it] has not contributed to the harm at issue." *Id.* (citing *Truly*, 744 S.W.2d at 938.  The unclean hands doctrine applies when a plaintiff's conduct "has been

unconscientious, unjust, marked by a want of good faith or violates the principles of equity and righteous dealing." *Bank of Saipan*, 380 F.3d at 840 (quoting *City of Fredericksburg v. Bopp*, 126 S.W.3d 218, 221 (Tex. App.—San Antonio 2003, no pet.)) (citations omitted).   "To invoke the doctrine, a defendant must show that [it] was injured by the plaintiff's improper acts." *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 796 (5th Cir. 1999) (footnote and citation omitted).  It is not enough to show simply that the plaintiff has unclean hands.  *Id.*  When "the harm done to the defendant is not serious and can be otherwise corrected, the unclean hands maxim should not be applied." *Id.* at 796-97.  Further, the defense cannot be used "if the unlawful or inequitable conduct of the plaintiff is merely collateral to the plaintiff's cause of action." *Id.* at 797.

### E.        Rule 702 Standard Applicable to Experts

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  District courts are assigned a gatekeeping role to determine the admissibility of expert testimony.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-98 (1993).  The court must find that the evidence is both relevant and reliable before it may be admitted.  *Id.*  To do so, the court must evaluate whether the reasoning and methodology underlying the testimony is valid and can be reliably applied to the facts of the case.  *Id.* This requires more than a glance at the expert's

credentials; the court must also ensure that the expert has reliably applied the methods in question. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

Factors to consider when evaluating reliability include: (1) whether a theory or technique can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards and controls; and (5) general acceptance of the theory in the scientific or expert community. *Daubert*, 509 U.S. at 593-95. The reliability inquiry is flexible, and the judge has discretion in determining which factors are most germane in light of the nature of the issue, the particular expertise, and the subject of the expert's testimony. *Id.* at 594-95; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999). The safeguards outlined in *Daubert* are less essential in a bench trial. *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000). In assessing whether an expert's testimony is reliable, the trial court must nevertheless strive to ensure that the expert, "whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. The relevance and reliability of expert testimony turn upon its nature and the purpose for which its proponent offers it. *See, e.g., Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 195 (5th Cir. 2006) ("Of course, whether a proposed expert should be permitted to testify is case, and fact, specific.") (citing *Kumho Tire*, 526 U.S. at 150-51).

The Advisory Committee's Notes explain that when a "witness relies solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's notes (2000 amendments). This is because the "trial

court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *Id.* (citing *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1994) ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability.  Under *Daubert*, that's not enough.")).  According to the Advisory Committee's Notes, "The more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable."  Fed. R. Evid. 702 Advisory Committee's Notes (citing *Kumho Tire Co.*, 526 U.S. at 152) ("[I]t will at times be useful to ask even of a witness whose expertise is based purely on experience, say, a perfume tester able to distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable.")).

## IV.   Analysis of the Parties' Claims and Defenses

### A.   BBRI's Prolongation Delay Claim

BBRI seeks $3,938,513 in damages for its Prolongation Delay Claim based on its contention that KCSR breached the Contract by delaying or hindering its work and preventing it from completing its work by the contractual deadlines.  BBRI contends that it was unable to complete its work on the dates required under the Statement of Work because:

> KCSR failed to deliver ballast in the quantities and time needed; trains that delayed or stopped BBRI's work as they arrived late or had no crews to operate them; delays due to [Gulf Coast] being on site and in BBRI's way; delays to move the NTC machine to the north; delays at the Colorado River bridge; delays due to KCSR not supplying enough tie plates at a siding; delays due to KCSR delivering rail in mixed sizes; and delays caused by KCSR delivering materials outside of BBRI's work area.

Pl.'s Br.  ¶ 115.  To calculate its damages, BBRI relies on a modified total cost method, which it contends is proper under Texas law for proving up delay or prolongation damages.  BBRI contends that it proved up its damages in accordance with the modified total cost method using the contractual rates, to the extent applicable, and reasonable and necessary costs.  BBRI contends that, contrary to

KCSR's assertion, the liquidated damages provision in the Contract is not an exclusive remedy and does not preclude it from proving up its Prolongation Delay Claim under Texas law using a modified total cost method.  Pl.'s Br. 42-43.  BBRI relies on the expert testimony of Bright to show that it suffered 28 days of delays attributable to KCSR's insufficient ballast deliveries, which Bright concluded were critical to the Project.[22]  BBRI's Prolongation Delay Claim is for more than 28 days because, according to BBRI, it "had to complete its other work after the ballasting was finished on May 28, 2009."  Pl.'s Br.  ¶ 116.

During the trial, KCSR referred to this delay claim as BBRI's "critical path delay claim, not the contract version, but noncontract version [under Texas law]."  Tr. 1534.  KCSR characterized BBRI's Prolongation Delay Claim in this manner because the alleged delays were not calculated as set forth in the SOW's liquidated damages provision but instead were calculated using a modified total cost theory.  Jt. Ex. 4.002.  KCSR contends that BBRI's Prolongation Delay Claim fails for a number of reasons.  KCSR asserts that the claim fails as a matter of law because the parties' agreement limits recovery for delays to days when BBRI's crews experienced a "Delay Day" as that term is defined in the Contract.  KCSR contends that BBRI seeks to recover its alleged costs for work performed between May 1 and July 11, 2009, but it failed to carry its burden of proving what costs were incurred as a result of the alleged 28 days of delay. Regarding causation, KCSR contends that BBRI's expert concluded that BBRI suffered 28 days of delay but did not opine that damages, if any, were caused by that alleged delay. KCSR asserts that Bright's testimony does not satisfy Rule 702's reliability requirements for expert testimony, whereas the evidence and its expert Bryd showed that

---

[22] BBRI actually contends that it suffered more delays days than those identified by Bright.  BBRI contends that, although Bright concluded that BBRI incurred only a 28-day delay in completing ballast work, it is entitled to recover delay-related damages for 71 days because its prolongation claim is for a "longer period than 28 days because [it] had to complete its other work after the ballasting was finished on May 28, 2009."  Pl.'s Br. ¶ 116.

KCSR's ballast deliveries never fell behind BBRI's work.  KCSR further asserts that, while BBRI complained at trial of other alleged delays caused by KCSR, it never provided expert or other testimony that quantified the extent to which these issues delayed the overall Project.  KCSR contends that, according to BBRI and its expert, ballast deliveries were the sole critical path issue that is basis of its delay claim.

Based on evidence presented at trial, the court concludes that BBRI, rather than KCSR, materially breached the Contract first, and the delays to BBRI's work and related costs it may have incurred are attributable to the shortcomings in its own performance under the Contract.  This was a large construction project that needed to be completed in a short time frame, and BBRI was admittedly in over its head from the beginning.  Garcia knew this and advised BBRI against bidding on the Project after KCSR terminated its contract with Gulf Coast.  Snailham did not heed Garcia's advice and wanted BBRI to bid on the Project because he thought it would look good on BBRI's resume to say that the company had completed such a large project, even though he knew BBRI would not make a profit on the Project.  The overwhelming evidence establishes that BBRI did not have the requisite prior experience to complete successfully a project of this scope; was unfamiliar with the equipment necessary to complete such a project, including the NTC machine; and did not have sufficient or appropriate equipment, processes, or labor in place to perform the work in a timely fashion.  To complicate matters, there was infighting within BBRI's ranks. BBRI's crews did not respect or like Altez, BBRI's designated project manager; and Altez was unable to effectively lead and organize BBRI's crews in the performance of their work.   Altez also had difficulty communicating with almost everyone on the Project.

John Dunsworth ("Dunsworth"), an independent bridge consultant hired by KCSR, went as far as to say that BBRI did not know what it was doing.  Def.'s Ex. 629 at 102-03.  Dunsworth's description of BBRI's performance is telling: "[Y]ou never knew how many people w[ere] going to be there.  You didn't know if they had the right tools.  Sometimes they'd be out [at] 3 or 4 o'clock in the morning wrestling around with stuff that they should have had done previous to that."  *Id.*  Cruz, KCSR's project manager, expressed similar frustration with BBRI's work and crews in his deposition and his written communications to BBRI.  Because of the delays to BBRI's work early in the Project, KCSR and BBRI knew as early as December 2008 that BBRI would not be able to complete its work under the Contract on time unless changes were made to the as-planned schedule for construction and delivery of rail and ballast materials. BBRI, however, was its own worst enemy and was unable to keep pace under the original schedule or the more aggressive revised schedule proposed by Whitfield to get back on schedule.

According to BBRI, the biggest reason that it did not complete its work by the contractual deadlines was KCSR's failure to deliver ballast in the quantities and time needed under the original schedule prior to February 2009 or Whitfield's later proposed revised schedules.  The undisputed evidence at trial, however, showed that, at the beginning of the Project, the stockpile of ballast was at capacity, and there was no place left for KCSR to deliver ballast until BBRI caught up with its work.  As a result, KCSR had no choice but to slow down its ballast deliveries in late December 2008 and stop ballast deliveries on December 20, 2008, for approximately two weeks to give BBRI a chance to catch up with its work.

BBRI contends, based on lay and expert witness testimony, that its slow start did not delay the Project overall because it caught up by mid February.  KCSR disputes whether BBRI ever caught

up and contends that, at most, BBRI only caught up with the skeleton track construction. The court is not convinced that BBRI ever caught up in all respects. Regardless, BBRI's slow start hindered and prevented KCSR from continuing to deliver ballast during a period of time of the Project that it maintains that KCSR's ballast deliveries were deficient. Further, BBRI admits that time was of the essence and contends that delivery of ballast was a critical Project activity. Thus, from this and the overwhelming evidence in the record of the Contract and the parties' communications demonstrating that time was always of the essence as far as completing the work and Project by the contractual deadlines, the court concludes this initial breach by BBRI was material.

By continuing to insist that BBRI perform despite the breach, KCSR's performance under the Contract was not excused. KCSR was, therefore, required to continue its performance under the Contract but did not waive its right to bring suit for BBRI's prior breach of the Contract. KCSR was also required to mitigate any damages attributable to BBRI's breach, to the extent it could reasonably do so, and the court concludes that it satisfied its duty in this regard by undertaking extraordinary efforts in expediting the delivery of ballast to the Project site in response to what are best described as BBRI's unreasonable and frantic demands.[23] The court disagrees that KCSR waived its rights under the Contract, including the time is of the essence requirement by continuing to demand that BBRI finish its work by the contractual deadline or attempting to meet BBRI's increasing demands for

---

[23] KCSR suggests that BBRI's increasing demands for ballast were a conscientious attempt to shift the blame to it for Project delays. The court instead believes that BBRI wanted to complete the Project on time as much as KCSR did, and BBRI's increasing demands for ballast were simply the result of Whitfield not knowing the status of BBRI's work, and the difficulty BBRI encountered in unloading ballast trains and directing the delivery of ballast to areas of the jobsite where it was needed. Because the court does not view BBRI's conduct as lacking in good faith, application of the unclean hands affirmative defense in this case is inappropriate. *See Bank of Saipan*, 380 F.3d at 840.

ballast.[24]  The court also disagrees with BBRI's contention that KCSR's failure to deliver markedly increased quantities of ballast on a shortened expedited schedule, as requested by BBRI halfway through the Project in mid-February 2009, constituted a breach of the Contract.

BBRI's witnesses agreed that the Contract only required 2640 tons of ballast per day. Whitfield acknowledged that KCSR was not required under the Contract to actually deliver 2640 tons of ballast to the site per day and that the Contract was satisfied as long as BBRI had available to it 2640 tons of ballast on any given day, which could include ballast in the stockpile.  The October 2008 as-planned construction schedule prepared by Whitfield included a ballast delivery schedule based on the foregoing assumption. Whitfield's proposed changes to the schedule and plan for BBRI to catch up and finish its work on time necessitated delivery of 3700 tons of ballast per day initially, and then increased a short time later to 4646 tons per day, which almost doubled the quantity of ballast to be delivered by KCSR.  Whitfield's proposed changes in this regard were not discussed with KCSR until almost halfway through the original Project schedule, and there is no evidence that KCSR ever agreed to a Contract amendment to provide the increased quantities of ballast on the accelerated schedule and in the condensed time frame proposed by Whitfield.  *See* Tr. 586.  Whitfield also acknowledged that he was not aware of any such amendment to the Contract.

Additionally, BBRI's argument that KCSR's ballast deliveries were deficient under the Contract prior to February 2009 fails to take into account the effect of its own initial two or more month delay in distributing the ballast stockpiled by KCSR, which left KCSR with no place left to continue delivering ballast for a period of time.  To find that KCSR breached the Contract by failing

---

[24] As previously noted, BBRI did not previously plead or include in the Joint Pretrial Order its posttrial contention that KCSR waived its rights under the Contract with respect to Plaintiff's claims.

to provide BBRI with the substantially increased amount of ballast requested by BBRI starting in February 2009 would require the court to disregard completely BBRI's role in the first instance in creating what it contends was a ballast shortage.  The court would also have to disregard the original agreed-upon manner in which ballast was supposed to be delivered by KCSR under the as-planned schedule prepared by BBRI and contemplated by the parties.  Under BBRI's theory of the case, even if it fell behind schedule and did not catch up until one month before the Project deadline, KCSR would be required to deliver all of the ballast for the Project in thirty days or less rather than over the course of several months as originally contemplated by the parties, and, KCSR's failure to do so would constitute a breach of the Contract, whereas BBRI's delays and slow start would not because it "caught up" to the construction schedule before the end of the Project.  Such a theory is unreasonable and untenable, and there is no evidence that the parties agreed to proceed in this manner if BBRI fell behind schedule.

Even assuming that BBRI caught up with the skeleton track construction as contended, neither this nor KCSR's request for BBRI to come up with a plan to get its work back on schedule  excused BBRI's prior breach, waived KCSR's contractual rights, or resulted in the Contract being amended such that any failure by KCSR to drastically speed up its ballast deliveries constituted a breach by KCSR.  Further, while BBRI relied on its daily reports to show that its crews were standing around waiting for ballast, its witnesses, including Brown and Whitfield, conceded that this was not necessarily evidence that there was no ballast on the Project site and could have simply meant that there was no ballast in the areas where BBRI's crews were working at the time.  There was also ample evidence that BBRI's crews delayed in unloading ballast cars delivered and did a poor job of directing

the delivery of ballast to areas of the jobsite where ballast was needed, which was BBRI's responsibility under the Contract.

Moreover, KCSR contends, and the court agrees, that the expert testimony relied on by BBRI in support of its Prolongation Delay Claim is not reliable or credible.  BBRI called Bright to offer his opinion that KCSR's ballast deliveries delayed BBRI's work.  Bright is the vice president of Veritas Advisory Group ("Veritas"), a company that provides consulting services regarding construction related projects, including litigation stemming from construction related projects.  Bright opined that KCSR did not deliver sufficient ballast in the quantities and time needed by BBRI to complete its work, and that ballast was a delay to the "critical path" of the construction schedule that resulted in a 28 day delay to BBRI's May 1, 2009 substantial completion deadline under the Contract to finish "all track construction, ballasting, tamping and rail adjustment." Jt. Ex. 4.001-.002.  BBRI included in its exhibit list documents considered by Bright and his company Veritas; Bright's summary of Project delays; Bright's expert report, dated July 8, 2011, and the documents attached to his report; and Bright's supplemental expert report. Pl.'s Exs. 495-498.

KCSR objected to the admission of Plaintiff's Exhibit Nos. 495 through 498 on hearsay grounds.  KCSR also moved during the trial to strike Bright's testimony under Rule 702 on the grounds that it is not reliable or relevant. The court carried KCSR's relevancy objection and denied its motion to strike but indicated that it would revisit the issue, as necessary, when it prepared its findings of fact and conclusions of law.  KCSR subsequently argued again in closing arguments and its proposed findings of fact and conclusion of law that Bright's testimony is not reliable or relevant.

Because this case was tried to the court, it allowed all proffered experts to testify during the trial over both parties' objections. The court let both parties cross-examine the experts and challenge

their opinions during trial rather than conduct separate time-consuming reliability hearings. The court similarly admitted all proffered experts' reports and related expert evidence, subject to the parties' objections, without first determining their relevance, reliability, or admissibility.  As noted, KCSR objected to the admission of Bright's expert reports and related documents (Pl.'s Ex. 495-98) as hearsay.  *See* Def.'s Objections to BBRI's Trial Exs. (Doc. 59).  BBRI similarly objected based on hearsay to the expert reports of Defendant's experts Brookings and Byrd and the exhibits containing information considered by Defendant's experts.  *See* Pl.'s Objections to KCSR's Trial Exs. (Doc. 63).

Generally, expert reports are inadmissible hearsay because they are out-of-court statements offered to prove the truth of the matter asserted and fall within the definition of hearsay in Federal Rule of Evidence 801(c)(2).  *Bianco v. Globus Med., Inc.*, 30 F. Supp. 3d 565, 570 (E.D. Tex. 2014). While experts are allowed to rely on hearsay in forming their opinions, "their testimony is not a vehicle by which evidence that is otherwise inadmissible may be introduced." *Id.* (citation omitted). Thus, the court considered the experts' trial testimony regarding the contents of their reports, but the reports themselves are inadmissible hearsay.  Additionally, in reviewing the reports and other materials after trial, the court only considered the facts and data that "experts in the particular field would reasonably rely on . . . in forming an opinion on the subject."  Fed. R. Evid. 703; *see also Daubert*, 509 U.S. at 595.  The court disregarded, as inadmissible hearsay, all other parts of the reports and evidence that do not fall under Rule 703.  Accordingly, the parties' hearsay objections to expert materials are **sustained** to the extent set forth.

After carefully reviewing the transcript of Bright's testimony, the court seriously questions whether he is qualified to testify as an expert in this case, and whether his testimony meets the requirement for expert testimony under Rule 702 of the Federal Rules of Evidence, *Daubert*, and

*Kumho Tire*.  Bright testified that he has an undergraduate degree in construction engineering technology and a master's degree in business administration.  The evidence establishes that Bright received these degrees in 1980 and 1984 respectively.[25]  Pl.'s Ex. 494.  Between 1980 and 1985, Bright gained work experience in the construction industry in project engineering, scheduling, and estimating.  *Id.*  From 1986 to 2013, Bright acted as a consultant specializing in construction and government contract disputes and provided analysis of delay damages.  *Id.*

Bright testified that he and Veritas[26] were retained to "review and analyze the documentation from the project and determine what, if any, delays occurred on the project for which Balfour Beatty would be due additional time."  Tr. 643.  It became apparent from Bright's later testimony that he was retained to identify delays to the critical path of the Project that affected BBRI's work and the Project completion dates.  Bright testified that he applied a "critical path schedule analysis" to  determine which Project activities were critical path activities, and that this type of analysis is the accepted practice in the industry for analyzing construction delays and time extensions.  Tr. 651-52.

Bright, however, never articulated in any detail, even with assistance and prodding from the court, the methodology used by analysts in the construction field to determine whether a particular activity or delay in a project was a critical path activity or delay.  Although retained to give expert testimony regarding critical path delays to support BBRI's Prolongation Delay Claim, not all of the delays identified by him to support his opinion were ultimately identified as critical path.  Bright made a number of general statements about the methodology for critical path scheduling analysis and stated that he reviewed certain documents and information provided to him by BBRI to determine

---

[25] KCSR did not object to the admission of Bright's resume.

[26] Unless otherwise indicated, the court refers to Bright and his company Veritas collectively as "Bright."

whether activities and delays were critical path, but the court was never able to ascertain with any degree of certainty from Bright's testimony what steps are normally taken in conjunction with the critical path schedule analysis, and whether Bright undertook such steps in performing his analysis. Absent such testimony, the court concludes that the opinions expressed by Bright are not sufficiently reliable.

Bright proceeded to testify whether certain events constituted critical path activities with little or no explanation other than to say that he reviewed certain documents, the schedules, and Project activities. Bright admitted that his conclusions of when a delay occurred were based on his review of delays reported, for example, in BBRI's February 10, 2009 letter and BBRI's daily reports. He concluded that BBRI's two and one-half month delay in the beginning of the Project did not impact the critical path because, according to BBRI's account, it had caught up with its track construction by mid-February using the NTC machine. Bright acknowledged that, in drafting his expert reports and opinions, he did not previously consider the Orfalinda Report, a key document in the case, that included the dates KCSR delivered ballast to the Project site and BBRI's crews unloaded the ballast trains. He also did not consider, prior to trial, the Orfalinda Report in determining whether KCSR was behind schedule in delivering ballast. When asked why he did not consider it prior to trial in preparing his expert reports and opinions, Bright stated that BBRI did not give him this evidence until after he prepared his expert reports and was deposed.

Bright testified regarding the importance of identifying the construction activities that are interrelated for purposes of determining which were critical path but discounted out-of-hand evidence that BBRI's slow start in the first half of the Project affected KCSR's ballast delivery, which he concluded was critical path. In particular, there is no indication that Bright considered Peek's

testimony and supporting evidence that KCSR had to slow, and ultimately stop, its ballast deliveries in December 2008 because there was no place left to put additional ballast onsite until BBRI started depleting the ballast stockpile for track construction.   Bright assumed but never explained why he believed that KCSR was contractually required to deliver ballast in substantially greater quantities than that called for under the Contract after BBRI fell behind or why KCSR was required to deliver ballast on an expedited schedule that was inconsistent with the as-planned schedule prepared by BBRI in October 2008.   He simply assumed that KCSR was required to deliver any quantity of ballast in any time frame demanded by BBRI.   Bright's reliance on this unsupported assumption is fatal to his opinion that BBRI's work was delayed because of insufficient ballast deliveries by KCSR, particularly when there is no evidence that the parties agreed to amend or modify their Contract to require KCSR to deliver, on an expedited basis, increased quantities of ballast demanded by BBRI. This is not to say that KCSR did not undertake extraordinary efforts in this regard.   In doing so, it satisfied its duty to take reasonable steps to mitigate the damages caused by BBRI's failure to timely complete its work.

The court expressed concern during the trial that Bright's opinion, that BBRI's slow start did not delay the Project because it caught up halfway through the Project, seemed overly simplistic and based on a common-sense review of what was reported in certain documents rather than specialized skill or knowledge.   BBRI maintained that Bright would provide expert testimony regarding the disputed issue of whether certain events constituted critical path activities.   The court allowed Bright's testimony to continue.   Again, however, the court was never able to determine how Bright identified critical path delays in the schedule and attributed them to KCSR, as there was insufficient testimony regarding the methodology, steps, and criteria that he used and whether he followed and

applied the methodology and criteria used by analysts in the construction industry for identifying critical path construction delays.  Overall, the court found Bright's testimony and his opinions to be overly simplistic, subjective, conclusory, and unhelpful.  As a result, his approach and conclusions cannot be objectively verified or reasonably assessed for reliability.

Bright's testimony is also unreliable because his opinions were based on erroneous assumptions and inaccurate data.  Specifically, Bright incorrectly assumed twenty-four days of ballast delivery in November 2008, which skewed his entire calculation of the delay attributable to insufficient ballast.  Bright also assumed incorrectly a greater number of ballast distribution days than the 130 days included in Whitfield's as-planned construction schedule.  In preparing his expert report, Bright incorrectly assumed that KCSR, rather than BBRI, was responsible for and controlled where the ballast, that was delivered by KCSR, was unloaded on the track.  Bright relied heavily on BBRI's daily reports to determine whether a delay had occurred, although he acknowledged that many of the reports did not provide any detail, for example, as to why there were ballast related or other delays. He simply attributed the delay to KCSR without further investigation.  Some reports flagged by Bright did not contain any evidence whatsoever of delay in BBRI's work, and he did not offer any testimony at trial that a delay occurred based on the facts he previously identified.  Bright's trial testimony also conflicted in some respect with his deposition testimony.

Further, in support of his opinion that 28 days of critical path delay were caused by insufficient ballast deliveries, Bright concluded that the final ballast delivery was May 26, 2009, 28 days after the as-planned baseline schedule prepared by Whitfield.  Bright's conclusion in this regard, however, is not supported by BBRI's daily reports and instead has built into it an assumption based on vague and incomplete information in BBRI's daily reports.  It is also inconsistent with the

Orfalinda Report prepared and maintained by KCSR during the Project, which shows that the last ballast delivery was made on May 17, 2009, but not unloaded by BBRI until eleven days later on May 28, 2009.

Unlike BBRI's daily reports, there is no evidence that the information in the Orfalinda Report is inaccurate.   KCSR's expert Byrd testified, based on a comparison of the Orfalinda Report and BBRI's daily reports, that the last ballast delivery for main line construction was May 13, 2009, and the amounts delivered after this were for quality control or "QA/QC" work performed by BBRI.  Byrd also pointed out the flaws in Bright's opinion and conclusions, and presented a credible graphical comparison of the ballast delivered by KCSR and BBRI's various activities to show that BBRI's critical activities never caught up with KCSR's ballast deliveries.

In addition, Bright did not consider all relevant information in forming his opinions. He limited his interviews to Whitfield, BBRI's scheduler who only visited the Project site twice, but did not interview any other BBRI employees actually involved in the work on the Project.  Although depositions were available, Bright did not review any of the depositions taken in this case before forming his opinions.  He also did not perform analysis of the Project data to rule out other causes of any delay experienced by BBRI in completing its work. Bright did not perform any weather analysis to determine the impact of adverse weather on BBRI's failure to timely complete its work, even though BBRI experienced days on which it could not work. Bright did not investigate the reasons why BBRI was experiencing delays at road crossings or analyze the impact of those delays on BBRI's failure to timely complete its work.  Bright did not perform any investigation into the reasons for the problems reported by BBRI in the documents beyond looking at documentation provided to him and discussing various items with Whitfield.

Although Whitfield admitted and was unable to explain why BBRI fell behind schedule in March 2009, Bright never considered or investigated this fact.  He performed no analysis to determine whether there were any days that BBRI was unable to work at least four hours due to KCSR's interference. Finally, there is no connection between Bright's opinion that BBRI suffered 28 days of delay and any of the damages sought by BBRI.  Bright offered no testimony that any damages alleged by BBRI were caused by the delays he concluded occurred.

During Bright's cross-examination, the court sustained numerous objections to his nonresponsive testimony. When questioned about the information that he did not consider, Bright was dismissive or evasive.  Bright was similarly dismissive when confronted about his incorrect assumptions and insisted, without explanation, that it did not affect his opinions.  The court was not persuaded by BBRI's attempt to rehabilitate Bright on redirect.

Even though Bright and Byrd were both qualified by education, knowledge, or experience, Bright's opinions were unreliable, and his testimony was not credible. The court, therefore, disregards Bright's opinions.  BBRI did not object to Byrd's testimony under Rule 702, and the court concludes that his testimony meets the requirement for expert testimony under Rule 702 of the Federal Rules of Evidence, *Daubert*, and *Kumho Tire*.

Regardless of the predicament created by BBRI's initial delay and its delays in directing and unloading ballast cars, the evidence shows that KCSR made every effort, though not required to do so under the Contract, to comply with BBRI's ever-increasing demands for ballast and requests that KCSR deliver unusually large amounts of ballast in a condensed time frame or manner not originally contemplated by either party.  Every time BBRI requested more ballast, KCSR pushed its people to increase ballast deliveries.  In doing so, KCSR satisfied its duty to take reasonable efforts to mitigate

any damages it had incurred as a result of BBRI's delay.  Because the court concludes that the dilemma regarding ballast was created by BBRI, and  its breach in this regard was material, it cannot recover under the Contract for delay damages allegedly incurred as a result of insufficient ballast deliveries, which according to BBRI, was the major reason it allegedly incurred delay damages.  For the same reason, the court gives no weight to BBRI's expert testimony, which fails to take into account the impact of BBRI's initial delay on the delivery and availability of ballast for use on the Project.

BBRI's contention that it incurred and is entitled to recover additional money under the Contract for other delays fairs no better.[27]  In a May 22, 2009 letter to KCSR, BBRI's vice president of rail services, Snailham, asserted that BBRI was entitled to additional compensation under the Contract in the form of a change order of "at least $3.0 million" because its crews had experienced delays to its work that were outside of BBRI's control, including a one-week delay to move to the North, a twelve-day delay to its work at the Colorado River bridge, a one-week delay in completing the El Campo siding in Louise because of KCSR's alleged delay in supplying tie plates, and alleged delays due to KCSR's delivery of rail in mixed sizes and delivery of materials outside of BBRI's

---

[27] The court previously dismissed at the summary judgment stage BBRI's request to recover under quantum meruit for its Prolongation Delay Claim and change order claims based on ballast and fill material for crossings.  In response to KCSR's summary judgment motion that BBRI could not recover in quantum meruit for these claims, BBRI merely argued that it was entitled to plead, in the alternative, contract and quantum meruit theories and pointed out that the Texas Supreme Court in *Truly v. Austin* had recognized certain exceptions to when recovery in quantum meruit was permitted despite the existence of an express contract that covers the subject matter of the claim.  BBRI, however, never explained why the claims at issue fell within any exception; nor did it come forward with any evidence to raise a genuine dispute of material fact as to whether these claims fell within one of the recognized exceptions.  Accordingly, although BBRI now asserts that its Prolongation Delay Claim is based, to some extent, on having to perform "extra work" outside the scope of the Contract, *see* Pl.'s Ex. 284, the court limits its discussion in this opinion of BBRI's so-called prolongation damages to whether BBRI can recover under the Contract for such damages and does not address whether recovery in quantum meruit for this "extra work" is appropriate.

work area.  Jt. Ex. 284.  Snailham contended that these were the reasons that BBRI was unable to

meet it May 1, 2009 deadline under the Contract.

On June 30, 2009, BBRI followed up with another letter from Snailham to KCSR in support

of its Prolongation Delay Claim, and this time demanded $3,938.513.  Jt Ex. 336.  In the June 30

letter, Snailham stated, "[a]s a further example of delays incurred by BBRI on the project, BBRI just

received an instruction to build the set out track at Louise siding commencing on June 28, 2009." *Id.*

Attached to Snailham's letter is a spreadsheet that, according to Snailham, "details the additional time

that BBRI resources remained on site to complete its works after the completion date of May 1, 2009

as a direct result of the delayed material deliveries." *Id*.  Kendrick, who prepared the spreadsheet,

similarly testified that BBRI's prolongation damages were due to KCSR's "late delivery of the

ballast." Tr. 920.  He nevertheless believed that BBRI was entitled to recover damages for more than

the 28 days of ballast related-delay opined by Bright.  According to Kendrick, BBRI was entitled to

recover damages for the 71 days because it performed work on the Project after its May 1, 2009

deadline.  In this regard, Kendrick explained:

> Whenever certain work is finished, there is still other work to be completed
> on the project, so the prolongation takes into effect from the date that was mentioned
> already in testimony. It adds additional time to that as the rest of the work is
> completed, and as we look at some of the other work that was on going beyond those
> dates as a result of the late delivery of the ballast.

*Id*.  Kendrick provided no explanation as to why KCSR's ballast deliveries did not comply with the

Contract or why he believed that the ballast deliveries caused the delay damages allegedly sustained

by BBRI other than to say, "Well, it was the fact that the material was not delivered on time causing

[BBRI] to be on the site longer than [it] had anticipated."  Tr. 1018.  This again appears to pertain to

BBRI's contention that KCSR's late delivery of ballast was the major reason for it not completing its work by May 1, 2009. The court, however, has already decided this issue in KCSR's favor.

Perhaps more perplexing is BBRI's prolongation damage model, which is based on Kendrick's misguided belief that BBRI is entitled to additional compensation or "cumulative delay damages" because it was on the site longer than anticipated. At most, this only proves that BBRI performed work after the May 1, 2009 deadline and incurred more cost than anticipated to complete its work by the contractual deadline. Without evidence that KCSR's conduct breached the Contract and proof that BBRI sustained damages as a result of KCSR's breach, BBRI cannot recover for breach of contract under Texas law. *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (citation omitted). BBRI appears to attempt to side-step the Contract's requirements for delay damages and the requirements for breach of contract claims under Texas law by characterizing and distinguishing its damages as "cumulative delay damages." As explained, though, evidence that it performed work after the May 1, 2009 deadline is insufficient and does not excuse it of satisfying its burden with respect to its breach of contract claim under the Contract and Texas law.

In its posttrial brief, BBRI relies on and cites to Kendrick's and Snailham's trial testimony, as well as Snailham's May 22 and June 30, 2009 letters to KCSR. Neither Kendrick nor Snailham, however, testified regarding the specific delays referenced in Snailham's letters. As a result, the factual basis of some of the alleged delays and Contract breaches, such as those for mixed rail and material delivery, is unclear. There was also no attempt by Snailham or Kendrick to link the delays in some fashion to the costs in the spreadsheet that BBRI seeks to recover. When asked on cross-examination to explain what KCSR did to cause certain delays, Kendrick appeared confused and was

unable to say or could not recall what action by KCSR caused the specific delays referenced in

Snailham's letters or the spreadsheet that he prepared:

> Q:   Now, we have sidings listed here, and several employees, looks like six employees are being billed to KCS for siding work. What did KCS do to delay Balfour's ability to construct sidings?

> A:   As a result of the delays to the other operations, that Balfour Beatty were working out of sequence and a lot of other activities were impacted because of that.

> Q:   Which particular sidings did KCS delay?

> A:   I can't recall.

> Q:   What materials were missing that Balfour Beatty needed that caused the siding work to come to a stand still?

> A:   It may have been ballast, but I can't recall specifically.

> Q:   Was there any period that the siding workers stopped working because there was nothing to do?

> A:   I don't recall.

Tr. 991-92. The spreadsheet and summary of BBRI's alleged damages that are attached to Snailham's

June 30, 2009 letter simply list the costs incurred by BBRI for equipment and labor from April 2009

to June 2009. They do not include any explanation of which costs are attributable to the delays alleged

in Snailham's letters.  From this evidence and testimony, the spreadsheet appears to be nothing more

than a laundry list of random expenses incurred by BBRI for everything from "porta john[s]" and "ice

water" to Garcia's annual salary.  BBRI also relies on Bright's testimony, but as previously noted, he

offered no testimony that any damages alleged by BBRI were caused by the delays he concluded

occurred.  As a result, BBRI has not met its burden of proving all elements, including breach and

causation, required to recover for breach of the Contract.

**Memorandum Opinion and Order - Page 69**

BBRI's request for prolongation damages based on the delays referenced in Snailham's letters also fails for other reasons. BBRI's contention that it is entitled to recover, for example, for delays that allegedly occurred in the early stages of the Project conflicts with Bright's and BBRI's theory of the case that such delays did not affect the critical path of the Project because BBRI caught up on its skeleton track work by mid-February. Similarly, any request by KCSR *after* May 1, 2009, for BBRI to "build the set out track at Louise siding commencing on June 28, 2009," could not have caused BBRI to meet its May 1, 2009 deadline. Jt. Ex. 336.

Moreover, Castle's testimony regarding the parties' negotiations and whether BBRI was required under the SOW to coordinate with Gulf Coast is inconsistent with the unambiguous Contract language, which required BBRI to coordinate with others on the Project, without exception. Consideration of this evidence for purposes of determining the parties' intentions or BBRI's understanding of the parties' agreement is, therefore, prohibited by the SOW and parol evidence rule because the provision at issue is unambiguous, and Castle's testimony that the SOW does not reference Gulf Coast does not make the otherwise unambiguous provision ambiguous.[28] Tr. 171. The court also notes that, in response to its questioning at trial, BBRI explained, while the parties

---

[28] During the trial, the parties disputed whether the bid materials and BBRI's bids or "proposals" constitute inadmissible parol evidence. In response to KCSR's objection that, "We have a written contract signed by the parties, and the proposal is not incorporated, so I object under the parol evidence rule" if offered to change the contract, BBRI responded:

> [T]he proposals are an important part of this project because for one it incorporates a schedule that is Exhibit No. 230 that we talked about at length this morning. That is where you find that schedule. Also, the lead up to the contract is important to know how the scope changed and evolved. We are not saying that the proposal is the contract. It is important for the Court to understand how this project was approached by both parties.

Tr. 88. This is one of several parol objections by both parties to evidence of the bid materials. BBRI acknowledged that its bid proposals were not part of the Contract, and the parties agreed that BBRI's proposals could be considered by the court for background purposes. The court concurred that the evidence was admissible for background purposes in light of BBRI's explanation that the evidence was not being offered as proof to show the substance of the parties' agreement.

**Memorandum Opinion and Order - Page 70**

interpreted some of the Contract provisions differently, it was not taking the position that the Contract was ambiguous. BBRI also appears to assert in its posttrial brief that the parties' Contract is unambiguous. *See* Pl.'s Br. ¶ 133. With respect to this provision of the Contract, the court agrees that it is unambiguous and required BBRI to coordinate with others, including Gulf Coast, in performing its work.

Castle, who oversaw BBRI's proposals, also acknowledged during the trial that he was aware that Gulf Coast was still on the jobsite performing work at the South end of the Project while BBRI and KCSR continued to negotiate the SOW. Tr. 132-33. The court, therefore, concludes that the contractual provision requiring BBRI to coordinate with others to avoid disruptions to its and others' work was included in the SOW that was executed on November 13, 2008, because the parties knew that Gulf Coast and other contractors would be on the jobsite performing work while BBRI did track construction. Because it was a premise upon which the parties' Contract was based, Gulf Coast's or other contractor's presence on the jobsite, without more, is insufficient to establish BBRI's entitlement to recovery delay damages under the Contract. BBRI's evidence that it bid the work on the assumption that Gulf Coast would be finished with its work before BBRI started is also insufficient to establish mutual mistake or another basis for reforming the Contract.

Regarding BBRI's move to the North of the Project, Kendrick believed and Garcia acknowledged that BBRI had been previously compensated via agreed upon change orders for the move. BBRI's request to recover for the related delay at the Colorado River bridge also fails for the same reasons that the court concludes herein that it is not entitled to recover for Change Order 38 through 40 for delays to equipment. In addition, BBRI acknowledged during closing arguments that the move to the North did not result in any delay to the Project.

**Memorandum Opinion and Order - Page 71**

Although Snailham's May 22, 2009 letter states that BBRI incurred delay due to KCSR's delivery of mixed rail, the Contract expressly provides that 136# and 141# rail would be used for the project in 1,400 and 1,600 foot strings, that the rail would not be supplied with pre-drilled holes, and that secondhand rail or "SH 115 CWR"[29] may be provided for siding and mainline construction through El Campo.  Altez testified that he was aware that secondhand rail would be used in the Project. He also knew that working with secondhand rail as opposed to new rail would be more challenging.  BBRI, therefore, knew that rail of different sizes would be delivered and used for track construction.  Moreover, nothing in the Contract precluded or required KCSR to deliver rail of only one size in a shipment, and BBRI has not shown that the condition of the rail provided did not conform to the Contract.

KCSR also presented credible evidence that the delays experienced by BBRI were actually caused by BBRI's crews mixing and stringing different sized rail, which required BBRI to go back and take out the rail so, for example, 141# rail was laid next to 141# rail.  *See* Tr. 1134.  According to Peek, this was one of the reasons why KCSR had to stop its ballast deliveries in December 2009.  To the extent BBRI contends that the rail delivered for use through El Campo caused delays, this is discussed in the court's analysis of BBRI's change order claims.  In sum, BBRI has not shown that it is entitled under the Contract for any delay-related damages for KCSR's delivery of rail in mixed sizes.

Further, Snailham and Kendrick, who testified at trial regarding BBRI's Prolongation Delay Claim, were heavily impeached on cross-examination on the reasonableness of BBRI's damage theory and BBRI's inclusion of certain sums in BBRI's damage model and conceded that certain amounts

---

[29] "SH" means "secondhand."  Def.'s Ex. 624 at 64.

should not have been included.  In retrospect, Snailham agreed that some costs should not have been included in BBRI's prolongation claim, and Kendrick acknowledged that certain costs in the spreadsheet were not attributable to any delay. In this regard, the court agrees with KCSR that BBRI's Prolongation Delay Claim is grossly overstated and has no logical relation to the delays alleged.  Byrd also explained why BBRI's claim deviated from what is generally accepted as recoverable delay damages in Texas.  For example, Byrd explained that BBRI was not entitled to recover for labor charges that it would have been incurred in performing its work under the Contract regardless of any delay; equipment charges for QA/QC and punch list work; and salaried personnel.  *See* Tr. 1534-38.

Moreover, while the liquidated damages provision applicable to delays does not specifically state that the remedy provided is exclusive, it does limit BBRI's recovery of delay damages to those caused by KCSR's failure to perform its obligations under the SOW that  "prevents Contractor's crews from working more than 4 hours during a day (each such occurrence referred to as a "Delay Day")."  Jt. Ex. 4.002.  In deciding the parties' summary judgment motions, the court did not determine whether the provision was ambiguous because the issue was not sufficiently briefed by the parties and was unnecessary to resolve the motions.  KCSR previously contended that BBRI's recovery of delay damages was limited to those provided in the liquidated damages provision, which only made it liable for delays if BBRI's "forces [were] unable to work at least four hours" in a day. Def.'s Mot. Summ. J. 15.  BBRI, on the other hand, contended that KCSR's interpretation of the liquidated damages provision and "Delay Days" would lead to the absurd result that "so long as one person in BBRI's workforce could work, then there was no delay" even though "BBRI had multiple *crews* working on multiple distinct tasks along the track" every day.  BBRI's Summ. J. Resp. 19

(emphasis in original).   BBRI further asserted that the parties' differing interpretations of this language created a fact issue.

During the trial, the court sustained an objection by BBRI to KCSR's questioning of Kendrick's understanding of and the parties' negotiations regarding this provision.  After revisiting the issue and reviewing the liquidated damages provision again in light of the different reasonable interpretations offered by the parties regarding the language used in the provision, the court concludes that it is latently ambiguous because, although the provision is unambiguous on its face, the ambiguity appears when applied to the manner in which work was to be performed by BBRI's crews on the Project.  Specifically, when read in context of the Project, it is not clear whether a Delay Day occurs when a single crew of BBRI is delayed by more than four hours during a day or when the work of all of BBRI's crews is delayed and none of BBRI's crews are able to work more than four hours in a day. The provision is, therefore, susceptible to two reasonable interpretations, and the court can consider parol evidence to determine the parties' intentions regarding this provision.

KCSR relies on Joint Exhibit 238 to support its interpretation and contention that this particular provision was given special attention by the parties in negotiating the SOW.  Joint Exhibit 238 is an e-mail chain, which includes the parties' discussions regarding the liquidated damages provision from November 10, 2008, to November 13, 2008.  Castle, Kendrick, and KCSR's counsel are included in the e-mails.  In one e-mail, KCSR's counsel asserted that, regardless of how the provision was worded, "as a fair compromise, the penalty to [KCSR] should only kick in when [it does] something that causes [BBRI] to incur a full shut-down for more than 8 hours (ie, a Delay Day). If we are late in delivering materials or providing locomotives, crews, but [BBRI] can still work at least 4 hours, then [KCSR] should not be forced to pay [BBRI] for such delays."  *Id.*  Castle did not

think that the provision should be limited to delays by KCSR in delivering materials but believed that the wording of the provision accounted for the "caveat" suggested by KCSR's counsel as to compensable delays only accruing from delays in excess of four hours per day. *Id.* Based on this exchange and understanding, Castle agreed to the wording of the liquidated damages provision that was ultimately included in the SOW. From this, the court concludes that the parties intended that BBRI's right to recover damages for delays caused by KCSR would be limited to those days in which there was a "full shut-down" of BBRI's work, that is, when none of BBRI's crews were able to work more than four hours per day. BBRI has not established that its request for additional compensation for delays attributable to KCSR, whether in the form of requested change orders or its Prolongation Delay Claim, complies with this contractual requirement, and its characterization of its delay-related damages as prolongation damages or "cumulative delay damages does not excuse it from complying with the parties' Contract and their agreement as to how Delay Days and KCSR's liability for related damages would be handled and calculated.

Finally, the court rejects BBRI's contention that application of the modified total cost method is appropriate for calculating delay damages in this case under Texas law. The court was unable to find any case in which this method was adopted by a Texas court, and the cases cited by BBRI do not support its contention that Texas courts recognize this method for calculating damages in construction or other cases. The cases cited by the Fifth Circuit in *Wallace v. Flintco Inc.*, 143 F.3d 955, 965 (5th Cir. 1998), which Plaintiff relies on, make clear that this method is generally "disfavored" by courts and only used as a "last resort." *See United States Indus., Inc. v. Blake Constr. Co., Inc.*, 671 F.2d 539, 547 (D.C. Cir. 1982); *Servidone Constr. Corp. v. United States*, 931 F.2d 860, 861-62 (Fed. Cir.

1991); *Neal & Co., Inc. v. United States*, 36 Fed. Cl. 600, 638 (Fed. Cl. 1996), *aff'd*, 121 F.3d 683

(Fed. Cir. 1997).

Accordingly, for all of these reasons, including the reasons set forth in KCSR's posttrial brief

regarding miscellaneous delays alleged by BBRI, the court concludes that BBRI is not entitled to

recover additional compensation for its Prolongation Delay Claim, and the court will dismiss with

prejudice this claim.  *See* Def.'s Br. 32-36.

### B.      BBRI's Claims Based on Change Orders 4 and 36 through 50

In the Joint Pretrial Order, BBRI asserts that KCSR breached the Contract "by failing to pay

numerous change orders submitted for extra work that was necessary to complete the Project both

during the performance of the work and at the completion of the work."  Jt. Pretrial Order 1.  For the

reasons previously explained, the court also considers, as appropriate, whether BBRI is entitled to

recover for any change orders under the theory of quantum meruit.   The parties have stipulated that

BBRI submitted Change Orders 4 and 36 through 50 to KCSR, and KCSR denied these change order

requests. BBRI seeks a total of $432,549 in additional compensation for these change orders.  With

respect to certain change orders, BBRI contends that it performed "extra work" not covered by the

Contract and incurred costs for supplying construction materials that KCSR was responsible for

providing.  BBRI also contends, with respect to other change orders, that it is entitled to damages for

delays to its work caused by KCSR.  The question that the court must decide with respect to each

change order is whether BBRI is entitled to recover under its breach of contract claim or quantum

meruit.

### 1.      Change Order 4 (Cold Mix Asphalt—$62,055.98)

BBRI seeks a total of $62,055.98 for its installation of cold mix asphalt on temporary road

crossings on December 5 and 19, 2008, and January 10, 15, and 26, 2009.  BBRI contends that it

installed the temporary crossings using cold mix asphalt "at KCSR's direction," Pl.'s Br. 30, and that

it was necessary to install the cold mix to maintain the flow of automobile traffic, prevent delays, and

address the concerns of TXDOT.  Based on Garcia's trial testimony and written correspondence from

Garcia to Cruz, BBRI maintains that this work "was 'requested by KCS to keep the cost to the

minimum and keep the public satisfy [sic] with KCS.'"  *Id.*  (quoting Jt. Ex. 57).  BBRI contends that,

while "[t]he permanent asphalt paving at the crossings was included in BBRI's work and Contract

at a unit price, . . . *the temporary cold mix was not in the Contract*."  *Id.* (emphasis added)*.*  In other

words, BBRI contends that this work was not included in the lump-sum Contract price, and it is,

therefore, entitled to additional compensation above the lump-sum Contract price paid by KCSR.

BBRI further asserts that the amount of this requested Change Order is reasonable because it is based

on actual material costs, labor, and a margin of some unspecified amount.

Based on Peek's trial testimony, KCSR contends that BBRI is not entitled to additional

compensation for this Change Order because temporary crossing services work was included in

BBRI's scope of work under the Contract.  KCSR asserts that this work "was [a] necessary part of

the construction process as it simply provided an access point for the public to cross the rail while

BBRI completed the permanent crossing."  Def.'s Br. 37.

According to Garcia's trial testimony, cold mix is a type of asphalt that is sold in bags at

Home Depot and Lowe's, and BBRI brought bags of the cold mix to the work site as needed.  Peek

testified that cold mix is a type of temporary asphalt that can be quickly installed directly from the

bag without heating to create a firm surface.  Peek further testified that when cold mix is used, it is replaced by regular asphalt once the track is finished.

Garcia testified that he did not believe cold mix was included in the Contract because his understanding of the Contract was that BBRI was going to use either asphalt or "base material" to construct temporary crossings, not cold mix.[30]  Tr. 298.  Garcia explained, however, that BBRI ultimately used cold mix at the temporary crossings because it was receiving complaints from property owners about not being able to access their homes and businesses when BBRI began removing the existing  private crossings.  Garcia further explained that using cold mix addressed safety concerns: "Also, for emergency situations, we would have to . . . take out the crossing, [and] raise the track[;] we had to build the track, raise the track, and we would put cold mix in order for the civilians to go into their homes and have emergency escape or entrance." Tr. 298.  Garcia testified that Peek "instructed" him to use cold mix in some areas rather than "base material because it [would] mess up the structure of the . . . ballast." Tr. 299.  This statement was given in response to a question about the status of the crossings at the end of the Project, so it is unclear whether it pertained to temporary or permanent crossings. In other words, it is unclear from Garcia's testimony whether any crossings with cold mix remained after installation of the permanent crossings or whether all cold mix was replaced by asphalt as Peek testified.

Peek, on the other hand, testified that KCSR denied Change Order 4 because "temporary crossing services" work was part of BBRI's scope of work under the Contract." Tr. 1214.  According to Peek, the Contract required BBRI "to provide access to the public to get across crossings until [BBRI] got the final surface in." Tr. 1214.  Peek further testified that KCSR received no benefit from

---

[30] Garcia was not asked and did not explain what he meant by "base material."

BBRI's use of cold mix on the crossings because it was only a temporary measure, and BBRI could have used ballast or other material for the temporary crossings.  Peek was not asked and did not say whether he ever instructed Garcia to use the cold mix on the temporary road crossings on the five dates in question.

Garcia first requested a change order and compensation for BBRI's use of cold mix for temporary crossings by written letter to Cruz on February 5, 2009.  In the letter, Garcia states:

> At the direction of KCS, BBRI made necessary arrangements for the delivery and installation for temporary crossings using cold mix.  By performing this procedure we were able to maintain the flow of traffic through private, county and state crossings; to give the public (in particular School Buses and Emergency Vehicles) a faster access to their destination.  In performing such work the school districts, Hospitals, Police Department, public in general, county commissioners, and Texas Department of Transportation would not attempt to delay the construction with vague excuses.
>
> Such activity implies extra cost that was not included in the original estimate which in turn added to the extra cost that BBRI already incurred [i]n the effort to satisfy and meet the needs required by KCS.  In addition this seriously affected the estimated cost of [the] project by $62,055.98.  For the mentioned reason, BBRI is requesting a change order for the following lump sum price [of $62,055.98].

Pl.'s Ex. 514.04 (BBRI001346).  In an e-mail dated March 11, 2009, Garcia stated as follows to Cruz regarding BBRI's requested change order for cold mix at temporary crossings:

> [A]s I was reading the scope of work again for the thousand[th] time I notice[d] on the third paragraph (Grade crossings) it states that BBRI will provide necessary road closures and traffic control, & associated permits.  Removal of existing crossing prior to rail distribution, and provision of temporary stone surface following rail distribution.  Removal of temporary surface prior to NTC operation, and installation of final construction (including ducts, drainage and rubber flange ways) following NTC operation.  And then it talks about the cost of asphalt install or concrete panel as appropriate.  What I do not see in this contract is the temporary [crossings] that required cold mix, the bottom line is that this process was requested by KCS to keep the cost to the minimum and keep the public satisfy with KCS and I do not believe[] BBRI should [have] incurred this cost.

Jt. Ex. 57.  Garcia followed up with another letter to Cruz on March 16, 2009, regarding BBRI's

requested change order for cold mix at temporary crossings. In this letter, Garcia indicates that when

BBRI first started surfacing the track, Peek agreed that KCSR would purchase the cold mix because

BBRI was surfacing on a weekend, and BBRI subsequently continued to use the cold mix during the

Project to facilitate and maintain traffic flow and expedite construction:

> On November 29, 2008, at the direction of KCS representative Frederick "Lee" Peek,
> BBRI made necessary arrangements for the delivery and installation of temporary
> crossings using cold mix.  At this time I discussed the use of fabric on the track to
> minimize the cost and then remove base at a later time. When BBRI started the
> surfacing of the track and Mr. Peek agreed to buy it for us the following week,
> because we were performing these duties on a weekend. As time progressed, BBRI
> performed this procedure in order to be able to maintain the flow of traffic through
> private, county and state crossings; to give the public (mostly School Buses and
> Emergency Vehicles) a faster access to their destination.  In performing such work
> (the school districts, Hospitals, Police Department, county commissioners, general
> public, and Texas Department of Transportation would not attempt to delay the
> construction with vague excuses.
>
> Such activities imply an extra cost that was not included in the original estimate
> which in turn added to the extra cost that BBRI already incurred on the effort to
> satisfy and meet the needs required by KCS.  In addition, this seriously affected the
> estimated cost of [the] project by $62,055.98.  For the mentioned reasons, BBRI is
> requesting a change order for the following lump sum price [of $62,055.98].

Pl.'s Ex. 514.04 (BBRI001347).  Garcia's February 5 and March 16, 2009 letters both include the

following chart to illustrate the change requested in the amount of $62,055.98 for Change Order 4.

| Date | Qty | Unit Price | Total Price |
|------|-----|------------|-------------|
| 12/5/2008 | 26.71 | 98.45 | 2,629.60 |
| 12/19/2008 | 103.31 | 98.45 | 10,170.87 |
| 1/10/2009 | 98.24 | 105.25 | 10,339.77 |
| 1/15/2009 | 198.33 | 96.95 | 19,228.08 |
| 1/26/2009 | 203.07 | 96.95 | 19,687.66 |

| | | |
|---|---|---|
| Totals | 629.66 | 62,055.98 |

Pl.'s Ex. 514.04 (BBRI001346-47).

Because BBRI contends that its purchase and installation of cold mix at temporary road crossings in Change Order 4 is not covered by the Contract, the court construes this requested change order as one based on quantum meruit and not one for additional compensation under the Contract. The court, nevertheless, considers whether this requested change order falls within the scope of the Contract as contended by KCSR.  The parties' proposed findings of facts and conclusions of law do not address in any detail the basis for their contentions that BBRI's purchase and installation of cold mix at temporary road crossings as set forth in Change Order 4 falls within or outside of the scope of the Contract.  Witness testimony regarding this issue is similarly conclusory and unhelpful.  After reviewing the Contract, the court concludes that the temporary crossing work does not qualify as "extra work" as that term is defined by Texas courts; rather, this is work that is provided for in the Contract.

Garcia acknowledged that BBRI was responsible under the Contract for temporary crossing work and testified that it was his understanding that BBRI would use either asphalt or "base material" to construct temporary crossings.  Thus, according to Garcia, it was understood that the Contract required BBRI to construct the temporary road crossings, and the only thing that actually changed was the material that BBRI used to construct the temporary road crossings.  Garcia's belief that BBRI was responsible under the Contract for constructing temporary road crossings is supported by a few provisions in the SOW.

The SOW indicates that the lump-sum amount of $10.4 million paid to BBRI included $774,898, based on an equivalent rate of "$5,166 per crossing (1 day)" for "Grade crossings (prep & follow-up)" work.  Jt. Ex. 4 at 11.  In addition to the lump-sum amount, BBRI was paid $1,790,473

to furnish and install asphalt.  Exhibit A to the SOW sets forth the "Scope of Work" to be performed

by BBRI under the Contract and describes "Grade crossings" work as follows:

> Provision of necessary road closures and traffic control, & associated permits. Removal of existing crossing prior to rail distribution, and provision of temporary stone surface following rail distribution. Removal of temporary surface prior to NTC operation, and installation of final construction (including ducts, drainage and rubber flangeways) following NTC operation. Installation of asphalt paving to be charged at $115/T rate as installed, or concrete panel as appropriate.

Jt. Ex. 4 at 7-8.  Exhibit F of the SOW further provides that "Contractor [BBRI] will furnish and

install the asphalt required at the new road crossings."  Jt. Ex. 4 at 20, ¶ 3.  Based on the foregoing

language in the SOW, the court concludes that the parties agreed that BBRI would not only furnish

and install the permanent asphalt paving for $1,790,473 based on a rate of $115 per ton of asphalt

installed, but also agreed and understood that BBRI would remove the existing crossings, construct

temporary stone surface crossings, and remove the temporary surface at crossings before installing

the permanent asphalt or concrete paving as part of the $10.4 million lump-sum price paid to BBRI.

Thus, even assuming, as BBRI contends, that Peek instructed Garcia to use cold mix at the temporary

crossings in lieu of another agreed upon temporary surface material and agreed to pay for the cold

mix, BBRI would not be entitled to additional compensation for the labor it expended in performing

this work because BBRI was already required under the Contract to construct or install the temporary

crossings.

     If anything, BBRI would be entitled to less compensation for labor than what was originally

agreed to under the SOW for the temporary crossing work because it is clear from Garcia's

correspondence and Peek's testimony that installing cold mix was faster than installing asphalt or

other materials.  Thus, installation of cold mix at temporary crossings would have required less labor,

not more labor than what was contemplated by the parties' Contract and the lump-sum price.

Accordingly, regardless of the material used, BBRI cannot recover for labor expended in installing temporary crossings, and the only issue is whether BBRI can recover for the cost of purchasing and providing the cold mix that was used.

The SOW indicates that KCSR agreed to supply "ballast (including temporary surfacing) for crossings." Jt. Ex. 4 at 18. This is consistent with Peek's testimony that Change Order 4 was denied because BBRI could have used ballast for the temporary crossings rather than cold mix. The court, therefore, concludes that the Contract covers and the parties contemplated that ballast would be used for temporary surfacing at crossings. In reaching this conclusion, the court gives more weight to Peek's testimony to the extent his and Garcia's testimony conflicted because Peek's testimony was consistent with the Contract. On the other hand, as explained below, Garcia's testimony and letters establish that he took creative license in the field in executing this and other work on the Project in an attempt to keep BBRI's work on schedule, even if doing so was inconsistent with the agreed-upon Project specifications and parameters.

Moreover, even assuming, as BBRI contends, that Peek instructed Garcia to use cold mix rather than ballast for temporary surfacing at crossings, BBRI was required, but failed, to comply with section 5 of the Master Agreement, which applies to change orders in the form of "additions, deletions, or revisions in the Work" *requested by KCSR*. Jt. Ex. 84 at 6. Garcia acknowledged that change orders were normally used in construction projects to address perceived delays to work and extra work not covered by the parties' contract. *See* Tr. 347. Garcia similarly agreed that the parties were required to follow a change order procedure on this Project. *Id.* at 351-52. Garcia conceded that a large number of the change orders, including those tried to the court, were not submitted in writing or negotiated until after the Project. According to Garcia, BBRI's request for additional compensation for this and other change orders was instead done as part of a post-Project forensic

analysis in an attempt to recoup Project costs that BBRI had underestimated in negotiating the Contract, which it insisted on doing on a lump-sum basis.

BBRI does not maintain that it complied with the contractual change order provision. It instead contends that it was not required to comply with the change order provision because: (1) the change order provision in the Contract only applies to changes requested by KCSR that are initiated by a written change order request from KCSR to BBRI; and (2) KCSR did not initiate this or any other change order request during the Project by a written change order request from it to BBRI. For support, BBRI relies on the testimony of BBRI contract manager Kendrick, who testified at trial regarding his understanding of the two sentences in section 5A. Specifically, Kendrick testified that the change order provision required KCSR to initiate change order requests by providing BBRI with a written change order.

Section 5A of the Master Agreement unambiguously provides with respect to change orders as follows: "The Company [KCSR] may, at any time or from time to time, order additions, deletions or revisions in the Work. Any such changes will be *authorized* by a written Change Order." Jt. Ex. 84 at 6 (emphasis added). Nothing in section 5A or section 5 requires change order requests by KCSR to be *initiated* by a written change order request to BBRI. Section 5A and the remainder of section 5 instead make clear that, to be valid, any change order or adjustment of the Contract requested by KCSR for which BBRI seeks additional compensation must ultimately be "authorized" and set forth in a written change order signed by BBRI and KCSR. Because Kendrick's interpretation and understanding of the change order provision conflict with and are contrary to the unambiguous language in section 5 of the Master Agreement, the court does not consider it. Further, because there is no evidence that BBRI complied with the procedure in section 5 for change orders, the court concludes that BBRI is not entitled to compensation under the Contract for Change Order 4.

Even assuming, as BBRI contends, that the work performed and the materials supplied in connection with Change Order 4 fall outside the scope of the Contract, the court concludes that BBRI is not entitled to recover for it under the equitable theory of quantum meruit.  As previously noted, quantum meruit is an equitable theory of recovery based on an implied agreement "to pay for beneficial services rendered and knowingly accepted," and to recover under this theory, BBRI as the movant has the burden of proof.  *See Vortt Explor. Co., Inc.*, 787 S.W.2d at 944.  BBRI, however, presented no credible evidence to show that, *befor*e it purchased and used cold mix to install the temporary crossings on the dates in question, KCSR was reasonably notified that it expected to be paid an additional amount above the lump-sum provided for under the Contract.    *See Heldenfels Bros., Inc.*, 832 S.W.2d at 41 & n.4.  Garcia was not asked and provided no explanation regarding BBRI's contention that its use of the cold mix at temporary crossings was done at Peek's instruction. He instead was simply requested to read a portion of one of his letters, and asked whether the cold mix was part of the Contract, to which he responded without explanation, "No, it was not."  Tr. 300.

Additionally, BBRI's contention that Peek instructed Garcia to use cold mix is not supported by Garcia's March 16, 2009 letter and other evidence.  In the March 16, 2009 letter, Garcia explains to Cruz that on November 29, 2008, he and Peek discussed options to minimize cost with respect to temporary road crossings.  According to Garcia's letter, "Peek agreed to buy it [cold mix] for us [BBRI] the following week, because we [BBRI] were performing these duties on a weekend."  Pl.'s Ex. 514.04 (BBRI001347).  Of the dates in question (December 5 and 19, 2008, and January 10, 15, and 26, 2009), only one fell on a weekend, January 10, 2009, which was more than one month after Garcia and Peek presumably had the conversation, not the following week.  Accordingly, any agreement Garcia and Peek reached regarding BBRI's use of cold mix the week following November

29, 2008, could not have extended to the dates for which BBRI seeks additional compensation in Change Order 4.

Moreover, it is apparent from Garcia's March 16, 2009 letter that Peek, at most, only approved the use of cold mix for one weekend or "a weekend" close in time to Garcia's and Peek's November 29, 2008 discussion, whereas Garcia opted to subsequently continue using cold mix at temporary crossings to save time and avoid further delays during the Project at a time when BBRI was admittedly behind schedule. *Id.* Garcia's testimony at trial supports this finding. Specifically, Garcia testified on cross-examination that he viewed his role as project manager on this Project and any project as doing whatever was necessary to complete the project on time, even if that meant being creative or innovative in executing the work in the field in a manner that was inconsistent with the agreed upon Project documentation and parameters:

| Garcia: | I needed to make it work.  It is not always like that at the instructions for Mr. Peek or Mr. Cruz.  I may have a plan as to how I am going to build this track, but that is not necessarily the plan that my customer wanted to build it at. |
|---|---|
| Counsel: | I didn't ask you about your customer. |
| Garcia: | You asked a question as to my plan how I was going to do it. |
| Counsel: | My question is simple. There is a purpose that Mr. Whitfield creates a schedule and there is a purpose with which Mr. Castle creates a bid; correct? |
| Garcia: | That is correct. |
| Counsel: | And they set those guidelines and those parameters now [for] doing the work, and you need to go and execute that plan in the field; correct? |
| Garcia: | I need to execute everything from A to Z, what happens in between [] I have to make it work in a better way. |

. . . .

Garcia:  If you play that clip [deposition video] before that and after that, you will probably see that I mentioned more than once that I was being creative and innovative to find ways to expedite the process. . . .

Counsel:  I cut you off.  I apologize.

Garcia:  What I did mention in my deposition is that once we get the projects then we find more creative and innovative ways to make it faster, and then we will go ahead and be creative and innovative.

Counsel:  My question is not how you made adjustments on the fly and tried to wing it out in the projects. My question is what was the plan?

Tr. 377, 400-01.  The court finds, based on this testimony by Garcia and his March 16, 2009 letter, that Garcia made the unilateral decision, without prior notice to KCSR, to continue using cold mix on the five dates in question in 2008 and 2009.  He did so in an effort to "make it work" and expedite the temporary road crossing work without further delays.  Pl.'s Ex. 514.04 ("Mr. Peek agreed to buy it for us the following week, because we were performing these duties on a weekend. As time progressed, BBRI performed this procedure in order to be able to maintain the flow of traffic through private, county and state crossings; to give the public (mostly School Buses and Emergency Vehicles) a faster access to their destination. In performing such work (the school districts, Hospitals, Police Department, county commissioners, general public, and Texas Department of Transportation would not attempt to delay the construction with vague excuses.").  The court sympathizes with Garcia's predicament, as he was put in the difficult position of being brought into the troubled Project in which BBRI was already seriously behind schedule and experiencing field management and equipment problems.  It would be unfair, however, to allow BBRI to recover additional compensation (whether in the form of labor, material costs, or the unspecified amount added by BBRI as a profit margin for Change Order 4) for Garcia's decision to perform this temporary road crossing work in a manner different from that set forth in the Contract, without prior authorization or notice to KCSR, in an

**Memorandum Opinion and Order - Page 87**

effort to get the Project back on schedule and make up for schedule delays attributable to BBRI prior to February 2009.

In support of its requested change orders, BBRI also relies on a Potential Change Order Log ("Log") that it created and used to track whether requested change orders had been paid by KCSR. In addition to referring to Garcia's two letters, the log states with respect to Change Order 4 that BBRI "received an email from Miguel [Cruz] on 3-28-09 asking for cold mix." Jt. Ex. 345. There are two problems with this evidence. First, Cruz could not have asked BBRI on March 28, 2009, to use cold mix for the temporary crossing work that was previously performed on December 5 and 19, 2008, and January 10, 15, and 26, 2009. Second, the March 28, 2009 e-mail from Cruz to Garcia contains the following handwritten notation "REFERENCE CHANGE ORDER #5." Pl.'s Ex. 514.04 (BBRI001348). The court, therefore, determines that this e-mail from Cruz pertains to BBRI's Change Order 5, which is not at issue in this case. These unexplained discrepancies undermine the credibility of BBRI's evidence. Pl.'s Ex. 514.04 (BBRI001347). Further, because it appears that Garcia purchased and used the cold mix to avoid further delays in its crossing work, it would have been required under the Contract to do so "without any additional cost to [KCSR]." *See* Jt. Ex. 4.002.

For all of these reasons, the court concludes that Plaintiff has not met its burden and is not entitled to recover for Change Order 4 under either a breach of contract or quantum meruit theory. Accordingly, Plaintiff's contract and quantum meruit claims based on Change Order 4 will be dismissed with prejudice.

### 2.    Change Order 36 (Survey Work at Lavaca River Bridge—$2,547)

Plaintiff seeks $2,547 for extra survey work that it performed at the Lavaca River bridge on February 1, 2, and 4, 2009. Plaintiff asserts that it submitted this change order request to KCSR on May 12, and July 9, 2009. Plaintiff contends that the work was necessary because, while surveying

and staking out the Lavaca River bridge, it found that the bridge was one foot lower than shown on KCSR's plans.  Plaintiff asserts that KCSR provided it with new elevations, and, as a result, it was necessary to restake and resurvey the bridge.  Plaintiff contends that it was KCSR's responsibility under the Contract to locate and construct the bridge, and it took BBRI three days to do this extra work at a cost of $849 per day.  Plaintiff contends that the amount requested is reasonable because it is based on the rate of $849 per day for survey work as set forth in the SOW.

Defendant contends that, because the request was submitted months after extra survey work was allegedly performed by BBRI in February 2009, KCSR could not determine whether the work was actually needed or performed.  Defendant, therefore, contends that its denial of this change order request was appropriate.  KCSR does not state in its proposed findings of fact and conclusions of law whether it believes this work and change order is covered by the Contract.

In support of this requested change order, BBRI relies on Garcia's and Kendrick's trial testimony and Plaintiff's Exhibit 36, which consists of two letters from BBRI to KCSR, dated May 12 and July 9, 2009, as well as three Daily Work Report Sheets dated February 1, 2, and 4, 2009.[31] The May 12, 2009 letter is from Altez to Cruz. The July 9, 2009 letter is from Garcia to Cruz. Although BBRI contends, based on Garcia's trial testimony, that the extra survey work was "necessary" and required in the performance of the Contract, Pl.'s Br. ¶ 101; Tr. 303, neither BBRI nor KCSR contends that this work was included in BBRI's scope of work and lump-sum payment under the Contract or subject to the contractual change order provision applicable to changes in work

---

[31] BBRI maintains in its proposed findings of fact and conclusions of law that these daily reports for February 1, 2, and 4, 2009, were attached to its change order request; however, there is no indication from Garcia's testimony or BBRI's May 12 and July 9, 2009 letters whether these daily reports were in fact attached to BBRI's letters or provided to KCSR before BBRI filed suit.

requested by KCSR.[32]  Because BBRI refers to the survey work as "extra work" and relies on Garcia's

trial testimony that KCSR, not BBRI, was responsible under the Contract for bridge elevations, the

court construes BBRI's Change Order 36 as a request to recover under quantum meruit.  Putting aside

the inconsistencies in BBRI's evidence,[33] the court concludes that BBRI is not entitled to recover the

amount sought for this change order under a theory of quantum meruit.  As was the case with Change

Order 4, there is no evidence that BBRI notified KCSR before it performed the extra survey work or

that KCSR had notice beforehand that BBRI anticipated payment for such work above the lump-sum

Contract price paid to BBRI.  *See Heldenfels Bros., Inc.*, 832 S.W.2d at 41 & n.4.

While the May 12, and July 9, 2009 letters from Altez and Garcia to Cruz show that KCSR's

surveyor Gable requested BBRI surveyor Cline to verify the alignment and elevation on February 1,

2009, the letters do not establish that Gable actually requested or instructed Cline to re-stake the

bridges and approaches, which appears to be the bulk of the survey work performed.  Plaintiff also

asserts in a footnote in its posttrial brief that "Gable was KCSR's Survey Manager in charge of all

surveying on the Project and ensuring that BBRI had the plans that [it] needed."  Pl.'s Br. 31 n.29.

BBRI does not explain the significance of this assertion, and it has never alleged or taken the position

that Gable had actual or apparent authority, on behalf of KCSR, to approve or agree to this additional

expense, or that Cline reasonably relied on any apparent authority of Gable to approve such an

---

[32] As previously noted, under Texas law, work is either "additional work," that is, work that is necessary or required for performance of a contract, or "extra work" that arises outside and independent of the contract and is not required in its performance.  *Brown–McKee, Inc.*, 538 S.W.2d at 844; *City of Houston*, 311 S.W.2d at 289-90.  For this reason, work cannot qualify as both "additional work" and "extra work," although BBRI contends with respect to this change order and a majority of its other change order requests that the work it performed was necessary extra work.

[33] The two letters, which BBRI refers to as its change order request, contain conflicting information regarding the amount sought by BBRI and the number of days it spent performing this work.  BBRI project manager Altez indicated in his May 12, 2009 letter that BBRI crews spent four days doing survey work in February 2009 and requested compensation in the amount of $3,396 based on a contract price for survey work of $849 per day.  In a July 9, 2009 letter, Garcia requested compensation for the same survey work but indicated that BBRI only spent three days performing the work and requested $2,547 based on a contract price of $849 per day. These discrepancies were not explained at trial.

expense in light of the contractual provision requiring the parties to communicate with each other through their designated Project managers. *See* Jt. Ex. 4.014. Because the issue of agency or authority was never specifically raised by BBRI or developed, the court declines to speculate or elaborate further on this issue, and concludes that it is not a basis on which BBRI can recover for this or any claim asserted by it in this case. Further, the Contract required the parties to communicate through their project managers, Altez and Cruz, and BBRI has not alleged or provided evidence to show that this provision of the Contract was waived by KCSR. Jt. Ex. 4.014.

Moreover, at trial, Garcia merely read from his July 9, 2009 letter when asked about this change order. Garcia's and Altez's letters similarly describe the circumstances giving rise to the extra survey work as follows, but neither these letters nor Garcia's testimony regarding this change order shows that KCSR was aware, before the work was performed, that BBRI anticipated payment for the extra survey work:

> On Sunday, February 1, 2009 BBRI's Surveyor, Corby Cline, while staking out the LaVaca River Bridge, found the structure of the bridge was a foot lower than the plans. He notified KCS's Surveyor John Gable and was instructed to verify the stake out of the elevation and alignment. After Corby Cline verified the alignment and elevation again, KCS provided BBRI's Surveyor with the new elevation. In addition, an email was sent to Miguel Cruz to notify him of the situation.

> Next, BBRI's surveyor re-staked the bridge and approaches per provided plans. The verification and re-staking took three days [of survey work]; February 1, 2009, February 2, 2009, and February 4, 2009.

Pl.'s Ex. 314.36. Both letters reflect, and Garcia testified that, "[i]n addition, an email was sent to Miguel Cruz to notify him of the situation." Pl.'s Ex. 314.36. The e-mail itself does not appear to have been admitted into evidence, and BBRI did not provide any other information regarding this e-mail. Specifically, BBRI did not elaborate at trial or in its proposed findings of fact and conclusions of law regarding the date the e-mail was sent; who sent the e-mail; the specific contents of the e-mail;

or whether Cruz responded to the e-mail.  Although not objected to at trial, the court concludes that the reference in the letters to the e-mail and Garcia's testimony regarding the contents of the e-mail are inadmissible hearsay.  Even if admissible, the statement that Cruz was notified of the situation is far too vague and insufficient for the court to determine whether BBRI notified Cruz, *before* performing the extra survey work, that it expected additional compensation from KCSR for the work beyond that provided for in the Contract.

Kendrick also testified regarding Change Order 36 by reading from and referencing Garcia's and Altez's letters to Cruz.  In addition, Kendrick testified regarding three Daily Work Report Sheets dated February 1, 2, and 4, 2009, which BBRI included as part of its Exhibit No. 514.36, together with the two letters from Garcia and Altez.  Kendrick testified that the Daily Work Report Sheets were KCSR forms but he was not certain who completed the forms.  Although Kendrick could not say, the reports appear to set forth in summary fashion the following work performed by one BBRI foreman on February 1, 2009, and two BBRI foremen on February 2, and 4, 2009, near the Lavaca River: "RESTART CURVE AT LA[V]ACA RIVER WITH CHRIS"; "S/O AT TRACK WITH 20' O/S CHECK BRIDGE AT LAVACA RIVER MEET WITH KCS ABOUT BRIDGE RESTAKE O/S FOR FM 647"; S/O AT TRACK WITH 20' HUB RECHECK PLANS AT LAVACA RIVER BRIDGE WITH KCS TO MATCH PLANS."  Pl.'s Ex. 514.36.003-006.  Kendrick did not seem familiar with the reports but testified, based on the contents of the reports and references to "S/O," that it looked like survey work had been performed.  Tr. 889.  He also confirmed that the report dates were the same as those in Garcia's letter for which BBRI seeks compensation, and that the work location referenced in the reports (Lavaca River)  was the same as that referenced in Garcia's letter.

Kendrick, however, did not testify, and it is not apparent from these reports whether KCSR had notice, before the work at issue was performed, that BBRI anticipated payment for what it refers

to as extra survey work.  Peek testified that BBRI did not notify KCSR until after the Project was complete that it had allegedly done this work.  As noted, the reports instead merely describe in summary fashion that restaking and rechecking work was presumably performed by BBRI's foremen on these dates, and Kendrick's testimony regarding this change order was tenuous, at best, as he appeared to have limited personal knowledge regarding the facts surrounding the change order and prefaced much of his testimony regarding this and other change orders with the words "I believe." His testimony was also based on documents that he was not familiar with and did not participate in creating.  As a result, the court found Kendrick's overall testimony regarding this change order unhelpful.  Accordingly, the court concludes that BBRI cannot recover under quantum meruit for this change order and work.

If, on the other hand, BBRI contends that its claim for this change order work sounds in contract, the claim still fails because BBRI appears to contend that it did this work at KCSR's request, but it has not shown that it complied with the change orders procedure in the Master Agreement. BBRI also submitted its request for payment more than 90 days after performing the work in violation of section 2 of the Master Agreement applicable to Compensation and Invoicing, which provides: "Invoices must be submitted to Company within ninety (90) days of performance of the Work contained thereon. Any portion of any invoice reflecting Work performed more than ninety (90) days prior to receipt of the invoice by Company will not be paid."[34] Jt. Ex. 84 at 4.

---

[34]  BBRI previously contended in conjunction with its summary judgment briefing that the ninety-day invoice provision in the Contract is unenforceable or  void under Texas law and section 16.071 of the of the Texas Civil Practice and Remedies Code.  The court disagrees.  Section 16.071 provides: "A contract stipulation that requires a claimant to give notice of a claim for damages as a condition precedent to the right to sue on the contract is not valid unless the stipulation is reasonable. A stipulation that requires notification within less than 90 days is void."  Tex. Civ.  Prac. & Rem. Code Ann. § 16.071(a).  Because section 16.071 "is restrictive and in derogation of the common-law right to freely contract, under well-settled rules [it is] to be construed strictly."  *Komatsu v. United States Fire Ins. Co.*, 806 S.W.2d 603, 606 (Tex. App.—Fort Worth 1991, writ ref'd).  Consistent with this policy, the Texas Supreme Court has held that the statute does not apply "when the notice to be given is not notice of a claim for damages."  *Community Bank & Trust v. Fleck*, 107 S.W.3d 541, 542 (Tex. 2002); *American Airlines Employees Fed. Credit Union v. Martin*, 29 S.W.3d 86,

Further, under the SOW, BBRI agreed to provide "all required surveying and setting out" work on the Project for $122,135 at $849 per day, which constitutes 143 days of survey and set out work.  BBRI, however, has not explained why the work performed on February 1, 2, and 4, 2009, was not included as part of the agreed upon lump-sum Contract price.  In other words, BBRI has not shown that the survey or set out work on these three days was in addition to the 143 days it was compensated for doing survey and set out work under the Contract.

Accordingly, for all of these reasons, the court concludes that BBRI is not entitled to recover the $2,547 sought for Change Order 36 for extra survey work performed at the Lavaca River bridge on February 1, 2, and 4, 2009, and this claim, whether based on a contract or quantum meruit theory, will be dismissed with prejudice for the reasons stated.

### 3.    Change Order 37 (110 Extra Welds—$52,250)

Plaintiff seeks $52,250 for 110 extra welds on the mainline track through El Campo.  Plaintiff maintains that the work was necessary because the secondhand rail that KCSR delivered for use at El Campo was in "poor condition."  Pl.'s Br. 31.  BBRI asserts that, because the ends of the rail delivered by KCSR had been "torch cut," it had to cut the ends and drill new bolt holes to join the rail together.  BBRI further asserts that KCSR instructed it to weld "some of the joints"; that this work

---

97-98 (Tex. 2000); *see also Ridglea Estate Condo. Ass'n v. Lexington Ins. Co.*, 415 F.3d 474, 478-79 (5th Cir. 2005) (discussing the Texas Supreme Court's interpretation of and holdings regarding section 16.071).  The language in section 2 of the Master Agreement applicable to Compensation and Invoicing does not require BBRI "to give notice of a claim for damages as a condition precedent to the right to sue on the contract" as contemplated by section 16.071 and does not preclude BBRI from filing a claim for damages for work performed more than ninety-days prior to KCSR's receipt of an invoice for the work.  It instead only requires BBRI to submit its invoices for payment to KCSR within ninety days of performing work.  This contractual provision and the Contract are silent as to any required notice of a claim for damages.  The court, therefore, concludes that the ninety-day invoice provision does not contain a condition precedent to the right of BBRI to bring claims for damages and does not violate section 16.071 of the Texas Civil Practice and Remedies Code.  *See Cardinal Health Sols., Inc. v. Valley Baptist Med. Ctr.*, 1:07-CV-00111, 2008 WL 5047673, at *4 (S.D. Tex. Nov. 21, 2008) ("The provision does not preclude a claimant who gives no notice or unseasonable notice of a disputed invoice from filing a claim for damages concerning goods or services represented by the invoice; rather, the provision stipulates that the invoice will be presumed correct in all respects. Defendants contend that this is a distinction without a difference. This Court disagrees.") (citation omitted).

was outside of its scope of the Contract; and "KCSR approved the work at a not-to-exceed price of $52,250 for 110 welds." *Id.* Plaintiff, therefore, contends that it is entitled to compensation for this work.

Defendant contends that BBRI is not entitled to additional compensation for this change order request for extra welds, which was submitted on July 9, 2009, because: (1) "welding the mainline after de-stressing was part of BBRI's scope of work"; and (2) "BBRI failed to establish which welds were 'extra' and why they were extra." Def.'s Br. 37.  For support, KCSR relies on Peek's trial testimony.

Regarding Change Order 37 and the extra welds at El Campo, Peek testified: "I believe the welds that they have in [this] change order [are] excessive.  They need to show us what welds were made that [were not] part of their scope.  They were required to do welds on all [of] the track once it was destressed." Tr. 1216.  Peek but did not believe that BBRI had established that welds were extra or outside its scope of the work under the Contract.  According to Garcia's testimony and letters to Cruz in March and July 2009, additional welds through El Campo and related work were outside of what was originally contemplated under the Contract and became necessary because the "115# second hand rail" provided by KCSR for use through El Campo was in "poor condition."  According to Garcia, the secondhand rail provided by KCSR rail was "torch cut at the end," and as a result, BBRI had to "crop the rail, cut the end of the rails and redrill [the rails]" so it could "join this rail together through El Campo." Pl.'s Ex. 514.37; Tr. 304-05.  Garcia testified that KCSR supplied new rail for the remainder of the Project but provided secondhand rail for use through El Campo because it planned to remove this rail in the near future and change the track so the track went around El Campo rather than through it.

The SOW establishes that the parties agreed to pay BBRI, as part of the lump-sum payment, $610,643 for welding and stressing based on an equivalent unit rate of "$4,691 per ½ mile (1 day)," which is the equivalent of $9,382 per mile of track.  Jt. Ex. 4 at 11.  The SOW also reflects that BBRI was to perform work on approximately 64 miles of the Project from milepost 18.6 near Rosenberg, Texas, to milepost 82.28 near Victoria, Texas.  Jt. Ex. 4 at 1.  The amount included in the SOW compensated BBRI for welding and stressing 65 miles of track ($610,643 ÷ $9,382 = 65 miles). Thus, as Peek testified, the Contract, as written, contemplated that BBRI would perform welding and stressing on the entire track that was the subject of their Agreement.

Moreover, the SOW specifically provides that KCSR will supply the following materials with respect to rail: "136#, 141# welded rail (1,400 ft and 1,600-ft strings). The rail will not be delivered with pre-drilled holes. SH 115 CWR maybe provided for siding construction as well as mainline construction through El Campo."  *Id.* at 18.  "CWR" stands for "continuously welded rail."  Tr. 469.

The parties, therefore, contemplated that the rail for El Campo would be secondhand, not new rail, that the rail would not include pre-drilled holes, and that BBRI would need to drill holes, as necessary, in the rail provided.  Garcia testified that KCSR supplied  secondhand rail for use through El Campo because it was always KCSR's intention to remove this rail in the near future and change the track so the track went around rather than through El Campo. This testimony and the provision for secondhand rail through El Campo in the SOW shows that this fact was accounted for in the parties' negotiations.

Plaintiff, however, has not shown or explained why the condition or quality of the secondhand rail supplied by KCSR with torch cut ends for El Campo was inconsistent with that called for under the Contract; nor has BBRI explained why the welds performed by it were "extra" or in excess of the 65 miles of welding work that it was already required to do under the Contract.  Garcia testified that

the work was "extra," but his testimony in this regard was conclusory and insufficient to establish that the work falls outside of the scope of the Contract. Garcia states in the last of his three letters to Cruz that KCSR (Cruz) agreed on March 17, 2009, to pay for extra welds, not to exceed 110 welds, but, again, there is no evidence to support Garcia's belief and BBRI's contention that the welds that were done in El Campo on the secondhand rail were "extra" and outside the scope of the Contract. Likewise, there is no evidence that Cruz agreed to pay BBRI additional compensation for work that was not actually "extra." Additionally, if, as BBRI contends, KCSR requested it to weld some of the rail joints, it was required to comply with the change order procedure, but there is no evidence that a change order was signed by both parties. To the extent the work was covered by the contractual change order procedure, Plaintiff is not entitled to recovery in quantum meruit.

Recovery under quantum meruit fails for another reason because, even assuming, as Garcia states in his July 9, 2009 letter that Cruz approved the cost for welding done in El Campo as an "extra cost" on March 17, 2009, BBRI has not established that Cruz approved the expenditure before the extra work was performed by BBRI or KCSR was notified beforehand that BBRI anticipated additional payment for the work. *See Heldenfels Bros., Inc.*, 832 S.W.2d at 41 & n.4. To the extent that BBRI contends that KCSR is estopped from denying that Cruz approved and agreed that KCSR would pay BBRI for extra work, the court does not consider the argument because BBRI's estoppel argument is only pleaded and included in the Pretrial Order as a defense to KCSR's counterclaims. *See* Pl.'s Br. ¶ 163. (BBRI contends that quasi-estoppel "prohibits KCSR from asserting a right inconsistent with a position that it previously took concerning the extra work performed and the providing of excess materials without notice to BBRI of any breach.").

Although not discussed by the parties, the court also reviewed BBRI's daily reports during the time in question when, according to Garcia, BBRI performed 110 extra welds because KCSR

allegedly provided nonconforming secondhand rail for use in this area of the Project. The court was only able to find two reports during this time frame that appear to be remotely relevant to this issue. BBRI Daily Report No. 00110 for March 21, 2009, states: "RAIL at El campo Future By Pass (Time Ties Section): Loaded Mini Train with 115# Second Hand Rail and moved it to MP 40.83." Pl.'s Ex. 435.109 (BBRI008825). Regarding welds, this report merely states: "WELDS: Will be updated tomorrow, The operation have not finished as of 6:00 pm tonight." *Id.* BBRI Daily Report No. 00096 states with respect to welding operations on March 8, 2009: "Welding Total of 18 Welds 12 Main Line 6 Destressing." Pl.'s Ex. 435.094 (BBRI008838). The lack of information in these and other reports reviewed by the court regarding the necessity and performance by BBRI of 110 extra welds causes the court to seriously question the veracity of Garcia's letters and testimony regarding Change Order 37 that BBRI performed any extra welds, let alone 110 extra welds.

Based on the evidence presented, the court concludes that BBRI has not met its burden with respect to this change order. Specifically, BBRI has not established that the welding fell outside the scope of the Contract or that it complied with the contractual change order procedure with respect to additional work that it contends was requested by KCSR. Additionally, it has not satisfied all of the elements necessary to recover under quantum meruit. Accordingly, BBRI is not entitled to recover additional compensation with respect to Change Order 37, whether based on a contract or quantum meruit theory.

### 4.    Change Orders 38-40 (Equipment Delays—87,798.36)

Plaintiff contends that it is entitled to $87,798.36 for delays to equipment that it experienced during a fifteen-day period when the NTC machine stopped at the Colorado River bridge while waiting for KCSR's subcontractor Kanza to finish subgrade work. Plaintiff seeks a total of $65,000 for the delay to the NTC machine at a rate of $5,000 per day; a total of $10,214.36 for the delay to

the tie loader and unloader at a rate of $785.72 per day; and a total of $12,584 for the delay to the tie

car.  BBRI contends that it incurred the aforementioned costs as a result of the delay to the NTC

machine at the Colorado River bridge and it is, therefore, entitled to compensation in this amount,

which is based on rates in Schedule 1 of the SOW for delays to equipment.

KCSR responds that its denial of these three change order requests, for crew and equipment

delays at the Colorado River bridge while the NTC machine waited for the bridge to be completed,

were properly denied because BBRI could have avoided any delay if it had pre-plated the ties for El

Campo and used the NTC machine through El Campo in accordance with its schedule.  KCSR asserts

that the NTC machine should have arrived at the bridge on March 30, 2009, and the bridge was ready

for track construction on March 19, 2009, eleven days before the NTC machine arrived.  KCSR

contends that its decision and instruction to BBRI to move the NTC machine to the north  prevented

the machine from sitting idle during the slow process of constructing El Campo conventionally.

The parties contemplated that there might be delays to BBRI's work attributable to KCSR and

included a provision in the Contract for dealing with such delays. Jt. Ex. 4.002.  BBRI's claim for

delays to equipment in Change Order 38 through 40, therefore, sounds in Contract.  In closing

arguments, BBRI acknowledged that the parties had reached agreement and had executed a change

order to compensate BBRI to the change in schedule to move the NTC machine to the North.  Garcia

also testified that a change order was executed to compensate BBRI for moving certain equipment

back to El Campo.  In addition, BBRI acknowledged in closing arguments that the move to the North

ultimately did not delay the Project.  BBRI contends that the issue of whether it had pre-plated wood

ties for El Campo is a red herring and irrelevant to its change order for equipment delays at El Campo

because it could have built track through El Campo without moving to the North and finished the

Project on time if Kanza had completed the subgrade at El Campo on time. The court disagrees.

The parties strongly dispute whether BBRI and KCSR (Kanza) were on schedule or behind schedule when BBRI arrived in El Campo, and there was conflicting evidence on this issue. The parties also dispute whether KCSR's decision to move BBRI and the NTC machine to the North was due to Kanza being behind schedule with grading at El Campo or because BBRI had not pre-plated the wood ties for El Campo and was, therefore, unable to proceed through El Campo as planned. The court finds Cruz's deposition testimony and Peek's trial testimony on this issue persuasive. Specifically, Cruz testified that, except for one instance that did not include El Campo, there was never a situation where BBRI was unable to perform its work because Kanza had not completed the subgrading in front of BBRI. Def.'s Ex. 627 at 307-08. Peek similarly testified based on Project records that Kanza was always approximately five miles ahead of BBRI's crews.

Even assuming, as BBRI contends, that Kanza was behind schedule in completing the subgrade at El Campo, the court determines that BBRI was not prepared to proceed with the track construction at El Campo before moving to the North because it had not yet pre-plated the wood ties that were to be used through El Campo.[35] Further, although Garcia believed that BBRI could use the NTC machine with wood ties that had not been pre-plated, Harsco recommended against using the NTC machine in this manner because it was unsafe. KCSR similarly concluded that it would be unsafe and would not allow BBRI to use the NTC machine without wood ties that had not been pre-

---

[35] During the trial, Castle testified that he thought KCSR was required to provide BBRI with pre-plated wood ties for use through El Campo. Garcia testified similarly. The court gives little or no weight to Castle's and Garcia's testimony regarding this issue because it is contrary to their prior deposition testimony. Castle previously testified that pre-plating the wood ties was included in BBRI's lump-sum bid and Contract price. Garcia, on the other hand, testified in his deposition that BBRI was either going to use the NTC machine with wood ties pre-plated by a subcontractor or construct the track through El Campo conventionally without the NTC machine while the NTC machine sat idle. Castle attributed the inconsistencies in his prior testimony to confusion, whereas Garcia testified that he was nervous in his deposition. Garcia also explained at trial that it was his job to be innovative and creative to get the job done. The inconsistencies in their testimony, however, are not trivial. Castle's and Garcia's trial testimony on this issue is the exact opposite of what they testified to in their depositions. For this reason, the court gives little or no weight to their trial testimony regarding this issue.

plated through El Campo and instead requested BBRI to move the NTC Machine to the North of the

Project to avoid delay as a result of the NTC machine sitting idle while BBRI constructed the track

through El Campo conventionally without the NTC machine.

BBRI was opposed to the move, even though it had previously considered adding a second

crew in the North to make up lost time and finish the Project work by May 1, 2009.  BBRI, however,

requested and KCSR agreed to compensate it for the move, which according to Garcia, took only five

days.  Garcia testified that KCSR also agreed to an change order for BBRI to move certain equipment

back to El Campo.

According to BBRI's daily reports, BBRI moved to the North on February 20, 2016.  Working

from the North, BBRI and the NTC machine reached the Colorado River bridge on March 11, 2009.

Because construction of the bridge was not yet completed by Kanza's bridge contractor, the NTC

machine sat idle until March 25, 2009, while BBRI waited for the bridge construction to be finished.

Although the NTC was idle from March 12 to March 25, 2009, BBRI was actually only delayed

approximately one week at the Colorado River bridge because under the Contract the NTC machine

was  only scheduled to work every other week and, according to BBRI's daily reports, there were also

rain days during this time when its crews were unable to do any work on the Project.  The time that

the NTC machine was delayed at the Colorado River bridge is far less than it and BBRI's skeleton

track construction would have been delayed if the NTC machine had sat idle in El Campo while

waiting for BBRI to build the track conventionally through that area.

For this reason and because BBRI was compensated for the move to the North when it would

have otherwise incurred noncompensable delays at El Campo for a much longer time period, the court

concludes that any delay at the Colorado River bridge could not have caused BBRI to incur

compensable delays to its equipment, and BBRI is not entitled to recover for such delays to equipment

that it claims to have experienced during a fifteen-day period when the NTC machine stopped at the Colorado River bridge while waiting for KCSR's subcontractor Kanza to finish subgrade work. In support of this determination, the court accepts and incorporates by reference KCSR's proposed findings of fact regarding BBRI's failure to pre-plate wood ties for El Campo, to the extent not inconsistent with the court's findings of fact.  KCSR's Br. 10-13.  The court's resolution of this issue is based entirely on the credibility of the witnesses' testimony, or lack thereof, regarding the pre-plating of wood ties, and its determination that the decision to not allow BBRI to use the NTC machine through El Campo with wood ties that had not been pre-plated was made for safety reasons in accordance with the Contract.  Castle and Garcia testified on behalf of BBRI regarding this issue, and they were both impeached with their prior inconsistent deposition testimony. As noted, the numerous inconsistencies in testimony seriously undermined their credibility and BBRI's claim for equipment delays, as well as its Prolongation Delay Claim for the delay at the Colorado River bridge. The court finds Castles' and Garcia's explanations attributing the inconsistencies to nervousness and confusion unpersuasive.  Accordingly, BBRI is not entitled to recover under a contract or quantum meruit theory for Change Orders 38 and 40.

### 5.    Change Order 41 (Guardrails—$27,500)

Plaintiff contends that it is entitled to reimbursement for $27,500 it spent to pay a subcontractor to install guardrails on the Colorado River bridge as a safety measure for its employees working on the bridge.  Plaintiff contends that it was KCSR's responsibility under the Contract to provide a safe work environment, and installation of the guardrails was necessary to ensure its employees' safety.  Plaintiff contends that the amount it seeks is reasonable because this is the amount it paid the subcontractor.

KCSR responds that this change order for temporary guardrail installation to protect BBRI's crews working on the bridges was BBRI's, not KCSR's, responsibility under the Contract.  KCSR further asserts that when Castle was asked why BBRI submitted this change order request to KCSR when the cost was included in BBRI's pricing, he was unable to provide any explanation.

In support of this change order, BBRI relies on Garcia's and Kendrick's trial testimony on direct examination and written correspondence from Garcia to Cruz dated May 9, 2009; July 3, 2009, and July 6, 2009.  *See* Pl.'s Br. ¶ 104.  Garcia's May 9, 2009 e-mail to Cruz attached a memorandum that contained a list of unresolved change orders, including Change Order 41, which, according to Garcia's memorandum, was discussed by Garcia and Cruz on May 9, 2009.  Pl.'s Ex. 514.41.009. With respect to Change Order 41, Garcia's memorandum states:

> 12.  Installation of the Guard Rail for the Colorado River Bridge: I discussed with you [Cruz] that I was going to send a change order request for the installation of the guard rails by a subcontractor, due to the fact that KCS did not provide a safe working environment; as per discussion with John Dunsworth.  I expressed to you that OCCI worked on this bridge without fall protection, as proof you have received pictures documenting these actions.

*Id.* at 514.41.010.  According to a letter from Garcia to Cruz dated July 3, 2009, Dunsworth "was a consultant for KCS on the project at the time and in charge of the bridge construction."  *Id.* at 514.41.0004.  In this letter, Garcia also states as follows:

> Per our conversation on May 9, 2009 and an e-mail sent to you on the same day. Item #12 in reference to the Guard Rails for the Colorado River Bridge, BBRI is requesting for a change order for $27,200.00.  For the fact that KCS did not provide a safe working environment to work on [the] bridge, this was also discussed with Mr. Dunsworth.

*Id.*  In his July 9, 2009 e-mail to Cruz, Garcia asserts that KCS was responsible under the Contract for furnishing a safe work environment and guardrails on the bridges:

> Per contract Section 6. Default by Contractor it states that in the event contractor's work under a [S]tatement of Work causes or creates an unsafe condition,

the Company [KCS] shall have the right to immediately suspend Contractor's work under the Statement of Work by notice to contractor specifying the **UNSAFE CONDITION** and requesting immediate rectification of same.  I would like to remind you that it is the Carrier's [KCS] responsibility to furnish and supply a safe working environment and a clear understanding of this scenario is that KCS place guard rails on all the rest of the bridges throughout the project no matter how small or large it was, the problem on this scenario was that the Colorado River bridge was not ready for us to work [o]n it [due] to other contractor's delay and BBRI took the lead by correcting an unsafe environment after the recommendations from Mr. Dunsworth and Mr. Smith.

*Id.* at 514.41.0002.  In response to this e-mail, Cruz rejected Garcia's contention that BBRI was entitled to additional compensation for installing guardrails on the Colorado River bridge on the ground that this expense fell within the lump-sum already paid to BBRI.  *Id.*

On cross-examination, Garcia acknowledged that it was BBRI's responsibility to provide its employees with "fall protection" but continued to maintain that it was KCS's responsibility to provide a safe work environment. Tr. 445.  Garcia further testified that BBRI's obligation to provide fall protection to its employees only extended to the provision of safety harnesses or life lines, and a roller on the rail, but this was not possible because there was no rail at the Colorado River bridge because it was being refurbished.  *Id.*

Neither BBRI's contention nor Garcia's belief that KCSR was responsible for providing guardrails is supported by the Contract or federal law. Unambiguous language in the Master Agreement and SOW instead leads the court to conclude that BBRI was required under the Contract to provide guardrails for the Colorado River bridge and other equipment necessary to conduct its work in a safe manner.  Section 7 of the Master Agreement sets forth in detail BBRI's safety obligations. Among other things, this provision requires BBRI to: (1) "cooperate with other contractors working in the area to ensure complete on site safety," (2) comply with KCSR's safety rules and applicable Federal Railroad Administration ("FRA") safety rules and regulations in performing its work under

the Contract; and (3) "provide all . . . safeguards, which may be necessary . . . at any place where conditions reasonable require the same." Jt. Ex. 84.007-008. The contractual provision referenced in Garcia's July 6, 2009 e-mail further establishes that BBRI was responsible under the Contract for conducting its work in a safe manner, as it expressly states that BBRI's failure in this regard constitutes default under the Contract by it as the contractor. *Id.* at 84.006 (Section 6(A). Default by Contractor). Accordingly, this provision does not support Garcia's belief that KCSR was required under the Contract but failed to provide guardrails.

Moreover, Exhibit E to the SOW states: "Unless otherwise stated herein, Contractor [BBRI] shall furnish all materials, supplies, tools, equipment . . . necessary for the proper prosecution and completion of the Services. . . . KCSR will be supplying the following materials." Jt. Ex. 4.018. The list of materials in Exhibit E to be supplied by KCSR does not include guardrails or safety equipment of any kind. *See id.* The court, therefore, concludes that BBRI was required under the Contract to conduct its work in a safe manner and supply the equipment necessary, including guardrails, to ensure the safety of its employees.

The court's conclusion in this regard is supported by the final rule issued by the FRA that establishes minimum federal safety standards "to prevent accidents and casualties to *employees*" involved in railroad construction, including Bridge Worker Safety Standards for fall protection and guardrails. *See* 49 §§ C.F.R. 214.1 (purpose and scope) (emphasis added), 214.103-105 (fall protection), and 214.109 (guardrails); *Association of Am. R.R.s v. Department of Transp.*, 38 F.3d 582, 584 (D.C. Cir. 1994) (per curiam). The Bridge Worker Safety Standards "apply to railroad employees, railroads, and railroad contractors performing work on bridges." 49 § C.F.R. 214.101. Because BBRI contends that the rail guards were necessary to protect its own employees while performing railroad construction work on the Colorado River bridge, the court concludes that it was

responsible under the Bridge Worker Safety Standards for providing its employees with necessary safety equipment, including fall protection and guardrails. *See id.*; *see also Binz v. Brandt Const. Co., Inc.*, 301 F.3d 529, 533 (7th Cir. 2002) (concluding that the defendant did not have a duty to provide safety equipment to the decedent because the decedent was not an employee of the defendant and "the Bridge Worker Safety Standards only impose a duty which runs to employees."). Because the Contract covers BBRI's safety obligations, including those under the FRA, and the parties' respective duties for providing equipment, there can be no implied contract or recovery based on quantum meruit.  *See Woodard*, 384 S.W.2d at 675; *Mitsubishi Aircraft Int'l, Inc.*, 675 S.W.2d at 288. Additionally, any change to the Contract terms regarding the parties' respective safety duties would have had to have been in writing and signed by both parties' authorized representatives, and there is no evidence that any such amendment occurred here.  *See* Jt. Ex. 84.016 ("This Agreement may not be amended or modified except in writing signed by an authorized representative of each party."). There is also no evidence that the parties agreed to verbally modify their Contract in this or any other respect.

Even if not covered under the Contract, BBRI cannot recover additional compensation for Change Order 41 based on quantum meruit.  According to Garcia's testimony, BBRI hired a subcontractor to install guardrails on the Colorado River Bridge *for safety reasons to protect BBRI's workers*.  Thus, this work was not undertaken for KCSR, the party sought to be charged, and, while KCSR may have benefited indirectly to some small extent as a result of BBRI conducting its work in a safe manner, any such incidental benefit is insufficient to recover in quantum meruit.  *See Truly*, 744 S.W.2d at 937 ("To recover in quantum meruit, the plaintiff must show that his efforts were undertaken for the person sought to be charged; it is not enough to merely show that his efforts benefitted the defendant."); *Bashara v. Baptist Mem. Hosp. Sys.*, 685 S.W.2d 307, 310 (Tex. 1985)

("It is not enough to show that attorney Bashara's efforts benefited Baptist Hospital, however. Those efforts must have been undertaken 'for the person sought to be charged.'") (citation omitted).

In addition, BBRI's evidence does not establish that KCSR had notice that BBRI expected to be compensated for this expense before the guardrails were installed. *See Heldenfels Bros., Inc.*, 832 S.W.2d at 41 & n.4. Garcia states that he discussed with Dunsworth, a bridge construction consultant for KCSR on the project at the time in question that, "KCS did not provide a safe working environment to work on the bridge." Pl.'s Ex. 514.41.0004. After Cruz denied BBRI's request for additional compensation for this change order, Garcia added for the first time that "BBRI took the lead by correcting an unsafe environment after the recommendations from Mr. Dunsworth and Mr. Smith."[36] Pl.'s Ex. 514.41.0002. Again, however, neither of these statements demonstrates that KCSR had notice that BBRI anticipated payment from KCSR for this work *before* installation of the guardrails; nor does the evidence establish that Garcia told Dunsworth, before installation of the guardrails, that BBRI expected to be reimbursed for this expense. At most, Garcia's written correspondence to Cruz only shows that the parties discussed the issue of additional compensation long *after* the guardrails were installed on the Colorado River bridge.

Garcia was not asked to elaborate at trial regarding his statement that BBRI performed this work pursuant to Dunsworth's recommendation. Even assuming that Dunsworth agreed with Garcia that installing the guardrails would make a safer work environment for BBRI's workers, it is not evidence that he and Garcia discussed the issue of additional compensation. Further, Dunsworth, whose deposition testimony was admitted during the trial, testified that it was BBRI's responsibility to provide its workers with fall protection while working on the Colorado River bridge or any other

---

[36] It is unclear what role Mr. Smith played in the Project.

bridge in accordance with KCSR's safety rules and federal, state, and local law, including "Title 49, Part 214". Def's Ex. 629 at 110-111.  Dunsworth was quite critical of BBRI's work in general and testified, with respect to safety, that BBRI did not have any safety processes or standards other than the training that he provided BBRI.  *Id.* at 102, 111.  In a letter dated March 13, 2009, Garcia "publically thank[ed] Mr. Dunsworth for the fall protection class he gave to the BBRI employees" and stated that it was "an honor working with people" of his caliber.  Pl.'s Ex. 514.38.009.

The court finds Dunsworth's testimony on this issue to be more credible than Garcia's testimony. Unlike Garcia, whose story regarding the guardrails seemed to evolve over time in his letters and memorandum, Dunsworth's testimony on this issue was consistent and resolute. Moreover, Dunsworth does not have a "dog in the fight."  While Dunsworth acted a consultant for KCSR during this Project, he was not employed by KCSR and, at the time of his deposition, he had not done any work for KCSR since the Project.  Based on his testimony, the court concludes that Dunsworth may have agreed with Garcia regarding the need for BBRI to perform the bridge work in a safe manner and likely even insisted that BBRI perform the work in a safe manner, but he would not have agreed on behalf of KCSR that BBRI was entitled to additional compensation for doing what it was already required to do under the Contract or applicable regulations.

Further, BBRI has never alleged or taken the position that Dunsworth had actual or apparent authority, on behalf of KCSR, to approve or agree to this additional $27,500 expense, or that Garcia reasonably relied on any apparent authority of Dunsworth to approve such an expense, which on its face would appear to be outside of any authority Dunsworth had in constructing bridges.  Because the issue of agency or authority was never specifically raised by BBRI, the court declines to speculate or elaborate further on the issue except to note that, without more, the July 6, 2006 e-mail from Garcia to Cruz referencing Dunsworth's recommendation is insufficient to establish that Dunsworth had

authority to approve the $27,500 expense, or that Garcia reasonably relied on any apparent authority of Dunsworth in this regard. Even if Dunsworth had authority to approve such expenditure, the court concludes that, in light of the strong opinions expressed by Dunsworth regarding BBRI's safety obligations and the use of written change orders, he would not have verbally approved any request by BBRI for additional compensation to install guardrails; nor would he have approved a change order after the fact.[37]

Moreover, in seeking approval from Cruz or Peek, for this and other change order requests by BBRI for additional compensation, Garcia's conduct shows that he understood that Cruz and Peek were the only persons on the jobsite with authority to approve change orders on behalf of KCSR. Language in the Contract also provides that the parties' project managers were to act as the point of contact for the other party, Jt. Ex. 4.014, and neither Dunsworth nor Smith were KCSR's designated project manager. Accordingly, for all of these reasons, BBRI is not entitled to recover additional compensation for this change order under the Contract or quantum meruit.

### 6.    Change Order 42 (TXDOT Delay—$15,590)

BBRI seeks compensation for the $15,590 that it incurred as a result of a delay at FM 444 on December 9, 2008. BBRI contends that its work was delayed on this date when TXDOT ordered it to stop work on the crossing because KCSR had not yet informed TXDOT of the location of the top of rail or crossing elevation at the FM 444 crossing, which BBRI asserts was KCSR's responsibility. From this, BBRI appears to contend that it was KCSR's responsibility under the Contract to provide TXDOT with such information. BBRI contends that the labor costs it incurred and seeks

---

[37] *See* Def.'s Ex. 629 at 89 (Dunsworth Dep.) (testifying that Peek and Cruz made it clear to every contractor that "if they did not have a witten change order in place and accepted by . . . KCS and issued, they were doing the work for free."); *see also id.* at 101 (rejecting notion that verbal notice of an issue satisfied the requirement of having a signed written change order in place before work was performed).

compensation for as a result of this delay are reasonable because they are consistent with the labor rates in the SOW.

Defendant contests the validity of this claim and contends that, even if valid, the change order amount requested is overstated because it: (1) includes a $5,000 charge for the NTC machine even though BBRI's daily report shows that the machine was used on the day in question; (2) includes equipment not yet delivered to the site (water truck at $368 per day); and (3) calculates equipment rates using daily, rather than monthly, equipment rates in the Contract. Defendant also contends that BBRI did not submit this requested change order until eight months after the alleged delay, and, as a result, it had no way of investigating the cause or scope of the alleged delay.

The parties contemplated that there might be delays to BBRI's work attributable to KCSR and included a provision in the Contract for dealing with such delays. Jt. Ex. 4.002. BBRI's claim for delays to equipment in Change Order 38 through 40, therefore, sounds in Contract. Regarding this change order, Garcia testified that on December 9, 2008, BBRI was "coming across [at FM 444] and the agent from [TXDOT] stopped [BBRI] from working that morning [because] nobody had told us how high the track was going to be." Tr. 312. According to Garcia, the TXDOT agent told Cruz that he wanted to know how high the top of the rail was going to be to determine whether the approach would go too far into Interstate Highway 59 to accommodate "18-wheelers" and "lowboys." *Id.* at 312-13. Garcia's testimony as to what the TXDOT agent told Cruz is inadmissible hearsay and disregarded by the court in considering this change order. Garcia also testified, without explanation, that it was not BBRI's responsibility to coordinate with TXDOT at this location, and it was KCSR's responsibility to provide information to TXDOT regarding the track height. *Id.* at 313.

On cross-examination, Garcia agreed that this and other BBRI change order requests should have been submitted to KCSR closer in time to performance of the work or delay in question.

KCSR's contentions regarding overstated charges are also supported by the record.  The court, however, determines that BBRI is not entitled to additional compensation for Change Order 42 for other reasons.

BBRI's request for additional compensation under this change order is based on its contention that it suffered delay damages because KCSR failed to perform as required, presumably under the Contract.  Garcia did not explain why he believed that KCSR was responsible for providing information to TXDOT regarding the rail elevation at crossings, and BBRI does not explain in its posttrial brief why this was KCSR's responsibility.  BBRI instead contends, based solely on Garcia's testimony, that KCSR was responsible for providing TXDOT with track elevations at this crossing. It is undisputed that KCSR was responsible under the Contract for the railway design.  The court, however, was unable to find any provision in the Contract, and BBRI has not pointed the court to any provision in the Contract that requires KCSR to provide TXDOT with rail elevations at this crossing or any other crossing.  The only contractual provision that the court was able to find that pertains to work at crossings and TXDOT makes BBRI, as contractor, "solely responsible for coordinating with local municipalities and government agencies for road closures during road crossing work. . . . The road closure shall be done per MUTCD, TXDOT and local municipality rules and regulations."  Jt. Ex. 4.015 ¶ 16.  BBRI was also responsible under the SOW for "[p]rovision of necessary road closures and traffic control, & associated permits" at grade crossings.  *Id.*  at 4.007.

Moreover, Cruz testified that work at road crossings was delayed and complicated over a period of one to two months in the beginning of the Project because BBRI failed to coordinate with TXDOT and provide TXDOT with the correct plans.  Cruz also testified that BBRI did not understand how to construct crossings properly, including grading compaction, elevations, and setting up the track in terms of approaches.  Cruz testified that, as a result, TXDOT shut down the work on the first

several crossings and did not trust KCSR or the people overseeing the work on the  Project. According to Cruz, it was only after a number of meetings with TXDOT after the first crossing debacle, including a meeting that required travel to TXDOT's main office in Austin, Texas, that TXDOT would allow KCSR to work at another road crossing.  In this regard, Cruz testified as follows:

> Q:    At the beginning of [] the project, was Balfour proficient with the road closures at crossings?
>
> A:    No, sir.
>
> Q:    What happened there?
>
> A:    They [] had a person that was supposedly—I can't think of the name—that worked for BBRI that came from some other location that was supposed to handle all the permits in coordination with TXDOT, all the different areas and offices along the route, and set up all the traffic control plans and set up all the signs, and [] only say okay, he'd set out to do his job.  *Came to—we had the first road crossing that we were going to do, and they weren't prepared.  They didn't have the correct plan.  They didn't coordinate it with TXDOT.  Basically TXDOT shut us down until we [] could—*
>
> Q:    *So the crossing work couldn't go [] forward that day?*
>
> A:    *No. And the same thing with several other crossings after that.* And that's when we told them that they needed to . . . get somebody that knew how to do that in Texas, that could design a traffic control plan as per TXDOT. . . .
>
> Q:    Did you recommend someone to them?
>
> A:    We had—there were several . . . companies, and one of them was Hanson-Wilson, and they decided to go with them.
>
> Q:    *Did things improve after Hanson-Wilson got involved?*
>
> A:    *Well, it was kind of a slow improvement. . . .   But you've got to understand that at the point where these people came on board the damage with TXDOT was pretty bad, and they didn't trust us to do the right thing.*
>
> Q:    And when you say 'these people came on board," who are you referring to?

A: Hanson-Wilson . . . and this sign company that [BBRI] hired.

Q: Okay.

A: *And so pretty much we had to go through a lot of meetings with TXDOT to reassure them that we knew what we were doing and pretty much show them how we were going to do it and everything else. And—I mean, . . . he came up —all the way up to their Austin main office for them to let us do another crossing because that's how bad—how bad it got in terms of doing the work.*

Q: *. . . How long of a period of time was that affecting the work? I mean, like the first week, the first month?*

A: *No, it went on for a good month, month and a half, probably, literally, more. And we got involved and basically I had to be there the whole time working with them because they didn't have a person on the ground that understood how to do grading compaction[] and elevations and all that. So it was either me or Keith Davis or Eduardo Pena that would kind of take them—guide them through how to do the crossings properly and how to set up the track and how to set up the . . . runoffs in terms of the approaches and everything.*

Q: *. . . Did the crossing work—not just the permitting but the actual work itself, was it longer than what was anticipated?*

A: *Yes, sir. In some cases, yeah.*

Def.'s Ex. 627 at 275-77 (emphasis added). BBRI's construction supervisor Humberto Garcia acknowledged that BBRI experienced TXDOT related delays at road crossings before hiring Hanson-Wilson. Def.'s Ex. 630 at 46:17-48:7. Even after BBRI hired Hanson-Wilson, it continued to struggle with road crossing work. In a January 18, 2009 e-mail from Cruz to Altez, Cruz expressed his frustration with Altez's lack of Project oversight and BBRI's continuing to install crossings that were supposed to be eliminated:

> Your crossing crew continues to install crossings that are supposed to be eliminated. They installed a private crossing at MP64.47. This needs to come out. Again, you are wasting valuable time and resources.
>
> I'm getting tired of doing your jobs. You need to learn to communicate better and spend time out in the field. This nonsense needs to stop now! If I don't see a dramatic

change for the better by Wednesday I will order BBRI to replace the project management.

Def.'s Ex. 589.

According to BBRI Daily Report No. 12 for December 9, 2008: "Crossings . . . Work at FM 444 Grade Crossings was cancelled today. TX Dot had a discrepancy with KCS about the approved design for the crossing. We are planning to build it tomorrow."  Pl.'s Ex. 435.009.  BBRI Daily Report No. 13, for December 13, 2008, states that work at the FM 444 crossing "has been performed as a temporary work to continue with the track installation. . . .  The operation of asphalt installation at FM 444 was stopped following Miguel Cruz['s]—KCS Project Manager—instructions, after coordination with TX Dot representative on site, at 9:00 a.m."  *Id.* at 435.010.  Garcia testified that he was onsite on December 9, 2009, when the delay at FM 444 occurred.  It is unclear from his testimony though whether he or someone else prepared BBRI's Daily Report No. 12 for this date. While Daily Report No. 12 states, and Garcia testified, that BBRI's work at FM 444 crossing was cancelled because "TX Dot had a discrepancy with KCS about the approved design for the crossing," Cruz's testimony and e-mail to Altez paint a different story and suggest that the road crossing delays experienced on the Project and TXDOT's increased scrutiny of the Project were attributable to BBRI's poor performance.

Given the conflicting evidence as to what motivated TXDOT to shut down work at the FM 444 crossing and the evidence that BBRI was responsible for crossing delays early in the Project, the court decides this claim in favor of KCSR.  In doing so, the court accords greater weight to Cruz's testimony and his e-mail and concludes that, but for the damage done early on in the Project by BBRI, TXDOT would not have been scrutinizing BBRI's work at this or any crossing, and this and the other delays associated with BBRI's crossing work would not have occurred. For this reason, the court

concludes that BBRI cannot recover the additional compensation sought for this change order under the Contract.  Because the change order is governed by the Contract, recovery in quantum meruit is precluded.

### 7.    Change Order 43 (Rail Delay—$61,127.22)

Plaintiff seeks $61,127.22 for this change order based on its contention that its work was delayed three days because it ran out of rail at MP 49.54 between February 5 and 7, 2009. In its posttrial brief, Plaintiff contends that it was KCSR's responsibility under the Contract to deliver rail, and its workers and equipment were "prevented from working as planned" on February 5, 6, and 7, 2009, in building the skeleton track during this time frame.  Pl.'s Br. ¶ 106.  In this regard, Plaintiff asserts:

> The Schedule showed that BBRI should have been building track between MP 47 and MP 46 (from south to north) on February 6, 2009. (Joint Ex. 230 at p. 11 under Activity ID A4650). Therefore, according to the Schedule, KCSR should have delivered enough rail for BBRI to build track down to MP 46 by February 6, yet BBRI ran out of rail at MP 49.54 the day before. (BBRI Ex. 435 at p. 62-67).

*Id.*  BBRI contends that the labor costs it incurred and seeks compensation for as a result of this three-day delay are reasonable because they are consistent with the labor rates in the SOW.

KCSR responds that BBRI is not entitled to compensation for this change order because it provided BBRI with a schedule as to when deliveries would occur, and BBRI has not proved that KCSR failed to meet that schedule.  On the other hand, KCSR asserts that, if the court determines that KCSR fell behind its schedule for rail construction, it agrees that the change order is proper subject to its requested setoff.  KCSR also contends that BBRI improperly charged daily, instead of monthly, equipment rates. KCSR therefore maintains that, at most, BBRI should only receive $52,080.45 for this claim *if* the court determines that KCSR was behind schedule, and BBRI is entitled to compensation.

The court construes this change order as one for breach of the Contract because BBRI contends that it was prevented by KCSR from performing its work under the Contract. The precise issue of whether BBRI's crew was "prevented from working as planned" under "the Schedule" on February 5, 6, and 7, 2009, in building the skeleton track, was raised for the first time in BBRI's posttrial brief. Pl.'s Br. ¶ 106. BBRI defines "the Schedule" in its posttrial brief as the original as-planned schedule prepared by BBRI's scheduler Whitfield in October 2008 (Jt. Ex. 230).

At trial, however, Garcia never said that BBRI was working under the as-planned schedule or was expecting rail deliveries from KCSR in accordance with that schedule between February 5 and 7, 2009. Garcia instead simply read from his July 6, 2009 letter to Cruz as follows:

> Letter 115, July 6, 2009, addressed to Miguel Cruz by me, three days without rail. Per our conversation on February 4, 2009, it was brought to your attention that Balfour Beatty Rail, Incorporated had installed all the rail that KCS has supplied and BBRI would be requesting a change order for this delay. KCS delivered rail on January 29, 2009, which BBRI had distributed and installed by February 4th. BBRI [was] therefore delayed and unable to complete construction work on February 5, February 6, and February 7, before the next rail was delivered on February 8. BBRI is requesting a change order for $61,127.22 for all labor and equipment delayed during this period.

Tr. 314. Regarding the reason why BBRI incurred these costs, Garcia explained: "Because we had to keep the equipment idle. We had to keep all the men. We couldn't tell the men to go home. We couldn't send the machines home. We had to keep the machines there. So everything was idle until we [received] the next shipment of rail." *Id.* When asked whose responsibility it was to ship the rail to BBRI, Garcia responded simply, "KCS." *Id.* When asked the leading question, "Did KCS cause this delay due to lack of rail," Garcia responded without explanation, "Yes, KCS caused this delay due to lack of rail." *Id.* at 313-314.

It is undisputed that KCSR was responsible for delivering rail for the Project. Garcia, however, was not asked and did not testify why KCSR should have delivered enough rail for BBRI

to build track from MP 49 to MP 46 by February 6, 2009 under the as-planned schedule.  Garcia also

did not testify whether it was his belief or the parties' intention as of February 6, 2009, that KCSR

was still delivering rail in accordance with the dates in the as-planned schedule.  Likewise, BBRI does

not point to and the court was unable to find any witness testimony in the trial transcript to support

its contention that KCSR should have been delivering rail under the as-planned schedule as of early

February, rather the revised rail delivery schedule referenced in KCSR's posttrial brief and discussed

by Peek during the trial.

Peek testified, and the evidence establishes that, KCSR modified its rail delivery schedule

because BBRI was behind schedule and had a slow start.  Peek testified regarding BBRI's numerous

problems in the beginning of the Project.  Tr. 1126-35.  According to Peek, in mid-to- late-December

2008, KCSR slowed and then stopped delivering ballast to the Project site because the ballast

stockpile was full.  Tr. 1128-29, 1134-35.  Around the same time, KCSR revised the rail delivery

schedule because it was concerned that BBRI would not complete its work by the deadlines set forth

in the Contract.

On December 18, 2008, Peek circulated by e-mail the first "Revised Rosenberg Rail

Schedule" to BBRI and other contractors, including Garcia and Altez.  Pl.'s Ex. 458.002.  Under the

revised schedule, the rail delivery date for "Train #9" for use on MP 50.9 to MP 45 was not scheduled

until February 16, 2009.  Pl.'s Ex. 458.002.  This schedule not only revised the rail deliveries for

BBRI's track work that was currently proceeding south to north, but also provided for delivery of rail

to the north end of the Project site in February 2009.  The change in rail deliveries also meant that

BBRI's track construction would have to be adjusted to coordinate with the rail deliveries because

the two activities were related.  KCSR initially considered adding a crew, either an additional BBRI

crew or another contractor to build conventionally from the north while the NTC machine continued to work from south and requested BBRI to provide a revised schedule in this regard.  Tr. 1135, 385-86; Jt. Ex. 53.  BBRI vigorously opposed KCSR's request for it to revise its construction schedule to work from the north because it had bid the Project on the assumption that it would be working in a linear fashion from the south.  Discussions as to how to revise the construction schedule continued for approximately two months.  *See* Pl.'s Ex. 458; Jt. Exs. 248, 50, 310, 312, 53, 315, 66; Pl.'s Exs. 462, 18 (illustrating chronological progression of discussions from December 18, 2008, to February 11, 2009).

BBRI continued to voice its opposition to working from the north as late as February 10 and 11, 2009, as requested by KCSR, but it ultimately agreed to the move and a change order was executed on February 16, 2009, to compensate BBRI for the change to its work.  *See* Pl.'s Ex. 462, 514.03; Jt. Ex. 18. Although BBRI was opposed to the move because it had bid on the assumption that it would work from the south and was concerned that moving to the North would delay its work, the change order provision in the Contract contemplated and expressly allowed KCSR to "at any time from time to time, order additions, deletions, or revisions" to BBRI's work.  Jt. Ex. 84.006.  The SOW also permitted KCSR to require BBRI to add additional manpower and equipment at no additional cost to KCSR if, in its opinion, BBRI fell behind schedule at any time.  Jt. Ex. 4.002.

The court, therefore, concludes based on the evidence before it, that KCSR's decision to revise the rail delivery schedule was effective immediately upon communication to BBRI in December 2008 and it was not incumbent on BBRI's agreement, although BBRI was entitled to seek compensation for the revision to its work under the change order provision.  The parties correspondence shows that BBRI was aware of the revised rail schedule.  Garcia, Altez, and Whitfield were copied on the

December e-mails that included the revised rail schedule and the subsequent correspondence regarding the change.  In response to questioning by BBRI's counsel, Garcia confirmed receiving Peek's e-mail and the attached revised rail schedule.  Tr. 196-97.  He also acknowledged that, according to this revised schedule, KCSR was not scheduled to deliver rail to MP 50.9 until February 16, 2009.  Whitfield testified, and the parties' communications during the two-month period shows, that he was requested to update or modify BBRI's construction schedule accordingly to complete its work consistent with the Contract deadlines.  Pl.'s Ex. 458.001, 458.008; Tr. 503:25-508.  On January 11, 2009, Altez advised Dunsworth, KCSR's bridge contractor, that BBRI was in the process of adjusting its construction schedule in light of KCSR's changes to the rail delivery schedule.  Jt. Ex. 50.  On January 22, 2009, two weeks before BBRI's crews reached MP 49.54, Whitfield acknowledged in an e-mail to Altez and Garcia that his revised construction schedule in which BBRI was still insisting on working from the south was inconsistent with "[t]he current KCS rail delivery schedule." Jt. Ex. 315.  Thus, Garcia, Altez, and Whitfield were all aware that changes had been made to KCSR's rail delivery schedule before February 6, 2009.

It appears from the parties' correspondence that some additional revisions were made to the rail delivery schedule between December 18, 2009, and January 22, 2009, based on their discussions. Regardless, the foregoing evidence establishes that KCSR was no longer required to deliver rail in accordance with the as-planned schedule, notwithstanding BBRI's protestations to the contrary between December 18, 2008, and February 16, 2009; and BBRI has not brought any evidence to the contrary to the court's attention to support its contention that KCSR should have been delivering rail under the as-planned schedule between February 5 and 7, 2009.  Further, the as-built schedule prepared by Whitfield shows that after BBRI notified KCSR on February 4, 2009, that it needed

additional rail, KCSR delivered "Rail Delivery Train 9 (Rail to Complete MP 50.9-MP 44.0)" on February 9, 2009, seven days ahead of the revised rail schedule, which is consistent with Garcia's testimony. Pl.'s Ex. 431 at BBRI003669. Accordingly, for all of these reasons, the court agrees with KCSR that BBRI has not met its burden of showing or pointing to any evidence to establish that KCSR was behind on rail delivery between February 5 and 7, 2009. Thus, BBRI has not established that KCSR breached the Contract, and it is not entitled under the Contract to recover additional compensation for this change order.

### 8.     Change Order 44 (Materials for CrossbBuck Installation—$686)

BBRI contends that it is entitled to compensation for $686 for materials used in crossbuck installation. BBRI asserts that the materials were necessary for BBRI to install the signs provided to it by KCSR, and KCSR was responsible for providing these materials. KCSR responds that BBRI is not entitled to compensation for this change order request because the materials at issue were not on the list of materials that KCSR was required to provide under the SOW.

Regarding this change order, BBRI relies on the trial testimony of Garcia and Kendrick and Garcia's July 9, 2009 letter to Cruz. *See* Pl.'s Br. ¶ 108. Garcia testified as follows at trial regarding this change order:

Q:     I want to turn your attention briefly to Balfour Beatty 514.44, can you identify for the Court this document?

A:     Letter 124, July 9, 2009, to Miguel Cruz, request for change order material for installation of cross bucks. BBRI is requesting a change order in the amount of $686.90 for the material costs such as lags, screws, washers, et cetera for the installation of cross bucks throughout the project.

Q:     Did Balfour Beatty incur the costs identified in this document?

A:     Yes, sir.

**Memorandum Opinion and Order - Page 120**

Q:     Did KCS pay it?

A:     I don't think so.

Q:     Was it—whose responsibility was it to provide this material that is listed here in 514.44.

A:     KCS.

Q:     Were these costs necessary?

A:     Yes, they were necessary.

Q:     Why is that?

A:     Because we were given the signs to put on the posts, and we had to buy the lag screws to make it attach to the post.

Q:     And were those costs . . . the responsibility of Balfour Beatty in the contract?

A:     No, they were the responsibility of KCS.

TR. 315-16.  Kendrick's testimony focused on the reasonableness of the amount requested by BBRI for this change order, which was based on actual cost of materials, plus a ten percent "mark up."  TR. 901-02.  Kendrick did not know what a "cross buck" was but testified, without elaborating, that he thought that it was reasonable or "a fair way to do it" for BBRI to use "actual cost plus a mark up." *Id.*

According to Chapter 471 of the Texas Transportation Code, a "Crossbuck" is "a standard [railroad] grade crossing warning sign . . . described in the Manual of Uniform Traffic Control Devices issued by the United States Department of Transportation, Federal Highway Administration." Tex. Transp. Code Ann. § 471.004 (West 2013) (Warning Sign Visibility at Railroad Grade Crossings).  Garcia did not explain why he believed that KCSR was responsible under the Contract for providing "lags, screws, washers," and other materials needed for installation of the "cross buck"

signs, and BBRI's posttrial brief is silent on this issue.  Exhibit A to the SOW sets forth the "Services" to be performed by BBRI or its "Scope of Work" and states that the work scope set forth in this exhibit is included in the lump-sum contract price.  Jt. Ex. 4.007.  One of the services or activities listed in the summary table is "Signage," which is described as:  "Installation of all required mileposts, whistle boards and grade crossing **cross buck signs** per, TXDOT specification."  Jt. Ex. 4.008 (emphasis added).  From this, the court concludes that BBRI was responsible under the Contract to install crossbuck signs as part of the lump-sum Contract price.

Exhibit E to the SOW lists the materials to be provided by KCSR and states, "Unless otherwise stated herein, Contractor [BBRI] shall furnish all materials, supplies, tools, equipment and labor necessary for the proper prosecution and completion of the Services."  *Id.* at 4.018.  Neither crossbucks nor materials for installing crossbucks are included in the list of materials to be supplied by KCSR under the Contract.  *See id.*  Further, the Contract defines the "Work" to be performed or furnished by BBRI as "all supervision, labor, materials, tools, equipment, supplies, and things of every nature, which may be needed in the prosecution of the work described in the [SOW] executed by the parties."  Jt. Ex. 84.003.  Accordingly, the court concludes that KCSR had no duty under the Contract to supply materials necessary for crossbuck sign installation, and BBRI is not entitled to additional compensation under the Contract to recover the amount it seeks for $686 for materials used in crossbuck installation.

Moreover, even if KCSR provided BBRI with "signs to put on the posts," BBRI has not shown or even alleged that such conduct amounted to a knowing waiver of KCSR's rights under the Contract or that the parties agreed to amend the Contract, either verbally or in writing, to make KCSR responsible for providing BBRI with materials necessary for crossbuck installation.  There is also no

evidence that KCSR directed BBRI to install the crossbuck signs in a manner or amount that was different from that contemplated under the Contract.  Even if KCSR requested BBRI to install crossbuck signs in a manner or amount different from that contemplated under the Contract, BBRI has not met its burden of establishing that it complied with the change order provision in the Master Agreement, applicable to changes, additions, revisions in the Work requested by KCSR.  Jt. Ex. 84.006.

Further, because the matter for which BBRI seeks recovery is covered by and falls within the scope of the Contract, it cannot recover under quantum meruit, *Black Lake Pipe Line Co.* 538 S.W.2d at 86, and none of the exceptions applies here to the rule that recovery in quantum meruit is precluded when an express contract covering the subject matter exists.  *See Truly*, 744 S.W.2d at 936-37 (discussing the partial performance exception); *W & W Oil Co.*, 784 S.W.2d at 537 (listing exceptions).  Even assuming that recovery for this change order is not covered by the Contract, any quantum meruit claim by BBRI with respect to this change order fails because there is no evidence that KCSR agreed to compensate BBRI for this expenditure or anticipated, *before* BBRI's purchase of the materials for crossbuck sign installation, that BBRI expected to be reimbursed.  *Heldenfels Bros., Inc.*, 832 S.W.2d at 41 & n.4.  Accordingly, BBRI is not entitled, under the Contract or quantum meruit, to recover the $686 sought for materials it purchased and used to install crossbuck signs.

### 9.    Change Order 45 (Ballast Off-loading at Edna—$2,850)

Plaintiff contends that it is entitled to compensation in the amount of $2,850 as a result of KCSR's off-loading ballast at Edna on March 9 and 10, 2009.  BBRI asserts that the work was

requested by KCSR and outside of its scope of work under the Contract.  For support, BBRI relies on Garcia's trial testimony and its Contractor Daily Reports dated March 9 and 10, 2009.

Defendant contends, based on Peek's testimony and his review of the Contractor Daily Reports dated March 9 and 10, 2009, that its denial of half of this claim was proper because this documentation "shows work at the El Toro siding, which was part of BBRI's work, and the Edna setout track, which was not part of BBRI's work." Def.'s Br. 40.  KCSR, therefore, agrees that BBRI is entitled to compensation for half of this change order request or $1,425 for the off-loading of ballast at Edna for one day, subject to a setoff.

The March 9, 2009 report states that BBRI dumped ballast in El Toro, not Edna as contended by BBRI.  The court agrees with KCSR that BBRI is not entitled to additional compensation for dumping ballast in El Toro because BBRI does not contend, with respect to this change order, and has not presented evidence that KCSR requested it to perform extra work in the form of off-loading ballast in "El Toro"; rather, its claim is for extra work for off-loading ballast in Edna.  Pl.'s Ex. 514.45.002-.003.

From the court's review of BBRI's March 10, 2009 report, it appears more likely that the off-loading of ballast on this date was also in El Toro.  While Edna is noted as the location for the work on the top right corner of the report, the work description below states that ballast was dropped at "~~Edna~~ El Toro." Pl.'s Ex. 514.45.004.  KCSR, however, has agreed to BBRI's request for $1,425 for the off-loading of ballast on March 10, 2009, subject to a setoff for its claims.  Def.'s Br. 40; Tr. 1223-24.  The court, therefore, concludes that BBRI is entitled to recover $1,425 for Change Order 45 for off-loading ballast on March 10, 2009, subject to KCSR's right to a setoff in this amount.

### 10.       Change Order 46 (Signs for Road Closures—$5,938.35)

BBRI seeks $5,938.35 for temporary signs it supplied to identify road closures for the crossings that were removed, as reflected in a March 31, 2009 invoice for the materials and July 9, 2009 letter.  KCSR agrees to this change order request, subject to its request for a setoff in this amount.  The court, therefore, concludes that BBRI is entitled to recover $5,938.35 for Change Order 46, subject to KCSR's right to a setoff in this amount.

### 11.       Change Order 47 (Rail Adjustment in Gulf Coast's Work Area—$26,608)

Plaintiff contends that it is entitled to $26,608 for rail adjustments (de-stressing) performed at KCSR's request in Gulf Coast's work area because it was outside of the scope of BBRI's Work under the Contract.  KCSR agrees to this change order request, subject to its request for a setoff in this amount.  The court, therefore, concludes that BBRI is entitled to recover $26,608 for Change Order 47, subject to KCSR's right to a setoff in this amount.

### 12.       Change Order 48 (Surfacing Delays—$85,000)

Plaintiff contends that it is entitled to $85,000 for delays to its surfacing work on 27 days between December 11, 2008, and April 1, 2009 (December 16, 22, 23, 27, 28, 29, 30, 2008; January 2, 12, 13, 21, 25, 30, 2009; March 25, 2009; and April 1, 2009).  Plaintiff contends that the "delay was caused by KCSR's train delays," and "BBRI's laborers and surfacing equipment were prevented from working as planned at the crossing at a cost to BBRI of $3,150 per day."  Pl.'s Br. ¶ 112.  BBRI maintains that it incurred these costs as a result of the delay, and the amount sought is reasonable.

KCSR disputes this claim and contends that it is not responsible for any delay to BBRI's surfacing work on December 16, 23, 27, and 29, 2008; January 12, 13, 21, and 30, 2009; or April 1, 2009.  KCSR asserts that even BBRI's expert agreed that there was nothing in his "record of delays"

that indicated that it did anything on these dates to delay BBRI's work.  Def.'s Br. 41.  Additionally,

KCSR contends that BBRI's documentation does not support the requested change order because it

does not show that KCSR delayed BBRI's work or that BBRI was unable to perform at least four

hours of work.

For support, BBRI relies on Garcia's and Kendrick's testimony; a letter from Garcia to Cruz,

dated July 9, 2009; and various BBRI Daily Reports authored by persons other than Garcia and

Kendrick.  A majority of the reports was prepared by William Brown.  The rest of the reports relied

on by BBRI were prepared by Bryan Brown, Teddy Martin, D. Hester, and Jose Ferguson.  In

observing Garcia and Kendrick testify regarding this change order, it was readily apparent to the court

that they did not have personal knowledge of the alleged delays referenced in the daily reports.

Garcia's July 9, 2009 letter to Cruz was not written until several months after the alleged surfacing

delays, and this change order, like many of BBRI's change orders, was prepared several months after

the alleged delays using a forensic-type review of daily reports prepared by others on the Project site.

Garcia's unfamiliarity with the basis for this change order was also evident from his testimony

or lack thereof.  At trial, Garcia merely confirmed that he had written the July 9, 2009  letter in which

he states: "BBRI is requesting a change order for $3,150.00 per day for the delays of the surfacing

operation for a total of 27 days.  The total cost associated with this change is $85,000."  Pl.'s Ex.

514.002.  When asked why BBRI incurred the costs for this change order, Garcia testified that BBRI

did not have sufficient ballast, so equipment sat idle.  Tr.  319 ("We had to keep the machines there,

so when the ballast comes in, we can do the raising and tamping, when the ballast comes in. When

we didn't have enough ballast, the machine had to sit there idle.").  Change Order 48, however, is not

for delays to equipment; it is for delays to labor associated with surfacing operations.  Additionally,

other credible evidence was presented that the ballast stockpile was near or at capacity, and there was no place left for KCSR to put the ballast.  KCSR, therefore, had to slow and eventually stop delivering ballast to the site in mid to late December 2008 to let BBRI catch up with its work.  BBRI, on the other hand, offered no credible evidence that it had insufficient ballast (less than 2640 tons available per day) to perform its work.

Further, the reports are not sufficiently detailed, and no witness testimony was provided to explain the basis or extent of the delay.  Most of the reports merely say "train delay," or "delayed by rock train."  Some reports indicate the length of the delay, while others do not.  Regardless, it is not clear from the face of these reports whether BBRI's crews were prevented from working more than four hours on the reported dates.[38]  Brown agreed in his deposition that BBRI was not prevented from working more than four hours on several of the reported dates and, in some instances, was unable to ascertain from his review of the reports whether this was the case.  Def.'s Ex. 628 at 121-126.  He also testified that the welding work delay reported on December 16, 2008, did not affect BBRI's surfacing operations because welding was not part of BBRI's surfacing work.  *See id.*

Finally, BBRI contends, but it has not proved by a preponderance of the evidence that it was prevented from doing surfacing work "as planned."  Pl.'s Br. ¶ 112. More specifically, BBRI has not explained or shown that its work was delayed because it was performing work in accordance with the construction schedule in place on the dates in question, but KCSR's train ballast deliveries were not done in accordance with its delivery schedule.  Because of BBRI's late start, the track construction and ballast delivery schedules were modified in mid-February 2009.  It is unclear what construction

---

[38] BBRI's acknowledged in closing arguments that the "Delay Day" provision in the Contract applied to the change orders, even though BBRI took the position that it did not apply to BBRI's cumulative impact or Prolongation Delay Claim.  For the reasons previously explained with respect to this provision and the Prolongation Delay Claim, the court concludes that the "Delay Day" contractual provision also applies to BBRI's change orders that are based on delays to its work that it contends were caused by KCSR.

and delivery schedule the parties were working under after this time.  Prior to this time, the parties'
ballast-related construction and ballast deliveries appear to have continued under the original as-
planned schedule created by Whitfield, even though KCSR revised the rail schedule in late December
2008, and Whitfield prepared several proposed revised construction schedules that included modified
ballast deliveries that were discussed by the parties from late December 2008 to mid-February 2009.

Based on the court's review of the as-planned schedule prior to March 2009, it appears that
KCSR's ballast deliveries were done in accordance with Whitfield's schedule or on dates when BBRI
was not scheduled to do surfacing work.  For example, no work by BBRI was scheduled for
December 25 to 28, 2008.  If BBRI was attempting to make up lost time by working on these dates
or other dates when it was not scheduled to do so, it can hardly blame KCSR for interfering with its
"as planned" work on these or other dates when KCSR was delivering ballast to the site in accordance
with the as-planned schedule.  BBRI has not provided the court with sufficient information regarding
the construction and delivery schedule that the parties were operating under after February 2009 for
the court to determine whether it or KCSR was responsible for the delay to BBRI's "as planned"
surfacing work on March 25 and April 1, 2009.  Because BBRI did not sufficiently develop this
evidence or show that its surfacing crews were prevented from working more than four hours on the
reported dates, the court concludes that BBRI has not met its burden of proof with respect to Change
Order 48.  In addition, as noted, the court found Garcia's and Kendrick's conclusory and inconsistent
testimony to be unhelpful and lacking in credibility.  The court put both parties on notice during the
trial that such conclusory testimony that was not sufficiently explanatory or detailed would affect the
court's ability to determine credibility and disputed fact issues. Tr.  244-45.  Accordingly, for all of
these reasons, BBRI is not entitled to additional compensation for Change Order 48.

### 13.    Change Order 49 (Extra Survey Work to Restake Center Line—$1,698)

On July 9, 2009, BBRI submitted Change Order 49 to KCSR for work performed on March 24 and April 3, 2009.  BBRI contends that it is entitled to $1,698 for labor associated with restaking the track center line on March 24 and April 3, 2009, because the staking originally performed by it was destroyed or knocked down by KCSR's grading contractor Kanza.  BBRI asserts that it was, therefore, necessary to restake the center line.  BBRI maintains that the amount sought is reasonable because it is based on the unit rate of $849 per day for surveying as set forth in the SOW.

Defendant, on the other hand, contends that it properly denied this claim for additional compensation because it was submitted months after the work was performed.  As a result, Defendant contends that it was deprived of the opportunity to investigate the claim.

Other than BBRI's reference to "extra survey work," neither party specifically addresses in their posttrial briefs whether the corrective work done by BBRI falls within the scope of the Contract. BBRI, however, relies on the testimony of Kendrick who testified that, while BBRI was responsible under the Contract for staking the center line initially, the Contract does not address a situation such as this when remedial or corrective work is necessary as a result of one party's contractor destroying work previously done by another party's contractor.  Kendrick further testified that it was industry practice for such work to be paid as "additional work."  Tr. 910.

It is unclear from the parties' posttrial briefs whether they contend that this change order claim is for corrective work that falls within or outside of the Contract.  The parties appear to acknowledge that BBRI was responsible under the Contract for survey work and staking, but BBRI's reference to "extra survey work" suggests that this claim is for work outside the scope of the Contract.  Pl.'s Br. ¶ 113.  Either way, the court concludes that BBRI is not entitled to recover the $1,698 sought for this

claim.  There is no evidence that KCSR was reasonably notified, *before* BBRI performed the survey and restaking work, that BBRI expected additional compensation for this work above the contractual lump-sum already received.  While the work is reflected in BBRI's Contractor Daily Report dated March 24, 2009, and April 3, 2009, there is no evidence that KCSR received a copy of these reports beforehand.  The Master Agreement requires BBRI to maintain daily reports, but it does not require BBRI to provide the reports to KCSR unless requested.  *See* Jt. Ex. 84.004. BBRI has not presented evidence that KCSR requested or BBRI provided KCSR with the March 24, 2009, and April 3, 2009, reports before performing the restaking work.   Accordingly, BBRI cannot recover in quantum meruit for this work.

Moreover, assuming that the work falls within the scope of the Contract, the claim fails because BBRI waited more than ninety days after performing the work before submitting an invoice or seeking compensation from KCSR.  The Master Agreement provides the following regarding compensation and invoicing: "Invoices must be submitted to Company within ninety (90) days of performance of the Work contained thereon.  Any portion of any invoice reflecting Work performed more than ninety (90) days prior to receipt of the invoiced by Company will not be paid."  Jt. Ex. 84.004.  This provision expressly applies to "the Work" to be performed by BBRI under the Contract and unambiguously requires BBRI to submit requests for compensation within ninety days of the work being performed.   *See id.*; *see also* Jt. Ex. 84.003 (defining "the Work").   Because BBRI received a lump-sum payment for its work under the Contract, the court concludes that this provision applies to requests by BBRI for additional compensation for Work, regardless of whether the Work was performed at KCSR's request.

The evidence unequivocally establishes that the extra survey and restaking work performed by BBRI was done more than ninety days before BBRI (Garcia) notified KCSR (Cruz) by letter dated July 9, 2009, that BBRI was seeking additional compensation in the amount of $1,698 for this work. On this issue, Peek testified that, if BBRI had notified KCSR as soon as it discovered that its staking had been knocked down, rather than waiting until after the end of the Project, KCSR could have investigated the issue and required Kanza to pay for any restaking if it determined that Kanza was to blame. Thus, even assuming that KCSR breached the Contract when its grading contractor destroyed or knocked down the staking done by BBRI, BBRI is not entitled to recover additional compensation for this work because it failed to comply with the ninety-day Compensation and Invoicing contractual provision.

Further, BBRI could have avoided the $1,698 in damages incurred in surveying and restaking the centerline if it had taken the simple step of notifying KCSR of the issue when it was discovered because, according to Peek, KCSR would have required Kanza to absorb this cost if it were able to confirm that Kanza was responsible for knocking down BBRI's staking. BBRI, therefore, failed to mitigate its damages for this work. *See Great Am. Ins. Co.*, 908 S.W.2d at 426 (explaining that the mitigation doctrine "prevents a party from recovering for damages resulting from a breach of contract that could be avoided by reasonable efforts on the part of the plaintiff."). For these reasons, the court concludes that BBRI is not entitled to recover under the Contract or quantum meruit for this change order.

### 14.    Change Order 50 (Whistle Boards—$849)

BBRI seeks $849 for staking whistle boards at a rate of $849 per day as set forth in the SOW. KCSR agrees to this change order request, subject to its request for a setoff in this amount. As KCSR

has agreed to this change order, the court concludes that BBRI is entitled to recover $849 for Change

Order 50, subject to KCSR's right to a setoff in this amount.

### C.     BBRI's Claim under the TPPA

The TPPA is limited to services covered by a contract.  Tex. Prop. Code Ann. § 28.002(a).

The claims for which BBRI prevailed upon, however, are for work that falls outside the scope of the

Contract.  Accordingly, BBRI is not entitled to compensation under the TPPA, and the court will

dismiss with prejudice this claim.

### D.     KCSR's Counterclaims

#### 1.     Wasted Ballast

KCSR contends that BBRI breached the Contract by wasting thousands of tons of ballast

supplied by KCSR and failing to perform its work in this regard in a workmanlike manner as required

by the Master Agreement.  KCSR asserts that BBRI:

> failed to install the KCSR-supplied ballast according to the SOW and plans and
> specifications. Specifically, it wasted ballast by dumping ballast too heavy in some
> areas, spreading the ballast out past where the regulator can bring it back in, and
> raising the track too much. BBRI broke a lot of concrete ties, and every time they
> were replaced, the ballast would have to be dug out causing more ballast to be used
> when the track was readjusted. It also dumped too much ballast in places resulting
> in shoulders that were too wide. There were places where the tampers raised the track
> too high or made mistakes on curves resulting in too much ballast being used.

Def.'s Br. 15-16 (footnotes omitted).

BBRI contends in response that KCSR has not met its burden of producing sufficient or

credible evidence that it wasted ballast, and KCSR's wasted ballast calculation fails to account

adequately for the amount of ballast that was delivered to other areas of the Project for use by other

contractors.  In addition, BBRI asserts:

> KCSR also seeks the costs of "extra-contractual materials" it contends were necessary to complete the project as a result of BBRI's failure to properly and completely perform in accordance with the Project plans and specifications. These damages are remedial in nature. KCSR failed to designate any witness, lay or expert, or provide sufficient testimony to meet its burden of proof as to as the "reasonable and necessary costs" of completing the job. Further, none of KCSR's lay or expert witnesses testified to establish [under *Mustang Pipeline Co.*] that the "costs of supplemental work forces" were "reasonable and necessary" for the completion of the project.

Pl.'s Br. 158.  The court assumes, although it is not entirely clear from BBRI's posttrial brief, that this argument and BBRI's reference to "extra-contractual materials" goes to KCSR's wasted ballast counterclaim because KCSR asserted in its Original Answer and Counterclaim in support of its affirmative defense of offset that "BBRI's claims are barred to the extent KCSR is entitled to an offset for extra-contractual material costs that were caused by BBRI's failure to perform the work according to the Contract specifications."  Def.'s Original Answer and Countercl. ¶ 40.

Contrary to BBRI's assertion, KCSR's evidence in support of its wasted ballast claim was credible and more than sufficient to establish that BBRI wasted ballast in performing its work under the Contract and, as a result, breached its agreement to perform the work in a workmanlike manner. As the injured party, KCSR was only required to produce the best evidence available to afford a sufficient basis for the court to determine its loss.  *Vance*, 677 S.W.2d at 484.  The court concludes that KCSR has satisfied its burden in this regard.

KCSR presented evidence to show that a total of 412,511 tons of ballast was delivered to the Project site.  This amount is a conservative total, as it only includes deliveries that occurred after November 1, 2008, even though there was evidence that a large stockpile of ballast was already on the site before BBRI commenced work.  KCSR demonstrated three ways in which the wasted ballast could be calculated.  Of these, KCSR advocated Peek's analysis and calculation that the Project

required 327,591 tons of ballast, which is based on an as-built survey of the constructed main line track.  KCSR presented credible evidence, based on BBRI's daily reports, that, at most, only 10,660 tons of ballast was diverted to other contractors.  KCSR established that its out-of-pocket costs to deliver the ballast to the Project totaled $31.67 per ton of ballast, which does not include profit or a margin.  Karnes, KCSR's  Director of Accounting, who is a licensed certified public accountant, performed an analysis of the per-ton cost of ballast delivered to the Project site and testified that her analysis of the per-ton cost comported with Generally Accepted Accounting Principals.

Using these figures, KCSR calculated that it was entitled to  $2,353,299.40 in damages for wasted ballast as follows: The amount of ballast needed by BBRI for the Project (327,591 tons) and the amount of diverted ballast (10,660 tons) were subtracted from the total amount of ballast delivered to the Project (412,511 tons) to arrive at the amount of wasted ballast (74,260 tons). The amount of wasted ballast was then multiplied by $31.69 per ton, an undisputed cost, to arrive at a total of $2,353,299.40 in damages as a result of the ballast wasted by BBRI.

KCSR's expert Brookings provided testimony regarding track construction methods and standards and explained that ballast is wasted when it is dumped in a place where it is not providing any support to the track.  Brookings opined that BBRI wasted tons of ballast and explained how that likely occurred through the use of inexperienced crews.   To show that BBRI wasted ballast, Brookings pointed to photos and videos taken at the Project site that showed areas of wasted ballast.

BBRI argued at trial that it needed to install extra ballast in constructing the track because of unexpected variations and dips in the road bed prepared by Kanza, and Kanza did not provide a road bed that was at least twenty-four feet wide.  BBRI contends that the narrow road bed caused ballast to fall in the ditch as the track was raised.  For support, BBRI relied on Castle's and Garcia's trial

testimony and Brown's deposition testimony.  Garcia testified that it was necessary to raise the top of the rail elevation with more ballast, and the road bed was too narrow throughout much of the Project. Castle testified that BBRI expected a twenty-four foot road bed.  Brown testified that if it had installed the same depth of ballast throughout the Project, the track would have looked and ridden like a "roller coaster." Pl.'s Ex. 539 at 66.  Based on Brookings's testimony, BBRI asserts in its posttrial brief that KCSR did not factor in the inadequate width of the road bed beneath the ballast in calculating wasted ballast.

Peek, on the other hand, testified that KCSR had notified BBRI in several locations at the beginning of the Project that it was not complying with the design requirements that there be ten inches of ballast under concrete ties and eight inches of ballast under wood ties, main track, and siding. Peek testified that the as-built survey showed that BBRI chose to ignore the top of the rail elevation when doing surfacing work and placed too much ballast in some locations and very little in others.  Peek testified that BBRI was notified after KCSR did its high rail inspections that BBRI was dumping too much rock and needed to cut back and not waste the ballast.

Peek testified that, instead of constructing the track and top of the rail in accordance with the design specification that called for one half inch tolerance in a thousand feet both vertically and horizontally, it appeared to him that BBRI was trying to make the grade one inch in a thousand feet to take out the highs and lows.  Peek testified that constructing the track in this manner takes out the highs and lows, but the Project was designed with "[u]ps and downs, dips," and BBRI's decision to disregard the design specifications and construct the track in this manner resulted in wasted ballast because differing amounts of rock or ballast was used to take out the highs and lows.  Tr. 1192-93. Peek explained that Garcia's understanding of the amount of tolerance in a thousand feet both

vertically and horizontally rule did not comport with the Project design, and that he thought there was a "disconnect" there.  *Id.*  Peek could only recall one instance when it was brought to KCSR's attention that the road bed was not wide enough, and that Kanza was requested to make the necessary changes.

Kanza project manager Stillwagon testified by deposition that Kanza provided a level, uniform, subgrade that was 24 feet wide and confirmed the width every 200 feet.  Brookings also opined, based on his site inspection of the Project and review of photographs taken during the Project, that Kanza provided a wide enough subgrade for BBRI to do its work. KCSR contends that if BBRI believed that the road bed was not sufficiently wide or level, "it had a duty to report this differing site condition to KCSR rather than to ignore it and dump ballast down the hill."  Def.'s Br. 19.

The disputed fact issue of whether Kanza provided a sufficient road bed that contributed to BBRI's waste of ballast turns on the credibility of the witnesses and other evidence.  The court found the trial testimony of KCSR's witnesses and videotaped deposition testimony of Stillwagon designated by KCSR on this issue more persuasive.  The court's conclusion in this regard is also based on its overall assessment of the evidence in this case, which makes it believe that many of the problems BBRI experienced on the Project were attributable to its inexperienced crews and poor management.  BBRI's slow start put it and everyone else in the untenable position of having to rush the work to complete the Project on time, and rushing caused BBRI's crews to work in a haphazard fashion that affected the quality of its work, including its usage of ballast.  As Peek testified, there seemed to be a "disconnect" regarding the design specifications for the rail elevation of the track for this Project.  In addition, there was evidence that BBRI's late start and attempt to "catch up" caused it frequently to be in areas at a given time where it was not supposed to be, which in turn resulted in

bottlenecks involving it, KCSR, and the other contractors on the site.  Accordingly, the court finds in favor of KCSR on this issue and concludes that the disputed fact issue does not affect its determination regarding KCSR's entitlement to damages for wasted ballast. The court further concludes that BBRI has not shown by credible evidence that KCSR failed to mitigate its damages by not requiring its contractors to perform their work properly.  *See* Pl.'s Br. ¶ 165.

Further, while the remedial and difference-in-value measures of damages generally apply in construction contract cases, the court concludes that application of these measures of damages is not appropriate under the facts of this case for a couple of reasons.  First, KCSR presented evidence that the wasted ballast could not be recovered or recaptured.  Thus, remedial damages are inapplicable. For the same reason, the court concludes that KCSR was not required under section 6 of the Master Agreement to provide BBRI notice of the defective work with respect to wasted ballast because the defect could not be remediated. Second, the ballast wasted by BBRI in constructing the track did not affect the value of the completed track.  In other words, it did not decrease or increase the value of the track.  KCSR instead had to pay much more than anticipated under the Contract to have the Project completed by BBRI.  The court, therefore, concludes that the proper measure of damages for this claim is the benefit-of-the-bargain measure, and an award of $2,353,299.40 in damages is necessary to put KCSR in the same economic position in which it would have been had the Contract not been breached. *See CQ, Inc.*, 565 F.3d at 278; *Parkway Dental Assocs., P.A.*, 391 S.W.3d at 607. Accordingly, the court determines that KCSR is entitled to recover $2,353,299.40 for its wasted ballast counterclaim against BBRI.

### 2.     Work Performed by Kanza and Holland

KCSR seeks to recover the costs it incurred to pay Kanza to perform tamping work at a cost of $234,703.31 and Holland to perform welding services at a cost of $73,185 to assist BBRI in completing its work under the Contract after BBRI failed to meet the May 1, 2009 deadline. BBRI contends that KCSR is not entitled to recover for this work because it failed to meet its burden of proving that these amounts constitute the reasonable and necessary costs of completing BBRI's work.

While the court concludes that BBRI materially breached the Contract, it agrees that the remedial or cost of completion measure of damages applies to this counterclaim to recover for work performed by Kanza and Holland to assist BBRI in completing its work under the Contract.  Under this measure, KCSR was required to show that the amounts sought are reasonable and necessary. KCSR provided evidence of the amounts charged by Kanza and Holland and paid by it.  Such evidence standing alone is insufficient to show that the charges are reasonable and necessary under Texas law.  *See Mustang Pipeline Co.*, 134 S.W.3d at 200-01.

In closing arguments, KCSR argued that if Kendrick's testimony that BBRI's use of actual invoices plus a markup to price its change orders to KCSR is reasonable, then KCSR's use of actual invoiced amounts without a markup to recover for work performed by Kanza and Holland is reasonable.  The only problem with this argument is that Kendrick's testimony that BBRI's use of actual invoices plus a markup is reasonable or a "fair way to do it," does not satisfy the requirement that the *amounts sought* be reasonable.  Tr. 901-02.  Kendrick's testimony instead merely shows that *the method* used by BBRI to price its change orders was reasonable.  Accordingly, the court concludes that KCSR is not entitled to recover the amounts sought for work performed by Kanza and Holland to complete BBRI's work and will deny this claim.

### E.    Affirmative Defenses

Except to the extent addressed in this opinion, the court determines that the parties' various affirmative defenses are either moot or the parties have not met their respective burdens of proof.

## V.    Defendant's Motion for Partial Judgment as a Matter of Law

The court's determination regarding Plaintiff's contract claim for delay damages moots Defendant's Motion for Partial Judgment as a Matter of Law (Doc. 90), which the court **denies as moot**.

## VI.    Calculation of Prejudgment and Postjudgment Interest

BBRI contends that if the court determines that it is not entitled to interest under the Texas Prompt Payment Act, it is entitled to receive prejudgment interest as a matter of equity on its damages, exclusive of attorney's fees.  Pl.'s Br. ¶ 145 (citing *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 529 (Tex. 1998)).  BBRI further asserts that it is entitled to postjudgment interest under the section 304.001 of the Texas Finance Code.  KCSR similarly alleges that it is entitled to recover prejudgment and postjudgment interest on its claims to the extent allowed by law.

 Prejudgment interest is calculated under state law in diversity cases.  *Boston Old Colony Ins. Co. v. Tiner Assocs. Inc.*, 288 F.3d 222, 234 (5th Cir. 2002).  Prejudgment interest is compensation allowed by law as "additional damages for lost use of money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Johnson & Higgins of Texas, Inc.*, 962 S.W.2d at 528. In Texas, prevailing parties receive prejudgment interest as a matter of course. *Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1329-30 (5th Cir. 1994).  "Any credits or offsets due a defendant should be deducted from the total damages awarded before—not after—prejudgment

interest is calculated." *Pringle v. Moon*, 158 S.W.3d 607, 611 (Tex. App.—Fort Worth 2005, no

pet.); *Sisters of Charity of Incarnate Word v. Dunsmoor*, 832 S.W.2d 112, 118 (Tex. App.—Austin

1992, writ denied).

"The Texas Supreme Court has recognized two separate bases for the award of prejudgment

interest: (1) an enabling statute; and (2) general principles of equity." *International Turbine Servs.,*

*Inc. v. VASP Brazilian Airlines, Inc.*, 278 F.3d 494, 449 (5th Cir. 2002) (quoting *Johnson & Higgins*

*of Texas, Inc.*, 962 S.W.2d at 528). "[S]tatutory prejudgment interest applies only to judgments in

wrongful death, personal injury, property damage, and condemnation cases." *International Turbine*

*Servs., Inc.*, 278 F.3d at 449. Because the claims in this case do not fall within the statutory

provisions, prejudgment interest in this case is governed by Texas common law. *Id.* "Texas common

law allows prejudgment interest to accrue at the same rate as postjudgment interest on damages

awarded for breach of contract." *Id.* When, as here, an interest rate is not specified in the parties'

contract, prejudgment interest is calculated based on the statutory rate for postjudgment interest

provided in section 304.003 of the Texas Finance Code. *Id.* Section 304.003 of the Texas Finance

Code provides that the postjudgment interest rate is "five percent a year if the prime rate as published

by the Board of Governors of the Federal Reserve System . . . is less than five percent[.]" Tex. Fin.

Code Ann. § 304.003(c)(2). The current prime rate is 3.5%, which is less than five percent.

Accordingly, the prejudgment interest rate that the court will apply is **five percent** per annum. Under

both the common law and the Texas Finance Code, prejudgment interest begins to accrue on the

earlier of: (1) 180 days after the date a defendant received written notice of a claim, or (2) the date

suit is filed. Tex. Fin. Code Ann. § 304.104 (West 2006); *see Johnson & Higgins of Texas, Inc.*, 962

S.W.2d at 532 (extending the statutory rule to prejudgment interest awards governed by the common

law; that is, those awards that are not based on wrongful death, personal injury or property damage, or otherwise governed by an agreement of the parties).  BBRI is entitled to recover prejudgment interest on the change order claims for which it prevailed. BBRI is, therefore, entitled to recover prejudgment interest at a rate of **five percent** per annum on the $34,820.35 awarded to it for these claims. Prejudgment interest on these claims will be calculated from **November 5, 2009**, 180 days after Garcia's May 9, 2009 memorandum, the date KCSR received written notice of the claims. Prejudgment interest on BBRI's claims totals **$12,741.08**.  The court will, therefore, setoff or subtract this amount and BBRI's damages award totaling **47,561.43 (damages and prejudgment interest)** from KCSR's damages award before prejudgment interest on KCSR's counterclaim is calculated.

Because Defendant prevailed on its wasted ballast claim, it is entitled to prejudgment interest on this claim (after setoff) at a rate of **five percent** per annum.  After setoff, KCSR's damages award totals $2,305,737.97 ($2,353,299.40 - 47,561.43).  Prejudgment on this amount will be calculated from the date KCSR filed its Original Answer and Counterclaims on **August 27, 2010**, to the date of the judgment.  Accordingly, KCSR is entitled to **$721,858.66** in prejudgment interest.

Regarding postjudgment interest, federal law applies on "any judgment in a civil case recovered in a district court . . . *including actions based on diversity of citizenship*." *Travelers Ins. Co. v. Liljeberg Enters.*, *Inc*. 7 F.3d 1203, 1209 (5th Cir. 1993) (citation omitted).  A court awards postjudgment interest pursuant to 28 U.S.C. § 1961.  Accordingly, postjudgment interest on KCSR's total award of **$3,027,596.63 (damages and prejudgment interest)** shall accrue at the applicable federal rate, which is currently **.67** percent per annum.

## VII.    Conclusion

For the reasons stated, the courts **grants** BBRI's claims with respect to Change Orders 45, 46, 47, and 50 in the amount of **47,561.43** ($34,820.35 in damages and $12,741.08 in prejudgment interest), subject to KCSR's right to a setoff.  All other claims asserted by BBRI, not previously disposed of at summary judgment, are **denied** and **dismissed with prejudice**.  The court **grants** KCSR's contract claim for wasted ballast in the amount of **$2,353,299.40**; and **dismisses with prejudice** KCSR's contract claim for the cost of retaining additional contractors Kanza and Holland to perform tamping, regulating, and de-stressing to assist BBRI.  Because the amount awarded to KCSR for its claims exceeds the amount awarded to BBRI, the court **deducts** and sets off the amount awarded to BBRI, which results in a total award of damages of **$2,305,737.97** to KCSR, and calculates prejudgment interest using this sum.

Accordingly, the court will enter judgment in favor of KCSR in the amount of **$2,305,737.97** damages and **$721,858.66** in prejudgment interest calculated at a rate of **five percent per annum**. Postjudgment interest shall accrue on the total amount of **$3,027,596.63** ($2,353,299.40 in damages minus setoff of $47,561.43, plus $721,858.66 prejudgment interest) awarded to Defendant at the applicable federal rate of **.67 percent per annum** from the date of this judgment until it is paid in full. The court **denies as moot** Defendant's Motion for Partial Judgment as a Matter of Law (Doc. 91) and will address the issue of attorney's fees postjudgment pursuant to Federal Rule of Civil Procedure 54(d).  Judgment will issue by separate document as required by Federal Rule of Civil Procedure 58.

**It is so ordered** this 25th day of March, 2016.

Sam A. Lindsay
United States District Judge